IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES *ex rel.* TIMOTHY
SCHNUPP,
    *Relator,*

    v.

BLAIR PHARMACY, *et al.*,
    *Defendants.*

Civil No. ELH-17-2335

**MEMORANDUM OPINION**

In this qui tam[1] action, filed on August 15, 2017, the Relator, Timothy Schnupp, has sued

his former employer, Blair Pharmacy, Inc. ("BPI," "Blair Pharmacy," or "Pharmacy"), and its

owner, Matthew Blair ("Mr. Blair") (collectively, "Blair"), pursuant to the False Claims Act

("FCA" or the "Act"), 31 U.S.C. §§ 3728 *et seq.  See* ECF 1 ("Complaint").  BPI was, at the

relevant time, a compounding pharmacy.[2]  Schnupp, who previously worked as "Pharmacist in

Charge" for BPI, alleged that defendants knowingly submitted false claims to the Medicare

Program, 42 U.S.C. § 1395 *et seq.* ("Medicare"), a federally funded health insurance program for

people ages 65 and older and for certain people with disabilities, and to the Department of Defense

TRICARE health insurance program ("TRICARE").[3]

---

[1] "Qui tam is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,'
which means 'who pursues this action on our Lord the King's behalf as well as his own.'"
*Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

[2] As explained, *infra*, "compounding" involves alteration or mixing of ingredients to create
a customized medication.

[3] TRICARE was formerly known as the Civilian Health and Medical Program of the
Uniformed Services or "CHAMPUS."  *See* 32 C.F.R. § 199.17.

In the Complaint, the Relator alleged that, pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R.

Civ. P. 4(d)(4), he served a copy of the Complaint on the United States on August 15, 2017,

"together with written disclosure of substantially all material evidence and information in his

possession . . . ."  ECF 1, ¶ 57; *see* ECF 47-1 (the "Disclosure Memorandum").  The Disclosure

Memorandum is dated August 14, 2017.  ECF 47-1.  It states that the "document and its

attachments [were] voluntarily provided to the United States in connection with the filing of an

action under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* for false claims submitted to

the Medicare and TRICARE Programs."  *Id.* at 1–2.[4]  The Disclosure Memorandum also states:

"Relator did not come forward sooner because he feared retaliation and loss of his job."  *Id.* at 7.

In May 2022, following a lengthy investigation, the United States declined to intervene in

the case.  ECF 28.  Nevertheless, the Relator opted to pursue the case, *see* 31 U.S.C.

§ 3730(b)(4)(B), and on May 11, 2022, he filed his "First Amended False Claims Act Complaint."

ECF 30 (the "Amended Complaint").[5]  The Amended Complaint contains two counts:  Count I

asserts false claims under 31 U.S.C. § 3729(a)(1)(A) and Count II asserts false claims under 31

U.S.C. § 3729(a)(1)(B).

In the Amended Complaint, Schnupp again alleges, *inter alia*, that defendants knowingly

submitted false prescription claims to Medicare and TRICARE.  In particular, the Relator claims

---

[4] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

[5] Schnupp included four exhibits with the Complaint, *see* ECF 1-1 through ECF 1-4, and one exhibit with the Amended Complaint.  *See* ECF 30-1.  In the Amended Complaint, Schnupp refers to Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 4, and Exhibit 5.  *See*, *e.g.*, ECF 30, ¶¶ 28, 29, 30, 45.  But, as noted, he only appended one exhibit to the Amended Complaint.  *See* ECF 30-1.

Exhibits 1 through 4 do not have titles.  Although Schnupp makes reference to them, he does not explain the exhibits, nor is it entirely clear what they are intended to establish.

that Blair knowingly submitted false claims for certain compound drugs by substituting a less expensive drug for a more expensive drug; by billing for medication that was not provided; by overcharging for certain medications; and by committing violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). *See* ECF 30, ¶¶ 28–43.

Of import, some of the claims lodged by the Relator were the subject of a federal criminal prosecution of Mr. Blair. *See United States v. Matthew Blair*, ELH-19-410 (D. Md.) ("Criminal Case"). Pursuant to a Plea Agreement in the Criminal Case (*id.*, ECF 181; ECF 181-1), Mr. Blair entered a plea of guilty on December 3, 2021, to one count charging payment of illegal remunerations, in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A). As discussed, *infra*, the charge is predicated on Mr. Blair's payment of kickbacks to Atlas Group, LLC ("Atlas"), owned by Bahram Alavi,[6] in connection with prescription claims paid by TRICARE.[7]

On February 10, 2022 (*id.*, ECF 188), pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Court sentenced Mr. Blair to a term of imprisonment of twelve months and one day. *See id.*, ECF 189 (Judgment). Mr. Blair was also ordered to pay restitution to the government in the sum of $3,176,470.83. *Id.* That sum has since been paid. *Id.*, ECF 194.

Several motions are now pending. The Relator has filed a post-discovery motion for summary judgment. ECF 149 (the "Motion").[8] It pertains only to "the defendants' violations of

---

[6] In some submissions, Bahram Alavi is identified as "B.A." *See*, *e.g.*, ECF 181-1.

[7] Blair has filed a Third-Party Complaint against Alavi and Atlas Medical Solutions, LLC, f/k/a Atlas Group, LLC, seeking contribution and indemnification. ECF 76. Blair subsequently filed an Amended Third-Party Complaint. ECF 127. By Memorandum (ECF 161) and Order (ECF 162) of September 5, 2024, I stayed the proceedings as to the Third-Party Complaint, pending resolution of Schnupp's FCA claims.

[8] Schnupp previously filed a pre-discovery motion for partial summary judgment. ECF 57. I denied that motion by Memorandum Opinion (ECF 100) and Order (ECF 101) of May 23, 2023.

the Anti-Kickback statute which have been conclusively established in this action by Matthew Blair's criminal conviction." *Id.* at 9.  This corresponds to what the parties refer to as the Fifth Scheme or Scheme 5.[9]  Schnupp states: "'Scheme 5' for which the pending motion seeks summary judgment in favor of the United States involves the *same transactions* at issue in Blair's criminal proceedings."  ECF 165 at 15 (emphasis in ECF 165).

Schnupp also contends that, as a result of Mr. Blair's criminal conviction under the AKS, he is "estopped" from disputing a violation of the FCA.  ECF 149 at 13.   The Relator argues: "Nothing revealed in discovery may change the facts established by Mr. Blair's criminal conviction and . . .  overwhelming evidence indicates that Mr. Schnupp is an original source and summary judgment in favor of the United States is now appropriate."  *Id.* at 11.  Schnupp has submitted as exhibits the deposition transcripts of Mr. Blair (ECF 149-1) and Mr. Schnupp (ECF 149-2).[10]

Defendants filed a combined opposition to the Motion as well as a cross-motion for summary judgment.  ECF 156 (the "Cross Motion").  The Cross Motion is aimed at all of the schemes alleged in the Amended Complaint.  *Id.*  It is supported by thirty-three exhibits. ECF 156-1 to ECF 156-33.

In the Cross Motion, Blair contends that the Relator helped to recruit "a network of independent sales representatives to generate business for BPI."  ECF 156 at 17.  For example,

---

[9] The Amended Complaint does not identify the different schemes by number, as the parties do in their submissions concerning the motions.  I shall refer to the alleged conduct consistent with the parties' identification in their briefing of the motions.  I note, however, that the facts identified in the submissions as Scheme 1 corresponds to Scheme 2 in the Amended Complaint.

[10] The deposition transcript of Mr. Schnupp appears at ECF 149-2.  But, it does not contain an ECF imprint or electronic page numbers.  Accordingly, when citing to this transcript, I will use the page number that appears at the top of the page to which I am referring.

Blair asserts that Schnupp recruited Derek Quinn, owner of Stratified Solutions, LLC, "to drive sales to BPI." *Id.*; *see* ECF 156-2 at 19.  Moreover, defendants maintain that Schnupp "used his leverage" as Pharmacist in Charge to manipulate Mr. Blair so as to increase his own compensation. ECF 156 at 17.  Defendants note that, at Schnupp's deposition, he acknowledged that his compensation was tied to BPI's revenue.  *Id.* at 20.

The Relator submitted a combined reply in support of his Motion and in opposition to the Cross Motion.  ECF 165 ("Reply").  It is supported by his Declaration.  ECF 165-1.  Defendants filed a reply as to their Cross Motion (ECF 170, "Cross Reply"), along with several additional exhibits.  ECF 170-1 to ECF 170-3.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion and I shall grant the Cross Motion, in part, and deny it, in part.  In particular, I shall grant the Cross Motion as to Scheme 4 and Scheme 5, but deny the Cross Motion as to Schemes 1, 2, and 3.

## I.      Factual and Procedural Background[11]

Mr. Blair was the founder of Blair Pharmacy as well as a director and a principal of BPI. ECF 30, ¶ 3.  The Pharmacy operated as an independent compounding pharmacy.  *Id.* ¶ 2. "Compounding" is a practice by which pharmacists combine, mix, or alter ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription.  *Id.* ¶ 24.

---

[11] I attempt to recount the pertinent events chronologically.  But, this is not always feasible, because many events overlap in time.

The Court has issued several written opinions in this case.  *See* ECF 55; ECF 80; ECF 100; ECF 125; ECF 147; ECF 161.  To the extent relevant, I incorporate here the factual summaries set forth in the earlier opinions.

Mr. Blair is not a licensed pharmacist.  Under Maryland law, a licensed pharmacist must be on the premises to provide services when a pharmacy is in operation.  *See* Md. Code (2021 Repl. Vol.), § 12-403(c)(3) of the Health Occupations Article.  In August 2014, BPI hired Schnupp as its Pharmacist in Charge, pursuant to an Employment Agreement.  *See* ECF 30, ¶ 1; ECF 156-1; ECF 156-2 at 4.  Mr. Blair signed the Employment Agreement on behalf of BPI.  ECF 156-1 at 7.  Schnupp and BPI executed an Addendum to the Employment Agreement on February 25, 2015, concerning Schnupp's compensation.  ECF 156-5.

Schnupp holds a Doctor of Pharmacy and is a Maryland licensed pharmacist.  ECF 156-1. He was employed by the Pharmacy from August 2014 until January 2017.  ECF 156-19.  Among Schnupp's duties, he was to advise the Pharmacy "with regard to maintaining pharmacy standards that meet . . . regulatory agency requirements for the operation of [BPI]."  ECF 156-1 at 1.  He was also to assist in communications with health care providers and customers.  *Id.* at 2.  Given Schnupp's employment with BPI, he asserts that the allegations in the Amended Complaint are based "upon his own direct and independent knowledge, and he is the original source of the information in this Complaint."  ECF 30, ¶ 1.

The Complaint, filed in August 2017, alleges that Blair perpetrated four fraud schemes involving Medicare and TRICARE.  *See* ECF 1, ¶¶ 27–34.  The Amended Complaint (ECF 30), filed in May 2022, alleges that Blair engaged in five fraud schemes.  *Id.* ¶¶ 36–43.  They are as follows: (1) substitution of less expensive Lipoderm cream for more expensive SteraBase cream, while billing for compound drugs that supposedly contained SteraBase cream (*id.* ¶ 28); (2) billing for medication that BPI did not provide, *i.e.*, billing for compound drugs that supposedly contained 360 grams of product when only 300 grams were dispensed (*id.* ¶ 29); (3) overcharging for Gabapentin by billing for compound drugs containing 10% Gabapentin when only 6% was

provided (*id.* ¶ 30); (4) using pre-paid gift cards or "burner cards" to pay coinsurance and/or deductible amounts for beneficiaries to induce them to use the Pharmacy "to fill lucrative compound medication prescriptions" (*id.* ¶ 34), in violation of the AKS, 42 U.S.C. § 1320a-7b(b) (*id.* ¶¶ 34, 35); and (5) payment of commissions to independent contractors, equal to 50 percent of reimbursements paid to the Pharmacy by Medicare and TRICARE for compounded prescriptions that were marketed by the independent contractors to physicians, in violation of the AKS. *Id.* ¶¶ 36–43.

As to Scheme 5, Schnupp alleges that Blair "recruited" Bahram Alavi, the owner of Atlas, "to market" BPI's "compounded drug prescriptions to physicians treating Medicare and TRICARE beneficiaries." *Id.* ¶ 36. Further, the Relator alleges that BPI and Atlas entered into a "Distributor Agreement" on November 24, 2014. *Id.* ¶ 37; ECF 156-7. It provided that Atlas would market the Pharmacy's scar and pain medications to physicians treating patients who had Medicare or TRICARE benefits, and then use the Pharmacy to fill the prescriptions. ECF 30, ¶¶ 36, 38; *see* ECF 156-7. Moreover, the Amended Complaint asserts that Blair agreed to pay Alavi[12] a commission equal to 50 percent of the gross reimbursement paid to BPI as a result of Atlas's marketing efforts. *Id.* ¶ 37; *see also id.* ¶¶ 38–41.[13] And, the Relator claims that Blair entered into similar agreements with other marketers. *Id.* ¶¶ 42, 43.[14]

---

[12] The Distributor Agreement provides that Blair was to pay Atlas the commission, rather than Alavi. ECF 156-7, Section VI.

[13] Attachment 3 to the Distributor Agreement (ECF 156-7) supposedly specifies the commission. But, it was not submitted with ECF 156-7.

[14] The other independent contractors included Paladin Enterprises, Brevor Medical, Stratified Solutions, and Absolute Ortho. ECF 30, ¶ 42. Blair allegedly arranged to pay these independent marketers a percentage of any reimbursement monies received by the Pharmacy from the TRICARE and Medicare programs. *Id.*

According to the Relator, from November 2014 until May 2015, TRICARE paid Blair Pharmacy $6,352,941.66 based upon claims that defendants submitted to TRICARE that "were tainted by the remuneration payments Defendants paid to [all] their independent sales contractors. . . ." *Id.* ¶ 43; *see id.*, ¶ 45; *see also* ECF 30-1 ("subset of the larger spreadsheet provided to the government" with the Disclosure Memorandum).

In August 2015, Atlas filed suit in federal court in Maryland against the Pharmacy and Mr. Blair. *See* JKB-15-2491 ("Atlas Suit"), ECF 1 ("Atlas Complaint"). Atlas alleged that defendants wrongfully refused to pay Atlas commissions of 50 percent of gross sales, as provided in the Distributor Agreement, allegedly in retaliation for issues raised by Atlas concerning health care fraud laws. Atlas voluntarily dismissed the Atlas Suit in October 2015. *Id.*, ECF 4.

Blair maintains that after the Atlas Suit was filed, "the Government began investigating BPI and Mr. Blair based on allegations in the Atlas Lawsuit that BPI paid Alavi/Atlas commissions for referrals of TRICARE business." ECF 156 at 20–21. Indeed, Blair contends: "By at least July 12, 2017 (i.e., one month *before* Schnupp filed his Complaint), the FBI had already assembled all of the facts supporting its allegations that Defendants had purportedly violated the AKS by paying commissions to 1099 sales representatives." *Id.* at 21 (emphasis in original). Defendants add, *id.*: "[B]efore Schnupp filed this *qui tam* action, the Government *already knew* of and about the relationship between Schnupp and Alavi, the number of TRICARE prescriptions being referred to BPI by outside sales representatives, and the details of the 2015 Atlas Lawsuit against Defendants." (Emphasis in ECF 156).[15]

---

[15] Indeed, the United States sought to delay its decision whether to intervene in the FCA case because the matter was "actively being pursued on a parallel criminal and civil track." ECF 10-1 at 3.

In January 2017, in connection with the investigation of Mr. Blair, U.S. Magistrate Judge A. David Copperthite signed a search warrant for a Google email account. ECF 46-1 (search warrant); *see also* ECF 156-20, ¶ 28. Then, in July 2017, U.S. Magistrate Judge Beth Gesner approved a search warrant application for J2 Cloud Services, LLC ("J2"). *See* ECF 156-20. The Affidavit in support of the J2 search warrant application, dated July 12, 2017, was submitted by Special Agent Eugene Choi of the Office of Inspector General, Department of Defense, Defense Criminal Investigative Services. *Id.* ¶ 3. He averred, *inter alia*, that the government learned of Mr. Blair's "possible malfeasance" in August 2015, when the Defense Health Agency ("DHA"), which manages the TRICARE program, provided a report detailing allegations of "fraudulent billings of compound prescriptions by [Mr.] Blair." *Id.* ¶ 10; *see also id.* ¶¶ 12–14. Of relevance, Choi also discussed the Atlas Complaint. *Id.* ¶¶ 19–21.

As indicated, on August 15, 2017, about one month after the search warrant was issued for J2, the Relator filed his qui tam suit. ECF 1. And, as noted, the Complaint only referenced conduct consistent with Schemes 1 through 4; it did not reference conduct pertaining to Scheme 5. *See* ECF 1, ¶¶ 27–34. However, the Relator also provided the government with the Disclosure Memorandum, as required by 31 U.S.C. § 3730(b)(2). ECF 1, ¶ 57; ECF 156-21.

Among other things, the Disclosure Memorandum referenced a "dispute" between Mr. Blair and Atlas, "in which [Mr.] Blair refused to pay Atlas sales commissions under a 'distributor agreement' with Atlas." ECF 156-21 at 5. Schnupp indicated that Mr. Blair agreed to settle the case because "Atlas threatened in its lawsuit to reveal [Mr.] Blair's use of 'burner cards' to unlawfully pay for patients' co-payments." *Id.* The text of the Disclosure Memorandum, which was prepared by counsel, made no reference to a scheme by which Blair paid commissions to Atlas

equal to 50 percent of monies paid to BPI by Medicare or TRICARE for certain compounded prescriptions marketed by Atlas to physicians.

Schnupp included thirteen exhibits with the Disclosure Memorandum, as follows: (1) the Atlas Complaint; (2) BPI purchase orders for Lipoderm Base cream; (3) the BPI Dispense Report in Excel spreadsheet format; (4), (5) two articles published by the United States Government Accountability Office on compound pharmaceuticals; (6), (7), (10) three articles published by the United States Department of Health and Human Services, Office of the Inspector General, concerning Medicare coverage of prescriptions; (8) a Department of Justice Press Release; (9) a Kaiser Health News article; (11) an unverified PowerPoint slide deck referred to as a "Drug Pricing Overview"; (12) publicly available business documents related to the formation of BPI; and (13) a December 2015 invoice from Medisca, Inc. to BPI for a 150 milliliter pump dispenser. *See* ECF 156-21.

According to the Relator, after he filed suit, his "first contact with anyone associated with the government's criminal investigation of Matthew Blair or Blair Pharmacy came on October 2, 2017, when [he] was interviewed at the U.S. Attorney's Office by government attorneys and investigators." ECF 165-1 at 2. The Relator claims that he provided "truthful information about the fraudulent activities" of Mr. Blair and the Pharmacy and that he "continued to do so in a series of interviews with government investigators and/or government attorneys on seventeen (17) separate occasions between October 2, 2017 and October 8, 2021." *Id.* He also maintains that at no time was he offered, nor did he ever receive, "immunity from prosecution or any other type of consideration in exchange for [his] cooperation during the criminal investigation of Matthew Blair and Blair Pharmacy." *Id.* at 3.

Daniel Parker, a Special Agent with the FBI, confirmed that Schnupp's first contact with FBI investigators involved in the criminal investigation of Mr. Blair occurred on October 2, 2017, when Mr. Schnupp was interviewed. ECF 75-1 (Parker Declaration). The FBI Interview Report for Schnupp is docketed at ECF 86-8. It states that in April 2017, Schnupp's attorney, Ray Shepard, advised Schnupp to "file a qui tam against Blair and Blair Pharmacy which Schnupp did in August 2017." *Id.* at 26. The Report continues, *id.*:

> [Schnupp] filed the qui tam to "cover his ass." Based on the way Blair was acting over the vacation time payment dispute (particularly that he was lying and fabricating information), Schnupp was worried that if Blair Pharmacy was ever audited or investigated, Blair would lie and throw Schnupp under the bus by trying to blame everything on him. Schnupp was further worried because he knew how it would look since he was the pharmacist in charge at the pharmacy and the one who submitted the claims for reimbursement. Schnupp did not want to go to jail.

Mr. Blair was indicted on August 27, 2019. *See* Criminal Case, ELH-19-410. ECF 1.[16] The Indictment contains ten counts. *Id.* In particular, Counts One through Five charge wire fraud, under 18 U.S.C. § 1343, and Counts Six through Ten charge aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b). Notably, the Indictment does not reference facts that correspond to Scheme 5.

A Superseding Indictment was filed on March 3, 2020, containing thirty-six counts. *Id.*, ECF 20. It added, *inter alia*, allegations as to Scheme 5. *See, e.g.*, ECF 20, ¶ 21. Specifically, it alleges, among other things, that Mr. Blair violated the AKS based on BPI's payments to Atlas in exchange for Atlas's referrals of compounded prescriptions to BPI that were paid by TRICARE. *Id.*, Counts Twenty-Nine to Thirty-Three. Mr. Blair was also charged with money laundering, under 18 U.S.C. § 1957, as well as additional counts of wire fraud and identity theft.

---

[16] This Court previously took judicial notice of certain pleadings from Mr. Blair's criminal case. *See* ECF 55.

Pursuant to a Plea Agreement (Criminal Case, ECF 181, ECF 181-1), Mr. Blair entered a plea of guilty on December 3, 2021 (*id.*, ECF 178), to Count Thirty-One of the Superseding Indictment.  That count (*id.*, ECF 20 at 17) charged Mr. Blair with payment of illegal remunerations to Atlas in April 2015, in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A), *i.e.*, two payments of $500,000 each, in the total sum of $1,000,000.  *See id.*, ECF 178.

In support of the guilty plea, the Plea Agreement included a detailed "Stipulation of Facts" ("Stipulation").  *See id.*, ECF 181-1.[17]  Under oath at his guilty plea proceeding, Mr. Blair agreed to the content of the Stipulation.  *Id.*, ECF 197 (Transcript of Arraignment Proceedings) at 8–9.

The Stipulation (*id.*, ECF 181-1) provides in part:  "Blair entered into 1099 independent contractor arrangements with several sales marketers . . . and Blair arranged to pay the independent marketers a percentage of any reimbursement money he received from health care benefit programs, including TRICARE."  *Id.* at 2.[18]  Further, the Stipulation provides that Mr. Blair recruited "B.A., the owner of Atlas Group, LLC," *i.e.*, Bahram Alavi, to engage in violations of the AKS.  *Id.*  And, it states that on November 24, 2014, Blair and Atlas entered into a "Distributor Agreement," which "Blair entered into . . . with the knowledge that such an arrangement violated federal law."  *Id.* at 3.  The Stipulation also posits, *id.*: "With this knowledge of the wrongfulness of his conduct, Blair intentionally entered into an agreement with B.A. to pay him a value based 50% commission on any successfully reimbursed TRICARE pharmacy benefit claim."

Moreover, the Stipulation asserts, *id.*:

The Distributor Agreement required Atlas to use Blair Pharmacy exclusively, and to refer all business within his established territory to Blair Pharmacy, and Blair

---

[17] With exhibits, the Stipulation exceeds twenty pages.  The factual summary consists of five pages that are typed and single-spaced.

[18] In the Stipulation, "Blair" was a reference only to Mr. Blair; BPI was not named as a defendant.

induced and encouraged these referrals to his pharmacy by offering B.A. a 50% percentage payment of any money that Blair received from health care benefit programs. The payment of 50% of the health care benefit program reimbursement monies was the "sole compensation" under the November 24, 2014 financial agreement between Blair and B.A. B.A. was not paid any money or compensation, unless Blair was successful in obtaining reimbursement from a health care benefit program for a prescription that B.A. referred to Blair, and then, and only then was B.A. paid a percentage of the successful reimbursement.

This "Distributor Agreement" was thus a financial arrangement based on the value and volume of prescription referrals that B.A. caused to be directed to Blair's pharmacy, including referrals of federal health care program business, such as TRICARE.

Relevant here, the Stipulation also states: "The amount of $6,352,941.66 (as described in detail in Attachment B, incorporated herein) was the total reimbursement amount TRICARE paid to Blair Pharmacy from November 2014 – May 2015, based upon the claims Blair submitted to TRICARE tainted by remuneration payments Blair Pharmacy paid to independent 1099 sales contractors." *Id.* at 5. Attachment B to the Plea Agreement specifically identified 582 false claims submitted by Blair to TRICARE, in violation of the AKS, and the amount TRICARE paid for each tainted claim, the total of which was $6,352,941.66. *Id.* at 7–21.

In the Plea Agreement, entered pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to recommend to the Court a sentence of twelve months and one day of incarceration for Mr. Blair. *Id.*, ECF 181, ¶ 9.[19] Mr. Blair also agreed to pay restitution to the government in the amount of $3,176,470.83. *Id.* On February 10, 2022, the Court sentenced Mr. Blair to the agreed upon term of imprisonment. Criminal Case, ECF 188, ECF 189, ECF 190. The Court also ordered defendant to pay restitution to the government in the amount of $3,176,470.83. *Id.*, ECF 189 at 5. As noted, that sum has been paid. *Id.*, ECF 194.

---

[19] The offense carries a maximum term of imprisonment of five years. *Id.*, ECF 181, ¶ 3.

With respect to the qui tam case, the government apparently conducted a lengthy investigation to determine whether to intervene. *See* ELH-17-2335, ECF 4; ECF 6; ECF 8; ECF 10; ECF 13; ECF 16; ECF 18; ECF 20; ECF 22; ECF 24; ECF 26. Ultimately, on or about May 2, 2022, the United States declined to intervene. ECF 28. In the interim, by Order of October 15, 2019, the Court partially lifted the seal to permit the government to disclose the qui tam suit to defendants. ECF 15.

Mr. Blair and BPI were served with the qui tam suit on June 6, 2022. ECF 32; ECF 33. Thereafter, they moved to dismiss the case. ECF 38. The Court denied the motion by Memorandum Opinion and Order of December 9, 2022. ECF 55, ECF 56. Soon after, plaintiff moved for partial summary judgment (ECF 57), "based upon the defendants' violations of the Anti-Kickback statute which have been conclusively established in this action by Matthew Blair's criminal conviction." *Id.* at 1. The Relator argued that, as a result of Mr. Blair's criminal conviction, Blair is "estopped" from disputing a violation of the FCA. *Id.* at 4. Further, the Relator asserted: "The United States is entitled to partial summary judgment in the total amount of $22,259,824.98, minus an offset under 18 U.S.C. § 3664(j)(2)(A) for restitution previously collected by the United States during Matthew Blair's criminal case." *Id.* at 11. By Memorandum Opinion and Order docketed on May 24, 2023 (ECF 100, ECF 101), I denied plaintiff's pre-discovery summary judgment motion.

Additional facts are included in the Discussion.

## II.    The False Claims Act and the Anti-Kickback Statute

As noted, the suit is premised on the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), as well as the Anti-Kickback Statute, 42 U.S.C. § 1320a7b(b).

The FCA "imposes civil liability for presenting false or fraudulent claims for payment to the federal government. 31 U.S.C. §§ 3729-3733." *United States ex rel. John Doe v. Credit Suisse AG*, 117 F.4th 155, 158 (4th Cir. 2024); *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023). It provides, in part, that "any person who—(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of that person." 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).

By "impos[ing] civil liability on persons who knowingly submit false claims for goods and services to the United States," the Act protects the public fisc. *United States ex rel. Beauchamp v. Academi Training Center*, 816 F.3d 37, 39 (4th Cir. 2016). And, to prevent fraud that might otherwise evade detection and to supplement government enforcement, the FCA permits a private individual, known as a relator, to file a civil lawsuit on behalf of the government against those who defraud the federal government. *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014), *cert. denied*, 574 U.S. 819 (2014); *see also* 31 U.S.C. § 3730(b)(1); *see, e.g.*, *United States ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 157 (4th Cir. 2020) (complaint alleged that defendant billed the federal government for "material and labor it did not provide, and for [projects] that were not constructed"); *Affinity Living Grp., LLC v. StarStone Specialty Ins. Co.*, 959 F.3d 634, 636 (4th Cir. 2020) (complaint alleged that defendant "submitted reimbursement claims for resident services that were never provided").

The government, as the "real party in interest," may elect to intervene in the qui tam suit. *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009). Even if the government declines to intervene, however, the relator may opt to pursue the case. *See* 31 U.S.C. § 3730(b)(4), (c)(3). As an incentive to bring such suits, a successful relator is entitled to share in the government's recovery from the defendant. *See* 31 U.S.C. § 3730(b); *United States ex rel. Bunk & Ammons v. Gov't Logistics N.V.*, 842 F.3d 261, 265 n.3 (4th Cir. 2016); *see also Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011); *ACLU v. Holder*, 673 F.3d 245, 246–51 (4th Cir. 2011).

The AKS, 42 U.S.C. § 1320a-7b(b), is "designed to prevent" fraud and abuse in connection with federal health care programs, including Medicare and Medicaid. *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015). In particular, it "was enacted to 'protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services.'" *Id.* (citation omitted). In addition, the AKS seeks "'to protect patients from doctors whose medical judgments might be clouded by improper financial considerations.'" *Id.* (citation omitted).

Section 1320a-7b(b) of 42 U.S.C. was enacted in 1977, when Congress amended the Social Security Act by adding the Medicare-Medicaid Anti-Fraud and Abuse Amendments. *See United States v. Shoemaker*, 746 F.3d 614, 626 (5th Cir. 2014) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977)); *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000). The amendments sought to address the "disturbing degree [of] fraudulent and abusive practices associated with the provision of health services financed by the Medicare and Medicaid programs." *Shaw*, 106 F.

Supp. 2d at 110 (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047).

Under the AKS, it is illegal for any person to knowingly solicit or receive "remuneration" in return for referring any "good, facility, service, or item" to someone who will be paid, at least in part, by a Federal health care program.  42 U.S.C. § 1320a-7b(b)(1)(B).  For example, if "a party offered remuneration to a physician to furnish a federally reimbursable healthcare service with the requisite mens rea, and the physician refused the remuneration but furnished the service anyway under her independent professional judgment, the offering party, but not the physician, would have violated the [AKS]." *Pharmaceutical Coalition for Patient Access v. United States*, ___ F. 4th ___, 2025 WL 271562, at *4 (4th Cir. Jan. 23, 2025).  The AKS also prohibits the knowing and willful offer or payment of remuneration to "'induce' an individual to purchase a federally reimbursable healthcare product." *Id.* (citing 42 U.S.C. § 1320a-7b(b)(2)).

 In March 2010, as part of the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111–148, 124 Stat. 119 (Mar. 23, 2010) ("Affordable Care Act"), the AKS was amended to provide expressly that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g) (as amended by § 6402 of the Affordable Care Act).  Therefore, "[a] violation of the Anti-Kickback Statute . . . automatically constitutes a false claim under the False Claims Act." *United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021) (citing *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017)) ("An [AKS] violation that results in a federal health care payment is a per se false claim under the [FCA]."); *see United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 193–94 (4th Cir. 2022).

### III.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-*

*Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322–24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585–86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P.*

*v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations. *Brown v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *In re French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Notably, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony of a nonmovant is based on personal knowledge

or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

When, as here, the parties have filed cross motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021). Simply because opposing parties have moved for summary judgment does not mean that summary judgment to one side or the other is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine dispute of material fact." 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2022) ("Wright & Miller"). And, as noted, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that

motion.'" *Defs. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## IV.    Discussion

In support of the Motion, Schnupp largely relies on the facts to which Mr. Blair stipulated in the Criminal Case. *See* ECF 149 at 15–20; ECF 65-3; Criminal Case, ECF 181-1 at 1–6. He argues: "Nothing revealed in discovery . . . may change the facts established by Mr. Blair's criminal conviction and nothing revealed in discovery supports Mr. Blair's assertion that Mr. Schnupp is not an 'original source' of the allegations underlying Mr. Blair's criminal conviction." ECF 149 at 11. Therefore, he contends that "summary judgment in favor of the United States is now appropriate." *Id.*

Schnupp's argument can be summarized as follows: (1) Mr. Blair was criminally convicted of a violation of the AKS; (2) a violation of the AKS automatically constitutes a false claim under the FCA; (3) Blair is estopped from denying the facts set forth in the Stipulation in Mr. Blair's Plea Agreement; (4) in the Stipulation, signed by Mr. Blair, he admitted that TRICARE paid $6,352,941.66 to the Pharmacy from November 2014 through May 2015 based upon claims submitted to TRICARE that were "tainted by remuneration payments" paid to independent sales contractors; and (5) the attachment to the Plea Agreement (Criminal Case, ECF 181-1 at 7–21) identifies 582 false claims submitted by defendants to TRICARE, in violation of the AKS. ECF 149 at 12–22. Accordingly, Schnupp contends that "there is no dispute in this case that the defendants submitted 582 false claims to TRICARE for which the United States suffered damages totaling $6,352,941.66." *Id.* at 22. Schnupp also contends that he is an original source as to Scheme 5. ECF 165 at 37.

Schnupp has calculated the treble damages to which he contends the United States is entitled, pursuant to 31 U.S.C. § 3729(a)(1). Specifically, he asserts that the government is entitled to treble damages of $19,058,824.98, *i.e.*, 3 x $6,352,941.66. ECF 149 at 23. Schnupp has also calculated the adjustment to the applicable penalties due to inflation. *Id*. at 25. According to Schnupp, because defendants submitted 582 separate claims to TRICARE, as identified in Mr. Blair's Plea Agreement, a penalty ranging from $5,500 to $11,000 for each false claim is required under 31 U.S.C. § 3729(a)(1). *Id*. at 25–26. This totals between $3,201,000 and $6,402,000. *Id*. at 26. Further, Schnupp contends that, after deducting the amount of restitution that Mr. Blair has already paid, *i.e.*, $3,176,470.83, *id*., the government is entitled to a sum ranging from $19,083,354.15 to $21,324,354.15.

In the Cross Motion, defendants argue that "Schnupp has failed to produce in discovery the required facts in support of his claims and has not provided the type of assistance to the Government as a relator that the FCA is intended to award. . . ." ECF 156 at 13. Therefore, defendants claim that they are entitled to summary judgment as to all claims. *Id.*

As to Schemes 1, 2, 3, and 4, set forth in Schnupp's original Complaint, Blair argues that Schnupp has not presented any evidence to corroborate his allegations, whereas defendants "have produced uncontroverted evidence disproving Schnupp's claims." *Id*.[20] As to Scheme 5, Blair advances multiple challenges.

---

[20] In defendants' Cross Reply (ECF 170), they raise, for the first time, the contention that Schnupp's suit is unconstitutional. *Id*. at 7. Citing *U.S. ex rel. Zafirov v. Florida Medical Associates, LLC*, 2024 WL 4349242, at *1 (M.D. Fla. Sept. 30, 2024), Blair argues that Schnupp was not properly appointed under Article II of the U.S. Constitution, and therefore, his suit as an unappointed government officer, is unconstitutional. ECF 170 at 7.

The opinion from the federal court in Florida was not issued until after defendants filed the Cross Motion. Nevertheless, the foundation of the claim was certainly as available to Blair as it

With respect to Scheme 5, Blair argues that Schnupp "has not made any effort to establish a link" between Mr. Blair's guilty plea and Blair's alleged liability under the FCA. *Id.* at 13. Defendants contend that they are entitled to summary judgment, "or at least, Schnupp's [Motion] should be denied," because he cannot establish causation, "an essential element of his FCA claim." *Id*. at 14. Blair also relies on the FCA's public disclosure bar. *Id*. at 13–14; *see* 31 U.S.C. § 3730(e)(4). According to Blair, Schnupp cannot prevail because the factual allegations underlying the qui tam suit were publicly disclosed when the qui tam suit was initially filed in August 2017. *Id.* at 35. Moreover, defendants contend that Schnupp cannot establish that he is an original source under the FCA. In this regard, Blair posits that the Relator's "disclosures were not voluntary," nor did he "provide the Government with any information related to the AKS violations to which Mr. Blair pled guilty that either materially added to or was independent from information the Government already had in its possession." *Id.* at 14.

Defendants also argue that the Court should deny Schnupp's Motion "because his damages demand and calculations are unsupported by the record." *Id*. Further, Blair maintains that "Schnupp's request for $22 million dollars and summary judgment becomes markedly more

---

was to the defendant in *Zafirov*. Blair's attorneys obviously knew of the existence of Article II of the Constitution.

In any event, the Court need not consider arguments made for the first time in a party's reply. *See, e.g.*, *United States v. Al–Hamdi*, 356 F.3d 564, 571 n. 8 (4th Cir. 2004) (declining to consider argument first raised in reply brief); *see also United States v. Williams,* 445 F.3d 724, 736 n. 6 (4th Cir. 2006) (declining to consider an argument raised for the first time in the reply brief); *Hanlin–Cooney v. Frederick Cnty., Md.,* 2014 WL 576373, at *11 n. 32 (D. Md. Feb. 11, 2014) (declining to consider an argument first raised in reply brief); *Price v. Grasonville Volunteer Fire Dep't*, ELH-14-1989, 2014 WL 7409891, at *8 (D. Md. Dec. 30, 2014). The rationale behind this general principle is that that the opposing party would be prejudiced by a consideration of the argument, absent an opportunity to respond. *See Clawson v. FedEx Ground Package Sys., Inc.,* 451 F.Supp.2d 731, 735 (D. Md. 2006) (citing *United States v. Head,* 340 F.3d 628, 630 n. 4 (8th Cir. 2003)). Therefore, I decline to consider the belated contention.

extreme and unjustified considering that, since this Court initially denied his first request for summary judgment, Schnupp has taken only one deposition and conducted very little written discovery." *Id.* at 12.  Blair asserts, *id.* "Simply put, Schnupp's case is no different today than it was when this Court denied his first Motion for Partial Summary Judgment on May 24, 2023."

I turn to address the contentions.

### A.  The Public Disclosure Bar

As discussed, in order to prevent fraud that might otherwise evade detection and to supplement government enforcement, the FCA permits a private individual, known as a relator, to file a civil lawsuit on behalf of the federal government against those who have defrauded the government.  31 U.S.C. § 3730(b)(1).  To encourage such suits, the statute allows the relator to collect a portion of any recovery as a reward.  *See* 31 U.S.C. § 3730(b); § 3730(d)(2).

However, a qui tam suit is of no help to the government if the alleged fraud has already been uncovered by the time the relator's suit is filed.  *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294–95 (2010).  Indeed, since enacting the FCA in 1863, Congress has repeatedly amended the FCA in an effort "'to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits' in which a relator, instead of plowing new ground, attempts to free-ride by merely reiterating previously disclosed fraudulent acts."  *Beauchamp*, 816 F.3d at 39 (quoting *Graham Cty. Soil & Water*, 559 U.S. at 295).

One such mechanism is the FCA's public disclosure bar.  *See* 31 U.S.C. § 3730(e)(4)(A) (1986), as amended by the Affordable Care Act; *see also State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 39, 44 (2016) (describing the public disclosure bar as a threshold

that a relator must clear in order to proceed on a qui tam suit).  Effective March 23, 2010, the public disclosure provision states, 31 U.S.C. § 3730(e)(4)(A):

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Thus, the public disclosure bar "disqualifies private suits based on fraud already disclosed in particular settings—such as hearings, government reports, or news reports—unless the relator meets the definition of an 'original source' under the FCA."  *Beauchamp*, 816 F.3d at 39 (quoting 31 U.S.C. § 3730(e)(4)); *see United States ex rel. Siller v. Becton Dickenson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994).  Put another way, if the relator qualifies as an "original source," the public disclosure bar does not apply.

The FCA permits a defendant to raise the public disclosure bar as an affirmative defense. *Beauchamp*, 816 F.3d at 40.  The public disclosure bar requires the Court to consider three questions:  (1) is there a qualifying public disclosure? (2) if yes, is the disclosed information the basis of the relator's suit? (3) and, if so, is the relator the original source of that information? *United States ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 528 F.3d 292, 308 (4th Cir. 2008), *rev'd on other grounds*, 559 U.S. 280 (2010); *see United States ex rel. Maharaj v. Est. of Zimmerman*, 427 F. Supp. 3d 625, 646 (D. Md. 2019); *United States ex rel. Moore v.*

*Cardinal Fin. Co., L.P.*, CCB-12-1824, 2017 WL 1165952, at *10 (D. Md. Mar. 28, 2017); *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 579 (E.D. Va. 2011).

As a threshold matter, the public disclosure bar does not apply unless the fraud alleged by the relator was previously disclosed to the public in a manner specifically enumerated in the statute. *See United States v. Meridian Senior Living, LLC*, 5:16-CV-410-BO, 2018 WL 1463347, at *8 (E.D.N.C. Mar. 23, 2018); *Davis*, 753 F. Supp. 2d at 579.  And, the disclosure "must be a disclosure of fraudulent 'allegations or transactions' and not merely a disclosure of information."  *See A1 Procurement, LLC v. Thermcor, Inc.*, 2:15-00015, 2017 WL 9478501, at *8 (E.D. Va. Apr. 4, 2017) (*citing United States ex rel. Saunders v. Unisys Corp.*, 1:12-00379, 2014 WL 1165869, at *1, *6 (E.D. Va. Mar. 21, 2014)).  As explained by the D.C. Circuit: "[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 654 (D.C. Cir. 1994).

The Fourth Circuit has said that "a 'public disclosure' requires that there be some act of disclosure *outside of the government*." *United States ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 777 F.3d 691, 697 (4th Cir. 2015) (emphasis in original) (cleaned up) (quoting *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 730 (1st Cir. 2007), *overruled on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)).  It reasoned that by "specifying that a 'disclosure' must be 'public,' Congress indicated that only disclosures made to the public at large or to the public domain had jurisdictional significance." *Wilson*, 777 F.3d at 696.  "The government," said the Court, "is not the equivalent of the public domain." *Id.* at 697.

However, as stated, the public disclosure bar does not apply if the relator qualifies as an original source. The Supreme Court has made clear that the relator must be an original source as to "the allegations in the original complaint *as amended*." *Rockwell Int'l Corp.*, 549 U.S. at 473 (emphasis in *Rockwell Int'l Corp.*). It reasoned that, otherwise, the relator could "plead a trivial theory of fraud for which he had some direct and independent knowledge and later amend the complaint to include theories copied from the public domain or from materials in the Government's possession." *Id.*

A timeline summary of some critical events follows.

1. Atlas filed suit against Blair in federal court in August 2015. *See* JKB-15-2491 (D. Md.). The Atlas Suit referred to the Distributor Agreement and included allegations consistent with Scheme 5.

2. In July 2017, in connection with the government's investigation of Mr. Blair, the government obtained a search warrant for J2. *See* ECF 156-20. The search warrant application reflects that the government knew of the Atlas Suit.

3. Schnupp filed his qui tam suit in August 2017. It includes allegations as to Schemes 1 through 4, but not Scheme 5. *See* ECF 1.

4. Also in August 2017, Schnupp submitted the Disclosure Memorandum to the government, with attachments.

5. Beginning in October 2017, Schnupp had multiple meetings and interviews with the government.

6. Mr. Blair was indicted in the Criminal Case on August 27, 2019. He was charged in ten counts with conduct unrelated to Scheme 5. *See* Criminal Case, ECF 1.[21]

7. The Superseding Indictment, filed on March 3, 2020, included facts pertinent to Scheme 5 and asserted, *inter alia*, violations of the AKS. *See id.*, ECF 20.[22]

---

[21] As noted, the Indictment charged Mr. Blair with five counts of wire fraud and five counts of aggravated identity theft. *Id.*

[22] The Superseding Indictment added additional charges of wire fraud and aggravated identity theft, as well as money laundering and violations of the AKS.

8. On December 3, 2021, Mr. Blair pleaded guilty to Count Thirty-One in the Superseding Indictment, which is based on conduct pertaining to Scheme 5.

9. Schnupp amended his qui tam suit six months later, in May 2022, adding facts pertaining to Scheme 5.  ECF 30.

The parties agree that, as to Scheme 5, the Superseding Indictment contains allegations that are also set forth in the Amended Complaint, filed in May 2022.  ECF 165 at 35; ECF 156 at 37. In addition, the parties agree that a qualifying public disclosure as to Scheme 5 occurred on March 3, 2020, when the Superseding Indictment was filed.  *Id.*[23]  On these and other facts, recounted earlier, the question is whether the public disclosure bar applies to Scheme 5.[24]

The Sixth Circuit's decision in *United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d 260, 267 (6th Cir. 2015), is informative.  There, the defendant argued that "there was a prior public disclosure of fraud in the administrative audit and investigation to others outside the government who were 'strangers to the fraud.'"  *Id.* at 269.  In particular, the defendant pointed to "disclosures between OIG and AdvanceMed [, a private corporation,] and between [the defendant] and the Deloitte auditors," employees of a private company engaged prior to the qui tam lawsuit to conduct an internal audit of fraud allegations.  *Id.*  The Sixth Circuit found that neither disclosure "constituted a public disclosure of fraud that would trigger the public-disclosure bar."  *Id.*  No qualifying public disclosure resulted because AdvanceMed received the information "for the purpose of acting on behalf of the government as part of the administrative audit and

---

[23] Defendants assert:  "This Court has previously found that Schnupp's claims related to the AKS were publicly disclosed before this action was filed via the Government's criminal case against Mr. Blair."  ECF 156 at 14.  In a Memorandum Opinion filed in December 2022 (ECF 55), I made reference to the *Relator's concession* that "'qualifying public disclosures of Fraudulent Scheme #5 occurred in connection with Blair's criminal proceedings before the Amended Complaint was filed.'"  *Id.* at 32 (quoting ECF 47 at 39).

[24] Neither party addresses whether the DHA Report, cited by Agent Choi in his Affidavit (ECF 156-20), qualifies as a public disclosure under the FCA.

investigation," and the disclosures to AdvanceMed "were confidential and remained so until after [the qui tam] action was filed." *Id.* Similarly, the court rejected the argument that disclosure of information to various Deloitte auditors constituted a public disclosure, because of their "obligation to keep the information confidential." *Id.* at 270.

The Second Circuit employed similar reasoning to conclude that "disclosures made pursuant to a confidential government investigation or audit do not constitute 'public' disclosures." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 126 (2d. Cir. 2021). The court noted that the information disclosed outside the government during its investigation was "designated 'CONFIDENTIAL' or 'HIGHLY CONFIDENTIAL,' suggesting that any disclosures to [the defendant company's] employees in connection with the government's audits and investigations were made under an obligation to keep such information secret." *Id.* at 125. In its view, such disclosures did not qualify as public disclosures under 31 U.S.C. § 3730(e)(4)(A). *Id.* at 126.

The same rationale applies here. By the time Schnupp filed his qui tam suit in August 2017, the government had possession of substantial information about Mr. Blair's conduct, as evidenced by information in the J2 search warrant application and the agent's Affidavit. *See* ECF 156-20. But, that information was not public. Moreover, both Google and J2 were under an obligation to keep the information confidential. Under such circumstances, the disclosures were more "private" than "public." *See Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d at 270; *see also United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1518 (9th Cir. 1995) (stating that "information that was 'disclosed in private' has not been publicly disclosed"). Put simply, the search warrant applications as to Google and J2 do not constitute public disclosures.

Nor does the Atlas Complaint constitute a public disclosure under 31 U.S.C. § 3730(e)(4)(A). Although the Atlas Suit was publicly filed in federal court, the government was

not a party to it.  And, the FCA "makes clear that a federal civil or criminal hearing qualifies for public disclosure status only if it is one 'in which the government or its agent is a party[.]'" *United States ex rel. Beauchamp v. Academi Training Ctr.*, 933 F. Supp. 2d 825, 844 n.36 (E.D. Va. 2013) (quoting 31 U.S.C. § 3730(e)(4)(A)(i)), *rev'd on other grounds*, 816 F.3d 37 (4th Cir. 2016). Because the Atlas Suit involved private parties, it cannot qualify as a public disclosure under 31 U.S.C. § 3730(e)(4)(A)(i).  *See United States ex rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 425 (S.D.N.Y. 2018) (stating that "actions between private parties . . . cannot generate public disclosures within the meaning of the current public disclosure bar."); *United States ex rel. Paulos v. Stryker Corp.*, 11-0041-CV-W-ODS, 2013 WL 2666346 (D. Mo. June 12, 2013) (stating that "the only lawsuits that can constitute public disclosure under the statute are suits 'in which the Government or its agent is a party.'").

The qui tam suit was filed in 2017, well before Mr. Blair was indicted in 2019.  And, because neither the search warrant records nor the Atlas Suit qualifies as a public disclosure under the FCA, Schnupp would not be foreclosed from qualifying as a whistleblower as of that date with respect to Schemes 1 through 4, even though, as the search warrant reflects, the government was already well aware of significant facts as to Blair's conduct.  Therefore, as to Schemes 1 through 4, I need not determine whether the Relator is an original source of the information contained in the Complaint.  *See Beauchamp*, 816 F.3d at 47 ("[W]here, as here, there was no public disclosure, the . . . inquiry under § 3730(e)(4) ceases, regardless of whether the relator qualifies as an original source.") (quoting *United States ex rel. Holmes v. Consumer Ins. Grp.*, 318 F.3d 1199, 1208 (10th Cir. 2003) (en banc)).

Conversely, the Relator previously conceded that "qualifying public disclosures of Fraudulent Scheme #5 occurred in connection with Blair's criminal proceedings before the

31

Amended Complaint was filed."  ECF 47 at 39; *see Moore*, 2017 WL 1165952, at *12 (federal criminal documents filed in criminal proceedings are qualifying public disclosures).  Moreover, Schnupp does not dispute that the allegations in the Amended Complaint are "substantially the same" as the allegations contained in Mr. Blair's criminal pleadings, because "the government had already investigated, indicted, and convicted Blair for his conduct of Fraudulent Scheme #5 when the Amended Complaint was filed."  ECF 47 at 39; *see Maharaj*, 427 F. Supp. 3d at 649.

Therefore, Schnupp agrees that the public disclosure bar would apply to Scheme 5, unless Schnupp is an "original source" of the information.  ECF 165 at 38 (citing 31 U.S.C. § 3730(e)(4)(A)).  A discussion of that issue follows.

## B.  Original Source

As noted, the public disclosure bar does not apply to a relator who is an original source. Schnupp maintains that he qualifies as an original source as to Scheme 5.  ECF 149 at 30.

Under 31 U.S.C. § 3730(e)(4)(B), an "original source" is defined as an individual who either:

> (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

Schnupp maintains that he did not learn of Scheme 5 from the government.  ECF 165 at 39. He asserts that, "at various times," he disclosed "'information' relating to Blair's AKS scheme involving independent sales representatives to the government . . . before the Superseding Indictment was filed on March 3, 2020."  *Id.*  Specifically, he contends that he provided relevant information to the government voluntarily, first in the form of the Disclosure Memorandum and

its exhibits, produced in August 2017, and then during numerous interviews with the government, beginning in October 2017. *See* ECF 149 at 34; ECF 165 at 39–40.

Defendants insist that, as to Scheme 5, Schnupp does not meet the statutory definition of an original source. They contend that his Disclosure Memorandum "was not voluntarily filed," because it was a required filing. ECF 156 at 37. Moreover, they maintain that the Disclosure Memorandum does not include any factual allegations pertinent to the Fifth Scheme. *Id.* Defendants also observe that Schnupp did not provide information to the government "related to Scheme 5 until after he was contacted by law enforcement," rendering involuntary any disclosures during his interviews with the government. *Id.* at 37–38.

Historically, qui tam actions were sometimes "brought by individuals with no independent knowledge of the fraud, some of whom learned of the fraud through the inspection of government criminal indictments." *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1153 (3d Cir. 1991) (citing S. Rep. No. 345, 99th Cong., 2d Sess. 10, U.S. Code Cong. & Admin. News at 5275); *see United States ex rel. Marcus v. Hess,* 317 U.S. 537, 546 (1943) (upholding a relator's ability to bring a qui tam action based solely on information derived from a criminal indictment). Congress amended the FCA in 1943 to preclude qui tam actions that were "based on evidence or information the government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded). However, the FCA's original source provision preserves the objective of "inspir[ing] whistleblowers to come forward promptly with information concerning fraud so that the government can stop it and recover ill-gotten gains." *U.S. ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 685 (D.C. Cir. 1997).

A "'relator's knowledge . . . is independent if the knowledge is not dependent on public disclosure.'" *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 276 (4th Cir. 2014) (quoting

*Grayson v. Adv. Mgmt. Tech., Inc.*, 221 F.3d 580, 583 (4th Cir. 2000)). Further, "[a] relator 'materially adds' to the public disclosures 'when it contributes information . . . that adds in a significant way to the essential factual background: the who, what, when, where and how of the events at issue.'" *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 184-85 (D. Md. 2019) (quoting *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016)).

According to Schnupp, "'information'" refers to "'*any* essential element of the fraud transaction.'" ECF 165 at 39 (quoting *Findley*, 105 F.3d at 690) (internal citation omitted) (emphasis in original). The *Findley* Court was quoting *Springfield Terminal Ry. Co.*, 14 F.3d at 656–57. In *Springfield Terminal Ry. Co.*, the court clarified that the FCA requires an original source to have "direct and independent knowledge" of "information" underlying an allegation of fraud, which is something less than "direct and independent knowledge of *all* of the vital ingredients to a fraudulent *transaction*." *Id.* (emphasis in *Springfield*). But, both cases were decided prior to the 2010 amendments to the FCA.

The "original source" definition "no longer contains a 'direct' knowledge requirement, instead requiring that an original source have 'knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.'" *Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772, 789 (N.D. Cal. 2020), *rev'd and remanded sub nom. on other grounds, United States v. Allergan, Inc.*, 46 F.4th 991 (9th Cir. 2022). But, there is no indication that Congress intended to alter the meaning of the words "information" that is "voluntarily provided . . . ."

Moreover, there is no dispute that Schnupp provided "information." Rather, the issues here concern the timing of his disclosures; whether they were voluntary; whether the information was

the basis for allegations or transactions in a claim; or whether the information "materially adds to the publicly disclosed allegations . . . ." 31 U.S.C. § 3730(e)(4)(B).

The conduct pertaining to Scheme 5 in the Amended Complaint corresponds to the allegations contained in a prior qualifying public disclosure, *i.e.*, the Superseding Indictment in the Criminal Case, ECF 20. The question is whether the Relator "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). As indicated, a relator qualifies as an original source if he "voluntarily disclosed to the Government the information" underlying the fraud claims or if he had "knowledge that is independent of and materially adds to the publicly disclosed allegations," which was voluntarily provided to the government before the qui tam suit was filed. 31 U.S.C. § 3730(e)(4)(B) (2010); *see also Maharaj,* 427 F. Supp. 3d at 649-50.

As indicated, the definition of "original source" in 31 U.S.C. § 3730(e)(4)(B) consists of two alternatives. Both require disclosures that are made "voluntarily." As noted, Schnupp claims that he voluntarily provided information to the government in two ways: the Disclosure Memorandum of August 15, 2017, and in extensive interviews conducted by the government after the qui tam suit was filed.

### 1. "Voluntarily"

The Court must determine whether Schnupp acted "voluntarily" when he submitted the Disclosure Memorandum or when he submitted to interviews with the government. The FCA does not define the term "voluntarily." This implicates principles of statutory construction.

Generally, "[w]hen faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cty., Md.*, 17 F.4th 497, 508 (4th Cir. 2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in

original); *see Groff v. Dejoy*, 600 U.S. 447, 468 (2023) (stating that "statutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says") (citation omitted) (alteration in *Groff*); *Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("As always, we start with the specific statutory language in  dispute."); *Pharmaceutical Coalition for Patient Access*, 2025 WL 271562, at *3 ("Statutory interpretation begins with the text of the statute."); *Williams v. Carvajal*, 63 F.4th 279, 285 (4th Cir. 2023) ("As always, an issue of statutory interpretation begins with the text.") (citing *McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022)); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision.") (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); *see also United States v. Bryant*, 949 F.3d 168, 174–75 (4th Cir. 2020); *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

A statute "means what it says."  *Simmons v. Himmelreich*, 578 U.S. 621 (2016); *see United States v. Cohen*, 63 F.4th 250, 253 (4th Cir. 2023). "'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain meaning" of the statute.  *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)); *see United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *Abdelshafi*, 592 F.3d at 607).  A court determines a statute's plain meaning by referencing the "ordinary meaning [of the words] at the time of the statute's enactment."  *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001); *see also HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021). Courts may "not resort to legislative history to cloud a statutory text that is clear."  *Ratzlaf v.*

*United States*, 510 U.S. 135, 147–48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

Terms in a statute that are not defined, such as the word "voluntarily," are "'interpreted' in accordance with "their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *see Holly Frontier Cheyenne Refining, LLC*, 594 U.S. at 388; *George*, 946 F.3d at 645. Moreover, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see also Gundy v. United States*, 588 U.S. 128, 141 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)); *see also United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them."); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Pharmaceutical Coalition for Patient Access*, 2025 WL 271562, at *3. Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 588 U.S. at 141.

After surveying judicial opinions on the subject, the court in *United States ex rel. Griffith v. Conn.*, 11-157-ART, 2015 WL 779047 (E.D. Ky. Feb. 24, 2015), concluded that the "most apt definition" of the word "voluntarily," as used in the FCA, is "an act done 'without a present legal obligation' or 'without valuable consideration.'" *Id*. at *9 (collecting cases); *see United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 744 (9th Cir. 1995) (en banc) (defining "voluntary" as "done, of one's own free will without valuable consideration" and "done without any present legal obligation to do the thing done."); *United States ex rel. Ackley v. Int'l Bus. Machines Corp.*, 76 F. Supp. 2d 654, 666 (D. Md. 1999) ("'Voluntarily' means not in response to a subpoena, . . . and, insofar as a government employee is concerned, not in exchange for a salary.").

In analyzing the parties' contentions, the ordinary meaning of the word "voluntarily," set forth above, shall frame the analysis.

### 2. Section 3730(e)(4)(B)(i)

Under 31 U.S.C. § 3730(e)(4)(B)(i), a relator qualifies as an original source if, "prior to a public disclosure under subsection (e)(4)(a), [the relator] has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based."

### a. Disclosure Memorandum

Schnupp claims that in August 2017, he voluntarily provided the government with his Disclosure Memorandum, dated August 14, 2017, and it included a copy of the Atlas Complaint, filed in case JKB-15-2491. ECF 165 at 39. In his view, this conduct meets the definition of original source in § 3730(e)(4)(B)(i).

The Disclosure Memorandum, prepared by counsel for Schnupp, states, in part, ECF 156-21 at 5–6:

> In addition to his own observations at Blair Pharmacy, Relator learned of a dispute between Defendant Blair and a sales company called Atlas Group, in which Blair refused to pay Atlas sales commissions under a "distributor agreement" with Atlas. Relator believes Defendant Blair settled the case and paid Atlas because Atlas threatened in its lawsuit to reveal Defendant Blair's use of "burner cards" to unlawfully pay for patients' co-payments. Among the records enclosed is a copy of a lawsuit filed by Atlas against Defendant Blair and the Blair Pharmacy for breach of contract and unlawful retaliation. Without providing any specifics, Atlas alleged in the case: "Upon information and belief, during the course of performance under this Agreement, Atlas learned from Blair's statements that Blair was using 'burner' cards (pre-paid credit cards that have a monetary value) to pay co-pays on behalf of patients, while posing as the at-issue patients over the phone to third party payors Medicare, TRICARE and Medicaid.
>
> According to Atlas, Matthew Blair was withholding commissions from Atlas because he feared the Pharmacy's failure to collect co-payments would cause payors to recoup funds from the pharmacy if an audit were to occur. Atlas alleges that Blair solicited Atlas to help impersonate patients and pay co-pays in violation of federal fraud and abuse laws.

The Disclosure Memorandum does not mention key elements of the arrangement between Blair and Atlas that violated the AKS.  For example, unlike the Stipulation to which Mr. Blair agreed in the Criminal Case (ECF 181-1), the Disclosure Memorandum does not mention that the "Distributor Agreement required Atlas to use Blair Pharmacy exclusively, and to refer all business within his established territory to Blair Pharmacy," nor does it mention that "Blair induced and encouraged these referrals to his pharmacy by offering B.A. a 50% percentage payment of any money that Blair received from health care benefit programs." *Id.* at 3.  Nor does the Disclosure Memorandum mention that this 50 percent payment "of the health care benefit program reimbursement monies was the 'sole compensation,'" and Alavi was "not paid any money or compensation, unless Blair was successful in obtaining reimbursement from a health care benefit program for a prescription that B.A. referred to Blair, and then, and only then was B.A. paid a percentage of the successful reimbursement." *Id.*

However, the Atlas Complaint, appended to the Disclosure Memorandum, contains certain allegations concerning Scheme 5.  But, as discussed, it appears to have been provided by Schnupp to support Scheme 4, involving burner cards, which is specifically addressed by Schnupp in the text of the Disclosure Memorandum.

The parties do not address whether Schnupp's intent, reason, or purpose for providing the Atlas Complaint is relevant.  Even if Schnupp produced the Atlas Complaint to support his contentions as to Scheme 4, and did not appreciate or realize that facts pertaining to Scheme 5 are also included in the Atlas Complaint, this would not alter the fact that Schnupp provided the Atlas Complaint to the government, with all that it alleged.  In my view, regardless of Schnupp's reason for producing the Atlas Complaint, it speaks for itself; the content constitutes "information." *See* 31 U.S.C. § 3730(e)(4)(B).

However, the Disclosure Memorandum, to which the Atlas Complaint was appended, was provided pursuant to 31 U.S.C. § 3730(b)(2). This provision states: "A copy of the [qui tam] complaint and written disclosure of substantially all material evidence and information the person possesses *shall* be served on the Government [by the relator]." 31 U.S.C. § 3730(b)(2) (emphasis added). The Fourth Circuit has made clear that "the word 'shall,' when used in a statutory context, is generally construed to be mandatory." *Holland v. Pardee Coal Co.*, 269 F.3d 424, 431 (4th Cir. 2001); *see also Navy Fed. Credit Union*, 972 F.3d at 356 (construing the word "shall" in a statute to be mandatory in nature).

The question, then, is whether a required disclosure, such as the Disclosure Memorandum, which included the Atlas Complaint, is one that is made "voluntarily," within the meaning of 31 U.S.C. § 3730(e)(4)(B). Schnupp acknowledges that there is a circuit split as to whether the Disclosure Memorandum required by 31 U.S.C. § 3730(b)(2) can be deemed to have been "voluntarily" provided. ECF 165 at 58.

To my knowledge, the Fourth Circuit has not addressed whether the fact that the Disclosure Memorandum is required by statute vitiates voluntariness. But, the Second, Seventh, and Tenth Circuits have determined that a Disclosure Memorandum cannot be considered to have been voluntarily provided. *See, e.g.*, *United States ex rel. Omni Healthcare, et al., v. U.S. Oncology, Inc.*, No. 23-1334-cv, 2024 WL 4751635, at * (2d Cir. Nov. 12, 2024); *U.S. ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001); *U.S. v. Bank of Farmington*, 166 F.3d 853, 866 (7th Cir. 1999), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009); *see also United States v. U.S. Oncology, Inc.*, No. 19-CV-5125 (NG) (LB), 2023 WL 5831140, at *5 (E.D.N.Y. Sept. 8, 2023) (concluding that the relator's disclosure statement, made as required under 31 U.S.C. § 3730(b)(2), was not voluntary because it was "made

pursuant to a legal obligation and in return for valuable consideration in the form of a possible *qui tam* award"), *aff'd sub nom. Omni Healthcare*, 2024 WL 4751635.  At least one trial court in this circuit has agreed with the Second, Seventh, and Tenth Circuits.  *See, e.g.*, *Beauchamp*, 933 F.Supp.2d 825, *rev'd on other grounds*, 816 F.3d 37.  But, the D.C. Circuit and the Fifth Circuit have taken the opposite view.  *See, e.g.*, *U.S. ex rel. Babalola v. Sharma*, 746 F.3d 157 (5th Cir. 2014); *Findley*, 105 F.3d at 690-91.

Schnupp contends that the position taken by the Second, Seventh, and Tenth Circuits would potentially require two disclosures of information to the government to be qualified as "voluntary." ECF 165 at 60.  This, he argues, is because 31 U.S.C. § 3730(b)(2) requires a relator to serve a copy of the complaint and written disclosure of "substantially all material evidence and information the person possesses" upon the government.  *Id.* at 59.  If this one disclosure does not qualify as voluntary, Schnupp argues, then a relator would need to make a second disclosure to the government prior to this statutorily required disclosure.  *Id.* at 60.  According to Schnupp, such an interpretation "raises irrational and arbitrary obstacles to protection of the public fisc."  *Id.*

I agree with the Second, Seventh, and Tenth Circuits that the Disclosure Memorandum required by 31 U.S.C. § 3730(b)(2) cannot be deemed to have been "voluntarily" provided under 31 U.S.C. § 3730(e)(4)(B)(ii).  If a relator's submission of a required disclosure statement to the government under 31 U.S.C. § 3730(b)(2) is deemed a "voluntary" disclosure under the original source exception to the public disclosure bar, this would "read[] the voluntary requirement" out of the original source exception, 31 U.S.C. § 3730(e)(4)(A).  *Omni Healthcare Inc.*, 2024 WL 4751635, at *3 (citation omitted); *see Beauchamp*, 933 F.Supp.2d at 846 ("Courts that have addressed whether these mandatory disclosures under § 3730(b)(2) also qualify as voluntary

disclosures under § 3730(e)(4) have held that they do not, as these are mandatory disclosures rather than voluntary disclosures.").

To conclude that a required disclosure may simultaneously qualify as voluntarily provided would eviscerate the statutory language that requires an original source to have provided the information "voluntarily." And, "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *see Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022); *Corley v. United States*, 556 U.S. 303, 314 (2009); *Pharmaceutical Coalition for Patient Access*, 2025 WL 271562, at *4; *Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016); *Barnes v. Holder*, 625 F.3d 801, 806 (4th Cir. 2010); *United States v. Fisher*, 58 F.3d 96, 99 (4th Cir. 1995).

### b. Interviews Conducted by the Government

Schnupp contends that during sixteen interviews with the government that began in October 2017, he voluntarily disclosed information on which "allegations or transactions in a claim are based." ECF 165 at 40–43. He explains that his filing of the qui tam suit in August 2017 "prompted the government to request an interview" of him, at which he voluntarily disclosed information, including as to the Fifth Scheme. *Id.* at 46. The first meeting occurred at the U.S. Attorney's Office in Maryland on October 2, 2017, and fifteen meetings followed. *Id.* at 40, 47. The Relator asserts: "Excluding . . . [a] relator like Mr. Schnupp from being an original source simply because the government ask[ed] for an interview after receiving the *qui tam* complaint would greatly undermine Congress' goal of encouraging more enforcement actions by private insiders." *Id.* at 46. And, the Relator previously claimed that it was only after "many meetings

and discussions with the Relator [that] the government filed a 36-count Superseding Indictment against Mr. Blair on March 3, 2020." ECF 47 (reply in opposition to motion to dismiss), at 12.

The parties describe the question as whether the disclosures provided by Schnupp during meetings initiated by the government after the filing of the qui tam Complaint qualify as having been provided by him voluntarily, within the meaning of the FCA. *See* ECF 156 at 41; ECF 165 at 43.

In particular, Schnupp asserts that he disclosed the following to the government: "'In total Blair hired approximately six sales reps that marketed to doctors to send prescriptions to Blair Pharmacy. . . . Blair paid his sales reps between 30 and 50 [percent] of the total amount Blair Pharmacy was reimbursed for each prescription the sales rep referred to Blair Pharmacy.'" ECF 165 at 40–41 (quoting ECF 67-2 at 9). Schnupp also revealed that the "'Pharmacy's prescriptions came into the pharmacy via electronic fax'" and that each sales representative had a "'separate eFax number'" by which Mr. Blair tracked who had made the referral. ECF 165 at 41 (quoting ECF 67-2 at 8). In addition, Schnupp informed the government that Mr. Blair "'transferred money from the pharmacy's bank account to another account he controlled in the name of Blair Medical LLC and paid the sales reps from that account.'" ECF 165 at 42 (quoting ECF 67-2 at 23). And, Schnupp claims that he provided specific information about the prescriptions prescribed by Dr. Rehrig, an Army doctor, and the doctor's connection with Alavi. *See* ECF 156-9 at 19. According to the FBI notes of Schnupp's interview, Schnupp disclosed that one of Alavi's doctors was Dr. Rehrig, an Army doctor, who "was the only physician who wrote the same prescriptions for his patients over and over." *Id.* Schnupp maintains that he also told the FBI that the majority of Dr. Rehrig's patients were insured by TRICARE because he was an Army doctor who worked on a military base. *Id.*

In support of Schnupp's contention that these disclosures were made voluntarily, he points to court decisions in the context of "non-custodial interviews conducted by law enforcement officers." ECF 165 at 44. Schnupp maintains that during the sixteen meetings he had with government attorneys and investigators, none of his "disclosures were compelled by the government, and none were made pursuant to any promise from the government." *Id.* at 47. He adds that there is no evidence that his "free will had been overborne, or that his capacity for self-determination had been critically impaired when he provided information to the government." *Id.* (citing *In re Mut. Funds Inv. Litig.*, 529 F.3d 207, 232 (4th Cir. 2008)).

Defendants insist, however, that "Schnupp's failure to plead anything about Scheme 5 in his initial qui tam Complaint is fatal to his claim that he is an original source (or at the very least raises a question for the jury that cannot be resolved at this juncture)." ECF 170 at 21. Blair also argues: "Because it was the Government who first made contact regarding any information that Schnupp arguably provided about Scheme 5, Schnupp did not provide information about Scheme 5 voluntarily through any cooperation with law enforcement." *Id.* at 23.

I am unaware of any Fourth Circuit case that has addressed the issue of voluntariness in the context of the circumstances attendant here. But, cases from other circuits are informative.

In *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 341 (3d Cir. 2005), the Third Circuit determined that disclosures made in response to a subpoena are not voluntary. But here, Schnupp was not under subpoena.

In *City of Chicago ex rel. Rosenberg v. Redflex Traffic Systems, Inc.*, 884 F.3d 798, 805–06 (7th Cir. 2018), the Seventh Circuit concluded that disclosures made in exchange for an immunity agreement were not voluntary. But here, Schnupp did not have an immunity agreement. Of relevance, however, the Seventh Circuit also determined that the disclosures were not voluntary

because the relator "did not voluntarily initiate contact with the OIG and only provided information once he was contacted as part of the City's investigation." *Id.* at 806.

Similarly, in *United States ex rel. Barth v. Ridgedale Electric, Inc.*, 44 F.3d 699 (8th Cir. 1995), the Eighth Circuit found that Barth's cooperation was not voluntary because it came only after Barth was contacted by a government investigator. *Id.* at 704 ("Barth's only contact with a government official prior to filing this action was his discussion with Richard Nark, the HUD investigator, which occurred almost two years after Ridgedale's alleged fraudulent activities. More importantly, however, this discussion was initiated by Nark rather than Barth.").

Both *Rosenberg* and *Barth* support the proposition that, in considering whether a relator's disclosures to the government are voluntary, it is significant to determine whether the first contact was initiated by the relator or the government. On the other hand, courts have found that disclosures were voluntary where the relator wrote a letter to the Department of Justice requesting an investigation, *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267 (7th Cir. 2016), and where the relator met with Department of Defense personnel to discuss her allegations before filing her suit. *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027 (9th Cir. 1998).

In *Fine*, 72 F.3d 740, the court determined that a salaried government employee who was compelled to disclose the fraud as part of his job responsibilities "was no volunteer." *Id.* at 743. In the same way, Blair argues that any information Schnupp may have provided to the government cannot be considered voluntary because "[i]t is undisputed that Schnupp was the Pharmacist-in-Charge and the only full-time pharmacist employed at BPI. As a result, Schnupp's job (and his pharmacy license) imposed a stringent obligation to come forward and report any activities he was

engaged in that related to fraud." ECF 156 at 42.[25]  Moreover, Schnupp's Employment Agreement (ECF 156-1) stated that he was to advise the Pharmacy "with regard to maintaining pharmacy standards that meet . . . regulatory agency requirements for the operation of [BPI]." *Id.* at 1.

As mentioned, there is no claim that Schnupp was under subpoena when he spoke with the government.  Nor is there evidence that Schnupp spoke with the government in exchange for an immunity agreement.  It is also undisputed that, after Schnupp filed his Complaint, the government reached out to Schnupp to initiate the interviews at which Schnupp claims to have provided information about Scheme 5; Schnupp did not initiate the contact.  *See* ECF 67-2.  Ultimately, Schnupp participated in sixteen interviews, without a subpoena or the promise of immunity.

That the government initiated the meetings seems to me a slender reed on which to conclude that the interviews were not voluntary.  To the contrary, I conclude that Schnupp participated voluntarily.  But, this is not the end of the inquiry.  The original source definition also requires voluntary disclosure to the government of "information on which allegations or transactions in a claim are based."  31 U.S.C. § 3730(e)(4)(B)(i).

It is undisputed that, by the time of the government's interviews of Schnupp, he had already filed his original qui tam Complaint and it did not include any reference to the facts concerning Scheme 5.  The government disclosed Scheme 5 in the Superseding Indictment filed on March 3, 2020, and the Relator subsequently added Scheme 5 to the Amended Complaint in May 2022.

The Relator acknowledges that the allegations in the Amended Complaint pertaining to Scheme 5 correspond to Count Thirty-One of the Superseding Indictment.  ECF 149 at 26 (". . . [T]he Anti-Kickback violations involved in Mr. Blair's criminal action are identical to those

---

[25] Defendants do not provide any legal authority for the proposition that Schnupp's license required the disclosures at issue here.

at issue in this Motion."); *see also* ECF 156 at 24 ("The only new fraud scheme added to the Amended Complaint (Scheme 5) related to Defendants' violations of the AKS via commission payments to 1099 sales representatives.").    The issue, then, is whether Schnupp disclosed information to the government on which the allegations in Count Thirty-One are based.

Blair argues that the government's investigation of Scheme 5 began with the Atlas Suit filed against Blair in federal court in 2015. *See* ECF 156 at 20–21.  Further, Blair contends that by July 12, 2017—one month before Schnupp filed his qui tam suit—"the FBI had already assembled all of the facts supporting its allegations that Defendants had purportedly violated the AKS by paying commissions to 1099 sales representatives." *Id.* at 21.  Schnupp provided the Atlas Complaint to the government in August 2017, with his Disclosure Memorandum.

Blair's contention is amply supported by the record.  In particular, Special Agent Choi filed an Affidavit dated July 12, 2017 (ECF 156-20), in support of the government's request for a search warrant for J2.  Agent Choi averred that the government's investigation began when the Defense Health Agency, the federal government entity that manages the activities of TRICARE, "provided a report which detailed allegations of potential excessive, fraudulent billings of compound prescriptions by Blair." *Id.* at 7.  According to Agent Choi, the report made reference to Dr. Rehrig, who prescribed compound drugs for TRICARE patients that were filled by the Pharmacy. *See id.* Notably, the Affidavit also references the Atlas Complaint. *Id.* at 11–12.  Moreover, the Affidavit references the Google search warrant signed by Judge Copperthite on January 20, 2017, authorizing the search of email accounts "related to those involved in this fraudulent scheme under investigation." *Id.* at 16.  The J2 warrant was approved on July 12, 2017. *Id.* at 24.

The events described by Agent Choi in the Affidavit took place well before Schnupp met with government investigators, and before Schnupp filed his qui tam Complaint on August 15,

2017.  ECF 1.  Schnupp has not presented anything beyond bald assertions to support his claim that in his interviews with the FBI, he revealed information as to Scheme 5 that was not already known to the government.

Congress has sought to preclude relators from bringing claims based on information gleaned from government criminal indictments.  Although Schnupp argues that it was he "who first contacted the government through the filing of his qui tam lawsuit," ECF 165 at 45, this is not true as to Scheme 5, the only scheme for which Schnupp seeks summary judgment.  Indeed, Schnupp filed the qui tam suit in August 2017, including allegations only as to Schemes 1 through 4.  Two and a half years later, on March 3, 2020, the government filed the Superseding Indictment, disclosing Scheme 5.  Nearly two years after that, on December 3, 2021, Mr. Blair pleaded guilty to a count in the Superseding Indictment that was based on conduct pertaining to Scheme 5.  It was six months after Mr. Blair's guilty plea, and nearly five years after Schnupp originally filed his qui tam suit, that Schnupp amended his qui tam suit to add Scheme 5.  Armed with Mr. Blair's guilty plea, accompanied by its lengthy Stipulation, Schnupp now seeks monetary recovery.

As to Schemes 1 through 4, Schnupp could argue soundly that the public disclosure bar does not apply, because his qui tam suit was filed before the government's Indictment charged Mr. Blair.  Indeed, if Schnupp had sought summary judgment as to Schemes 1 through 4, there would be little question that he would qualify as a whistleblower as to those claims.  But, these are not the claims for which Schnupp seeks summary judgment.  Rather, Schnupp seeks summary judgment only as to the conduct laid out in Count Thirty-One of the Superseding Indictment and Mr. Blair's Plea Agreement, for which he relies on the government's proof.

Indeed, Schnupp does not dispute Blair's contention that "Schnupp has taken only one deposition and conducted very little written discovery" since he filed his pre-discovery motion for

summary judgment.  ECF 156 at 12.  Rather, Schnupp has done what the Supreme Court warned

against in *Rockwell Int'l Corp.*, by pleading a theory of fraud for which he had some independent

knowledge of, *i.e.*, Schemes 1 through 4, and "later amend[ing] the complaint to include theories

copied from the public domain or from materials in the Government's possession," *i.e.*, Scheme 5.

*Rockwell Int'l Corp.*, 549 U.S. at 473.  Schnupp seems to be the type of free-riding relator seeking

recovery on a parasitic allegation that Congress has tried to stifle by repeatedly amending the FCA.

*See Beauchamp*, 816 F.3d at 39 (quoting *Graham Cty. Soil & Water*, 559 U.S. at 295).

To allow Schnupp to recover as to Scheme 5 merely by piggybacking on the government's

investigation of Mr. Blair, the Superseding Indictment, and the Plea Agreement would, in my view,

undermine the objective of the FCA.  *See Findley*, 105 F.3d at 685.  Based on the information

presented, I conclude that, as to Scheme 5, Schnupp does not qualify as an original source under

the definition's first prong.

### 3. Section 3730(e)(4)(B)(ii)

To satisfy the second definition of original source, the relator must have "knowledge" that

is "independent of and materially adds to the publicly disclosed allegations or transactions."  31

U.S.C.  §  3730(e)(4)(B)(ii).  And, again, the relator must have "voluntarily" provided "the

information" to the government prior to filing the qui tam action.  *Id.*

The Disclosure Memorandum is rooted in 31 U.S.C. § 3730(b)(2).  It states:  "A copy of

the complaint and written disclosure of substantially all material evidence and information the

person possesses *shall* be served on the Government." (Emphasis added.)  I have already

determined that because the statute requires the relator to submit a Disclosure Memorandum, it

cannot be regarded as having been produced voluntarily.

As to the "independent" question, Schnupp argues that his disclosures to the government through the Disclosure Memorandum in August 2017 are "independent" of the Superseding Indictment. ECF 165 at 56. He also argues that his inclusion of the Dispense Report with his Disclosure Memorandum of August 2017 "materially added" to the information contained in the Superseding Indictment, "because it included every conceivable detail about each false claim submitted by the [P]harmacy, including the claims underlying the commission payments that were the focus of Count 31 to which Mr. Blair pled guilty." *Id.* at 57.

In his Reply, Schnupp states that whether he qualifies as an original source under the second prong "comes down to whether the Disclosure Report [he] provided to the government prior to filing his lawsuit may be considered to have been 'voluntarily' provided." *Id.* at 58.

Under 31 U.S.C. § 3730(b)(2), a relator must serve upon the government "written disclosure of *substantially all material evidence* and information the person possesses" (emphasis added). Schnupp does not suggest that he was not obligated to provide the Atlas Complaint and the Dispense Report with the Disclosure Memorandum. Because Schnupp was required to include such documents, disclosure of those documents cannot be regarded as made "voluntarily" under 31 U.S.C. § 3730(e)(4)(B)(ii). The statute's language requiring disclosure of substantially all material evidence possessed by the relator speaks for itself.

Having concluded that Schnupp is not an original source as to Scheme 5 under either prong of 31 U.S.C. § 3730(e)(4)(B), I shall deny Schnupp's Motion as to Scheme 5 and grant the Cross Motion as to Scheme 5. *See Beauchamp*, 816 F.3d at 39 (quoting 31 U.S.C. § 3730(e)(4)).

In an abundance of caution, I address the parties' alternative arguments as to Scheme 5.

## C. Estoppel

Schnupp argues that Blair is collaterally estopped from denying liability as to any of the allegations in this case. *See* ECF 165 at 13–25. In the Cross Reply, Blair counters that the elements of Mr. Blair's plea "do not permit statutory or common law collateral estoppel" as to all elements of an FCA claim. ECF 170 at 6. Rather, Blair argues that Schnupp must still establish causation and damages, which he has failed to do. *Id.*

Blair concedes that courts have interpreted a violation of the AKS as a *per se* false claim for the purpose of the FCA. *Id.* at 15. But, Blair posits that the FCA requires additional elements to establish liability against a defendant, including knowledge, materiality, and causation. *Id.* at 13. Moreover, Blair contends that "Schnupp does not cite one FCA case supporting this estoppel argument or the notion that the Government is a 'victim' under the FCA. . . ." ECF 170 at 15. Blair adds, *id.* "This is especially true in cases (like this one) that are brought by a private citizen where the United States declines to intervene."

In support of Blair's position, Blair points to the case of *United States v. Novak*, No. 17 C 4887, 2018 WL 4205540, at *1 (N.D. Ill. Sept. 4, 2018), an FCA case in which the defendant had previously been convicted of paying illegal remunerations under the AKS. The court said, *id.* at *2: "The basic problem with the government's argument is that the charges on which Novak was convicted did not 'charg[e] fraud or false statements.' Rather, they charged violations of the Anti-Kickback Statute. The elements that the jury had to find did not include false statements or fraud."

*United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 317–18 (3d Cir. 2019), is also instructive. There, the Third Circuit concluded that although a defendant's plea collaterally estopped her from denying some elements of the FCA claims against her, the government, which

had intervened in the case, was still required to produce additional evidence to establish the "materiality" and "causation" elements.

The doctrine of nonmutual offensive collateral estoppel applies when a non-party to a previous action can "prevent a defendant in the current action from relitigating issues already decided against him in that previous action." *S.E.C. v. Resnick,* 604 F.Supp.2d 773, 778 (D. Md. 2009) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5 (1979)); *cf. Washington v. Pellegrini, et al.,* __ F.4th __, 2025 WL 29228, at *9 (4th Cir. Jan. 6, 2025) (explaining the related doctrine of nonmutual, defensive collateral estoppel).  Here, Schnupp was not a party to the Criminal Case.  He is the party asserting nonmutual offensive collateral estoppel.  A party asserting nonmutual offensive collateral estoppel must establish that: (1) the issue sought to be precluded is identical to the one previously litigated; (2) the issue was actually determined in the prior proceeding; (3) that determination was a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party to be estopped must have had a full and fair opportunity to litigate the issue in the prior proceeding.  *Resnick,* 604 F.Supp.2d at 778 (citing *Sedlack v. Braswell Servs. Grp., Inc.,* 134 F.3d 219, 224 (4th Cir.1998)).

For claims arising under the FCA, the principle of collateral estoppel is codified at 31 U.S.C. § 3731(e):

> [A] final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

In the Amended Complaint, Schnupp alleges false claims under 31 U.S.C. § 3729(a)(1)(A) (Count I) and 31 U.S.C. § 3729(a)(1)(B) (Count II).  ECF 30 at 19–20.  Central to the collateral estoppel analysis here is an examination of the facts contained in Mr. Blair's plea in the

criminal case and a determination of what a factfinder must find in this civil action to establish liability. The Fourth Circuit has stated: "Both a presentment claim and a false-record-or-statement claim under the False Claims Act require four elements: (1) 'a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due.'" *Nicholson*, 42 F.4th at 193 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)).

A violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, "automatically constitutes a false claim under the False Claims Act." *Mallory*, 988 F.3d at 741 (citing *Lutz*, 853 F.3d at 135); *accord* 42 U.S.C. § 1320a-7b(g) ("[A] violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31."). But, establishing a violation of the AKS does not automatically establish all of the elements for a violation of the False Claims Act.

For purposes of collateral estoppel, a defendant is bound by the statement of facts included in his plea agreement. *United States v. Wight*, 839 F.2d 193, 196 (4th Cir. 1987) ("[A] defendant is precluded from retrying issues necessary to his plea agreement in a later civil suit.); *see Nat'l Mortg. Warehouse, LLC v. Bankers First Mortg. Co.*, 208 F. Supp. 2d 565, 567 (D. Md. 2002) ("As part of his guilty plea, [defendant] agreed to a Statement of Facts which leaves the material allegations in the . . . complaints undisputed. . . . Consequently, he is collaterally estopped from denying his liability."); *see also United States ex rel. Kline v. Docs at the Door, P.C.*, No. 13 C 7837, 2023 WL 2631647, at *5 (N.D. Ill. Mar. 24, 2023) ("[T]his court concludes that Ayeni is legally bound by his admissions to the conduct underlying all of the false claims to which he admitted in his plea agreement, not merely the one at issue on the single-count misdemeanor to which he pleaded guilty."), *appeal dismissed sub nom. United States v. Ayeni*, No. 23-1794, 2023

WL 7179960 (7th Cir. July 13, 2023); *United States v. Harris*, No. 06 C 2996, 2008 WL 4324032, at *1 (N.D. Ill. Jan. 31, 2008) (holding defendant was collaterally estopped from challenging additional admissions in his plea agreement in the civil proceeding against him), *aff'd*, 303 F. App'x 348 (7th Cir. 2008).

In the context of an FCA retaliation claim, the First Circuit has construed the 2010 amendment of the AKS, § 1320a-7b(g), to mean that "if there is a sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA." *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019). It "further read the AKS amendment as obviating the need for a plaintiff to plead materiality." *Id.*

In this case, (1) Mr. Blair may not relitigate specific facts that he has admitted would have been proven beyond a reasonable doubt if his Criminal Case had gone to trial; (2) these facts were critical and necessary to the criminal plea and Mr. Blair's acceptance of guilt; (3) the plea agreement led to a final and valid judgment; and (4) Mr. Blair had a full and fair opportunity to litigate the allegations against him in the Criminal Case. *See* ECF 156-22.[26]

Mr. Blair pled guilty to a violation of the AKS, not to a violation of the FCA. As noted, a violation of the AKS constitutes a false claim under the FCA. *Mallory*, 988 F.3d at 741; *Lutz*, 853 F.3d at 135. But, to establish a violation of the FCA, the Fourth Circuit requires a relator to prove more than a violation of the AKS. Therefore, I shall next address the parties' causation arguments.

### D. Causation

In their Cross Motion, defendants urge the Court to deny Schnupp's Motion, claiming that "his sole reliance on the Plea Agreement . . . does not establish the causation required by § 1320a-

---

[26] Neither side has addressed the question of whether the Pharmacy is bound by the facts to which Mr. Blair pled guilty in the Criminal Case. But, it is unnecessary to do so here because I have determined that Schnupp is not the original source as to Scheme 5.

7b(g)." ECF 156 at 48. According to Blair, § 1320a-7b(g) includes a causation element that requires a relator to establish that the government's "FCA damages 'result[ed] from 'an AKS violation." *Id.* at 47 (citing *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834 (8th Cir. 2022)). Blair maintains that Schnupp must establish "a causal connection between the purported false statements" of defendants and the damages incurred by the government. ECF 156 at 45. Further, Blair argues that "'something more than a showing that a claim was merely "tainted" by an AKS violation'" is necessary; and Schnupp must show that "'the relevant provider in an AKS-based FCA case was aware of the alleged kickback.'" *Id.* at 49 (quoting *U.S. ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 1567645, at *6 (D. Md. May 18, 2022)). According to Blair, the relevant provider here would be the doctor who prescribed the medications filled by BPI. ECF 156 at 43.

Defendants urge the Court to adopt a "but for" causation standard. *See id.* at 51. Addressing the "but for" causation standard, defendants contend that "Schnupp has not identified one claim for reimbursement with or without particularity that would not have occurred anyway." *Id.* at 52. According to defendants, this is because "no doctor or patient was ever directly (or indirectly) exposed to any sort of payment or incentive" by the defendants. *Id.* at 52–53. But, they contend that under either "but for" causation or the "causal link" test used in *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F. 3d 89 (3d Cir. 2018), discussed *infra*, Schnupp has failed to meet his burden. ECF 156 at 51.

Defendants have submitted the declarations of a licensed pharmacist, Alyson Wooten (ECF 156-31), and a practicing physician, Norman Chideckel, M.D. (ECF 156-32), to support the defense contention that "the compound medications at issue would have been prescribed and filled regardless of BPI's renumeration payments to the 1099 sales representatives." ECF 156 at 54.

They add that the 1099 sales representatives who were paid by BPI "did not exhibit any sort of demonstrated influence over the prescribing physicians and/or their patients to the point that the sales representatives impact whether and what compounded medications were prescribed." *Id.*

In the Cross Reply, Blair posits that "Schnupp must establish that the remunerations paid to BPI's independent sales representatives affected the clinical decision making of the doctors who prescribed the medications that were ultimately filled by BPI and reimbursed by TRICARE." ECF 170 at 17.  Defendants state, *id.*: "The fundamental flaw in Schnupp's FCA causation argument is that he focuses on two isolated facts with no nexus: that Defendants paid remunerations and that TRICARE reimbursements separately occurred."  In Blair's view, "[t]he correct focus for establishing FCA causation (under either the 'but for' or 'causal link' standard) is that the TRICARE reimbursements (and underlying medical care) occurred because of Defendants' payment of remunerations." *Id*.

As stated, the Fourth Circuit has made clear that a violation of the AKS "that results in a federal health care payment is a *per se* false claim under the FCA." *Lutz*, 853 F.3d at 135; *see Mallory*, 988 F.3d at 741; ECF 165 at 20.  Schnupp argues that as part of Mr. Blair's plea agreement, he "'stipulate[d] and agree[d] that the financial loss he caused to TRICARE *resulted from* the claims for reimbursement that Defendant submitted and caused to be submitted to TRICARE.'" ECF 165 at 17–18 (quoting ECF 65-3, ¶ 19) (emphasis in ECF 165).[27]  Moreover, Schnupp points to Mr. Blair's certification in his plea agreement that he had reviewed the attachments, "agree[d] with the statement of facts in each attachment," and understood that the

---

[27] Presumably, by "Defendant" Schnupp is referring to Mr. Blair.  But, he has sued both Mr. Blair and BPI.

attachments were "'included as part of [his] plea agreement with the government in this case.'"
ECF 165 at 30 (quoting ECF 65-3 at 6).

In addition, Schnupp argues that Blair's arguments regarding "but for" causation are
inconsistent with *Mallory*, 988 F.3d 730. ECF 165 at 24. According to Schnupp, the Fourth
Circuit in *Mallory* "rejected Blair's argument . . ., explaining that the AKS 'statute expressly
prohibits individuals from receiving remuneration in exchange for arranging for or recommending
purchasing healthcare services [which] includes sales representatives who are compensated for
recommending a healthcare service . . . to physicians.'" ECF 165 at 25 n.6 (quoting *Mallory*, 988
F.3d at 738) (citation omitted) (cleaned up).

Blair regards Schnupp's interpretation of *Mallory* as "disingenuous." ECF 170 at 20. First,
Blair contends that, unlike this case, the defendants' FCA violations in *Mallory* involved direct
payments to physicians. *Id*. Additionally, defendants posit that *Mallory* does not establish that
"an AKS § 1320a-7b(b)(2)(a) violation for paying indirect remunerations to salespeople, standing
on its own, is sufficient to establish FCA causation." *Id*.

Defendant Mallory was the owner of a blood testing laboratory that he founded. *Mallory*,
988 F.3d at 734. Defendants Dent and Johnson led its sales operations. *Id*. They also formed
Defendant BlueWave Healthcare Consultants, Inc. ("BlueWave"). *Id*. at 735. Of relevance,
BlueWave entered into an "exclusive contract" with the lab "to market and sell the lab's tests in
exchange for a percentage of the lab's revenue based on the number of tests that physicians
ordered. *Id*. It reached a similar agreement with another lab. *Id*.

At trial, the government argued that the AKS prohibited the laboratories from paying
BlueWave to induce others to arrange the tests, and also barred BlueWave from paying its sales
force to recommend purchasing the tests. *Id*. at 735–36. The labs also paid doctors a "process and

handling fee." *Id.* at 735. Between 2010 and mid 2014, Medicare and TRICARE paid Mallory's lab almost $540 million, and the lab, in turn, paid BlueWave about $220 million. *Id.* The government contended that the "volume-based commissions" paid by the lab constituted a violation of the AKS because the commissions constituted "remuneration" intended to induce sales representatives "to sell as many tests as possible." *Id.*

The defendants were found liable for violations of the FCA. *Id.* at 730, 734. The government established that the defendants violated the FCA by, *inter alia*, paying physicians "for drawing patients' blood and processing the blood samples in violation of the [AKS]." *Id* at 735.

On appeal to the Fourth Circuit, the Court said: "The Anti-Kickback Statute expressly states that 'a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of' the False Claims Act." *Id*. at 741. The Fourth Circuit also concluded that the jury instruction requiring the government to "prove 'that at least one purpose of the remuneration' was to induce the referral of services" was proper. *Id*. This suggests that, to prove a violation of the FCA, it is not enough merely to establish a violation of the AKS.

The Sixth Circuit has also provided a useful interpretation of the "but for" causation standard. It has said: "So long as proof exists that the referrals would not have been made without the remuneration, and that claims would not have been submitted to the government without those referrals, causation for False Claims lawsuits would be satisfied too." *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1055 (6th Cir.), *cert. denied*, ___ U.S. ___, 144 S. Ct. 224 (2023).

The alternative standard cited by both parties is the "causal link" standard used in *Greenfield*, 880 F.3d 89. *See* ECF 156 at 49–51; ECF 165 at 21–23. In *Greenfield*, the plaintiff, Greenfield, filed a qui tam suit against Accredo Health Group, Inc. ("Accredo"), a specialty

pharmacy that provided home care for hemophilia patients. 880 F.3d at 91. Accredo made donations to charities, and two of these charities allegedly recommended Accredo as an approved provider for hemophilia patients. *Id*. This raised the question of "whether the donations came with something expected in return for the recommendations, which might trigger violations of the Anti–Kickback Statute, 42 U.S.C. § 1320a-7b(b), and, if so, whether Accredo's healthcare reimbursement claims for persons who may have received the charities' recommendations ran afoul of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(B)." *Id*. After the district court granted summary judgment to Accredo, Greenfield appealed. *Id*.

The Third Circuit analyzed the connection between a violation of the AKS and a violation of the FCA by looking to the intention of Congress. *Id*. at 96. With regard to the AKS, the court concluded that because Congress intended "'to strengthen the capability of the Government to detect, prosecute, and punish fraudulent activities under the [M]edicare and [M]edicaid programs,'" *id*. (quoting H.R. Rep. No. 95-393, at 1 (1977)), "[t]his counsel[ed] requiring something less than proof that the underlying medical care would not have been provided but for a kickback." *Greenfield*, 880 F.3d at 96 (first two alterations in *Greenfield*). Further, the court noted: "Although the legislative history of the provision does not explain the term 'resulting from,' the Congressional Record indicates it was enacted to avert 'legal challenges that sometimes defeat legitimate enforcement efforts.'" *Id.* (quoting 155 Cong. Rec. at S10853).

With regard to the FCA, the court pointed out that the "'Act is intended to reach *all* fraudulent attempts to cause the Government to pay ou[t] sums of money or to deliver property or services,' and '[a] false claim for reimbursement under Medicare, Medicaid, or similar program . . . may be false even though the services are provided as claimed.'" *Greenfield*, 880 F.3d at 96 (quoting S. Rep. No. 99-345, at 9 (1986)) (emphasis added in *Greenfield*). Thus, the Third Circuit

concluded that a requirement that plaintiff must prove that "a kickback actually influenced a patient's or medical professional's judgment . . . would hamper False Claims Act cases under that provision even though Congress enacted it to 'strengthen[ ] whistleblower actions based on medical care kickbacks.'" *Greenfield*, 880 F.3d at 97 (quoting 155 Cong. Rec. at S10853).

In applying this standard, the *Greenfield* Court stated: "Greenfield d[id] not need to prove [the charities'] referrals actually caused their members to use a particular healthcare provider." *Greenfield*, 880 F.3d at 98. The court concluded: "For a False Claims Act violation, Greenfield must prove that at least one of Accredo's claims sought reimbursement for medical care that was provided in violation of the Anti-Kickback Statute (as a kickback renders a subsequent claim ineligible for payment)." *Id*.

As applied to the facts in *Greenfield*, the court also stated, *id*. at 99:

> It follows that Greenfield may not prevail on summary judgment simply by demonstrating that Accredo submitted federal claims while allegedly paying kickbacks. Nor may he prevail by hypothesizing that at least some of [the charities'] recommendations must have been directed to federal beneficiaries because Accredo submitted claims for 24 federally insured patients during the relevant time period. Instead, he must point to at least one claim that covered a patient who was recommended or referred to Accredo by [the charities].

As noted, Mr. Blair pleaded guilty to Count Thirty-One of the Superseding Indictment, which charged him with payment of illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). Criminal Case, ECF 181. The elements of the offense include the following: (a) defendant paid, or offered to pay, any remuneration; (b) that one purpose of the payment was to induce the recipient of the payment to refer an individual for the furnishing of any item or for which payment may be made in whole or in part by a federal health care program, such as the TRICARE program, and (c) defendant acted knowingly and willfully. *Id*. at 2–3.

The Plea Agreement included the Stipulation (*id.*, ECF 181-1), which said, in part, *id.* at 3, 4 (first bracket added):

> Blair presented B.A. with a signed "Distributor Agreement" between Blair Pharmacy and Atlas, in which Blair agreed to pay B.A. [*i.e.*, Mr. Alavi] as follows[:] "commission will be 50% of gross reimbursement to [Blair Pharmacy] paid bi-weekly." The Distributor Agreement required Atlas to use Blair Pharmacy exclusively, and to refer all business within his established territory to Blair Pharmacy, and Blair induced and encouraged these referrals to his pharmacy by offering B.A. a 50% percentage payment of any money that Blair received from health care benefit programs. The payment of 50% of the health care benefit program reimbursement monies was the "sole compensation" under the November 24, 2014 financial agreement between Blair and B.A. B.A. was not paid any money or compensation, unless Blair was successful in obtaining reimbursement from a health care benefit program for a prescription that B.A. referred to Blair, and then, and only then was B.A. paid a percentage of the successful reimbursement.
>
> This "Distributor Agreement" was thus a financial arrangement based on the value and volume of prescription referrals that B.A. caused to be directed to Blair's pharmacy, including referrals of federal health care program business, such as TRICARE.
>
> \*   \*   \*
>
> B.A. influenced the decision regarding which pharmacy the prescriptions were sent to, in that B.A. directed and sent and referred all of the pain and scar cream prescriptions S.R. [a doctor] authorized directly to Blair's pharmacy. Neither S.R., nor the TRICARE beneficiaries for whom the creams were authorized, had a chance or opportunity to choose which pharmacy they wanted to fill the prescription because B.A. submitted the prescriptions directly to Blair.

In view of the content of the Stipulation, the Court need not decide which causation standard is appropriate. This is because both standards are readily satisfied with the admissions in the Stipulation.

For example, the link to which the *Greenfield* Court refers is satisfied with the following undisputed facts set forth in the Stipulation incorporated in the Plea Agreement, *id.* at 5:

> After receiving payment from TRICARE for the prescriptions B.A. directed to Blair Pharmacy, Blair paid 50% of the reimbursement amount to B.A.
>
> \*   \*   \*

61

Blair admits that he made payments of illegal remunerations in violation of 42 U.S.C. § 1320a-7b(b), in that he knowingly and willfully paid, and offered to pay, remuneration; and that one purpose of the payment was to induce the recipient of the payment to refer an individual for the furnishing of any item or service, for which payment was made, in whole or in part, by TRICARE, a federal health care benefit program. Blair further agrees that TRICARE would not have approved of or reimbursed any claim for compounded ingredients made by Blair Pharmacy, had TRICARE known that Blair had agreed to pay a 1099 independent contractor based on the volume and value-based commission of prescription referrals of TRICARE business to Blair Pharmacy.

The "but for" standard is satisfied by other admissions of Mr. Blair contained in the Stipulation, *id.* at 4:

As to S.R.'s patients, there were times when some of his TRICARE patients received cream bottles in the mail from Blair Pharmacy, the receipt of a box on their doorstep was the first time they learned that a prescription for a cream or vitamin had been written for them. In some instances, the beneficiaries did not need, did not want, and did not use the creams or vitamins that they received on their doorstep.

* * *

Some of the TRICARE beneficiaries had no idea of the cost to TRICARE of these creams and vitamins that they received in the mail. Other TRICARE beneficiaries learned about the high cost of the creams and vitamins after they reviewed their TRICARE Explanation of Benefits letter a month or two after they received the creams on their doorstep. Some of these TRICARE beneficiaries lodged official complaints, and made fraud referrals to TRICARE and ESI. When physician S.R., referenced above, learned of the cost of the creams he had authorized prescriptions for, he was outraged at the high costs, and he immediately stopped authorizing any additional cream prescriptions and he provided notice of the problem to his management. S.R. advised TRICARE patients who made complaints about the creams, to send the creams back to the pharmacy.

Therefore, contrary to Blair's assertions, Schnupp's reliance on the Plea Agreement would establish causation, as required by 42 U.S.C. § 1320a-7b(g).

### E.  Schemes 1 Through 4

As noted, Schnupp seeks summary judgment only as to Scheme 5, and has indicated his "intention . . . to seek permission to voluntarily dismiss the remaining allegations in the Amended

Complaint" if summary judgment is granted.  ECF 165 at 66.  In the Cross Motion, however, Blair seeks summary judgment as to all claims.  Therefore, I shall address Schemes 1 through 4.

Blair argues:  "The record is completely devoid of any evidence that supports Schnupp [sic] allegations with respect to Defendants [sic] (Scheme 1) billing 360 milligrams of product but only dispensing 300 grams, (Scheme 2) billing for Sterabase but dispensing medication containing Lipoderm, (Scheme 3) billing for compounds containing 10% Gabapentin while dispensing medication containing only 6% Gabapentin, and (Scheme 4) utilizing prepaid 'burner' credit cards to pay patient copays."  ECF 156 at 28.  Blair concludes, *id.* "Schnupp has not and cannot meet his burden of proof and therefore Defendants are entitled to summary judgment on Schemes 1 through 4 of the Amended Complaint."

Schnupp contends that Count Thirty-One of the Superseding Indictment, to which Mr. Blair pled guilty, begins by incorporating Paragraphs 1 through 35 of the General Allegations of the Superseding Indictment, which provides details of Schemes 1 through 4.  ECF 165 at 64–65.  Therefore, Schnupp urges the Court to deny the Cross Motion.  *Id.*

The schemes described in Paragraphs 1 through 35 of the Superseding Indictment were specifically the subject of counts to which Mr. Blair did not plead guilty.  *See* ECF 65-2 at 10–16.  And, Schnupp cites no case law that would permit the Court to consider these paragraphs as admissions by Mr. Blair.  To defeat summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

I will address each scheme, in turn.

## 1.  Scheme 1

In Schnupp's Disclosure Memorandum provided to the government, Scheme 1 is described as follows:  "Defendant Matthew Blair directed Relator to routinely bill the government for 360

grams of compounded drug when only 300 grams were actually dispensed to the Medicare or TRICARE beneficiary."  ECF 156-2 at 4.

As Blair observes, the basis for Schnupp's allegations for Scheme 1 is that the "'pumps' that BPI used to ship compounded medications to customers only 'held a maximum of 150 grams each,' and, since only two (2) containers were used for each prescription, 'only 300 grams of compounded medication were provided' whenever BPI billed for 360 grams."  ECF 156 at 28 (citing ECF 156-23 at 7–8).

Included with Blair's Cross Motion is a document titled:  "Relator/Plaintiff's Answers To Defendant Matthew E. Blair Pharmacy Inc.'s First Set Of Interrogatories."  ECF 156-23.  In this document, Schnupp was asked to "[g]ive a full and complete account of the basis for [his] contention that BPI and/or Blair billed for a greater amount of a given 'compounded drug' than was dispensed as specifically set forth in Paragraphs 51–58 of the Amended Complaint."  *Id.* at 7. Schnupp answered as follows:  "The pumps the prescriptions were dispensed in held a maximum of 150 grams each.  Two pumps were used per prescription.  Thus only 300 grams of compounded medication were provided, but BPI billed for 360 grams."  *Id.* at 7–8.

Defendants retained David Joseph, a licensed pharmacist, to "investigate[] and test[] Schnupp's Scheme 1 allegations in a laboratory setting."  ECF 156 at 29.  According to Blair, Joseph's tests demonstrate "that two 150 milliliters pumps can hold 360 grams of compound medication," which they claim "empirically disproves Schnupp's allegations in Scheme 1."  *Id*. at 30. Mr. Joseph was never deposed by Schnupp.  Nor has Schnupp presented evidence to contradict Mr. Joseph, apart from his own assertions.

In the Criminal Case, I conducted *Daubert* hearings on July 12, 2021, and September 28, 2021.  *See* Criminal Case, ECF 133; *id.*, ECF 159; *see also Daubert v. Merrell Dow Pharms., Inc.*,

509 U.S. 579 (1993). In my Memorandum Opinion of October 29, 2021 (ECF 169), I considered the testimony of David Joseph, R.Ph., FIACP, in which he claimed that he conducted experiments that demonstrated that a 150 ml container can hold 180 grams or more of a compounded formula. *Id.* at 52, 54, 55. At the *Daubert* hearing, the government endeavored to undermine the reliability of those experiments. *See id.* at 52, 55–58. In my Memorandum Opinion, I stated, *id.* at 56: "The process Mr. Joseph outlined was not complicated science. There were certainly errors in [his] early experiments, but they were corrected. Mr. Joseph will be permitted to testify about the experiments he conducted to establish that, on the occasions of his tests, a 150 millileter container held 180 grams of product." But, I also stated, *id.*: "[T]here is absolutely no basis for Mr. Joseph to opine . . . that the outcome of his experiments would be the same, regardless of the ingredients he might use."

Schnupp provides no rebuttal except to cite to records of his interview with the FBI (ECF 67-2) and his deposition transcript (ECF 149-2), where he discussed his use of the pumps as the Pharmacist in Charge. He also baldly asserts that he "has personal knowledge" of Schemes 1 through 4 "based upon his own observations at Blair Pharmacy." ECF 165 at 63.

Nevertheless, the jury does not have to credit Mr. Joseph's experiments. And, even assuming that Joseph's tests are accurate, just because Blair Pharmacy *could have* filled 360 grams of compound medication does not prove that this is what actually happened. Moreover, Relator has stated in the Complaint, the Amended Complaint, his FBI interview, and in his sworn deposition testimony that he has personal knowledge of this scheme. It is for the jury to assess the credibility of Schnupp's testimony.

As such, there is a dispute of material fact. The evidence is not "so one-sided that [Blair] must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

## 2. Scheme 2

In Schnupp's Disclosure Memorandum, Scheme 2 is described as follows: "Defendant Matthew Blair . . . instructed Relator to use Lipoderm cream, but bill the government as if the more expensive SteraBase cream had been used when compounding the drugs dispensed." ECF 156-21 at 4. Relevant here, Schnupp also stated: "The Pharmacy will be unable to produce purchase records to document acquisition of SteraBase cream in the amounts billed to the government." *Id.*

In regard to Scheme 2, Blair contends that Schnupp has no support for these allegations, other than his own testimony. ECF 156 at 30. At his deposition, Schnupp testified that he was told by Mr. Blair "that Sterabase only reimbursed for a greater amount, but Lipoderm actually created a better product, and patients were complaining about the compound being running [sic] and sticky. . . ." ECF 156-2 at 31. Schnupp also said, *id.*: "[Mr. Blair] told me that the independent contractors were used to getting paid out on the reimbursements that were associated with Sterabase. So he said continue billing for Sterabase, but use Lipoderm to result in a better product." Schnupp was then asked, *id.*: "So your testimony is Mr. Blair told you to do it, and then, you did it, and you also lied on these pharmacist worksheets, and you fabricated them; is that what you're saying?" Schnupp responded: "Yes." *Id.*

According to defendants, Schnupp's claim relies on defendants' purported inability to produce evidence showing the acquisition of Sterabase cream. ECF 156 at 31. But, Blair contends that defendants have produced documentation that the Pharmacy acquired shipments of Sterabase that it used to fill the compound prescriptions. *Id.* Defendants include with their Cross Motion an email dated December 30, 2014, to Mr. Blair from Harry Avetisyan, an Account Executive at Pharmaceutica North American, Inc., confirming that Avetisyan sent the Pharmacy 12,500 grams of Sterabase. *See* ECF 156-26 at 2.

Blair also argues that Schnupp does not recall "when and if [the Pharmacy] stopped receiving Sterabase samples." ECF 156 at 31. Indeed, at his deposition, Schnupp stated that he did not remember when BPI last received a sample of Sterabase. ECF 156-2 at 44. But, he estimated that BPI received samples "once a month at the most" for a year. *Id.*

In his Affidavit, Schnupp responds that he "reviewed Blair's argument . . . that Blair Pharmacy received 12,500 grams of Sterabase samples," and he believes it to be "an accurate amount." ECF 165-1 at 4. However, he also states that he reviewed the Dispense Report, "which records the amounts of each ingredient billed for," and it shows that the Pharmacy "billed for prescriptions containing 66,172.32 grams of Sterabase." *Id.* Schnupp argues that this corroborates his testimony regarding drug substitution. *Id.*

As discussed, *supra*, in the face of conflicting evidence, summary judgment is not appropriate. It is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp.*, 436 F.3d at 442.

### 3.  Scheme 3

In Schnupp's Disclosure Memorandum, Scheme 3 is described as follows: "For a period of time, certain prescriptions were made with 10% Gabapentin. Compounds containing 10% Gapapentin, however, hardened prematurely making the drug difficult to spread over the skin. Blair Pharmacy addressed this problem by reducing the amount of Gabapentin to 6% instead of 10%. This change solved the premature hardening problem, however, Defendant Blair instructed Relator to continue billing for 10% Gabapentin as a way to increase profits." ECF 156-21 at 4. Thus, Schnupp contends that "Mr. Blair instructed that we continue to bill at the 10% level because salespersons were used to obtaining the higher commissions associated with the use of Gabapentin at 10%." ECF 156-23 at 8.

Blair counters that Schnupp has not: "(1) identified any witnesses in support of his allegations; (2) produced any documents that support his allegations; or (3) provided any medications compounded by BPI that he contends contains the Gabapentin reduction he alleges." ECF 156 at 32.  Moreover, defendants contend that the Dispense Report "establishes that BPI began dispensing compounds containing both 10% and 6% Gabapentin in September 2014, when BPI began operating," which Blair contends contradicts Schnupp's allegations.  *Id.* at 33.

Schnupp provides no rebuttal.  But, at Schnupp's deposition, he testified that he recalled a communication between himself and one of the ingredient manufacturers because BPI was "trying to figure out why all of a sudden patients' creams were solidifying," and after "speaking to some of the consultants" at the manufacturer, they determined that the issue was "an interaction when [Mr. Blair] increased the percentage of Gabapentin from 6 to 10 percent, that it react[ed] with . . . Flurbiprofen, and then, creates [sic] the cream to solidify."  ECF 149-2 at 69.  Moreover, Schnupp testified that the situation with the Gabapentin cream "ultimately resulted in patients not refilling their prescriptions, which affected the revenue," so Mr. Blair told him to substitute for a higher percentage "to increase refill for patients."  *Id.* at 72.

As discussed, testimony from a nonmovant that is based on personal knowledge can constitute evidence of material facts, even if it is uncorroborated and self-serving.  *Lovett*, 700 F. App'x at 212.  The testimony of the Relator is sufficient to create a dispute of material fact.

### 4.  Scheme 4

Schnupp's Disclosure Memorandum describes Scheme 4 as follows:  "A single compound drug prescription can be worth thousands of dollars to the pharmacy that fills the prescription and dispenses the drug.  Through his interaction with Defendant Blair, Relator learned that Blair

routinely paid patients' copayments with prepaid credit card or 'burner cards' to avoid losing lucrative sales and to incentivize patients to use Blair Pharmacy." ECF 156-21 at 4–5.

In regard to Scheme 4, Blair maintains that Schnupp has admitted "that he has no evidence to support his allegations related to 'burner cards.'" ECF 156 at 33 (citing ECF 156-2 at 26–27). As is also the case with the third scheme, Schnupp's deposition testimony is based on his personal knowledge. For example, Schnupp was asked: "[T]here's no document that would demonstrate that he did not purchase the burner cards?" ECF 156-2 at 27. Schnupp agreed. *Id*. Schnupp was then asked, *id.*: "There would only be documents that demonstrate he did purchase the burner cards. So I'm asking you, who has the burden of proof in this case, to put forward whatever evidence you have that he did it?" Schnupp responded: "I have firsthand knowledge. I witnessed him do it." *Id*.

Notably, a civil suit under the FCA sounds in fraud, and thus is "subject to" Rule 9(b), which requires that claimants plead fraud with particularity." *Harrison*, 176 F.3d at 783–84. Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

To be sure, Rule 9(b) is particularly useful in addressing a motion to dismiss, and the motions here seek summary judgment. But, even at the outset of a fraud case, the heightened pleading standard of Rule 9(b) requires a plaintiff alleging claims that sound in fraud to "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation

omitted); *see United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010); *see also Harrison*, 176 F.3d at 784.

"A 'complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud . . . without identifying each individual defendant's participation in the alleged fraud.'" *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mar. 29, 2016) (citing *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000)). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted); *see United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). By this stage in the case, a plaintiff certainly should satisfy these criteria.

The "'clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed.'" *Harrison*, 176 F.3d at 789 (citation omitted); *see Wilson*, 525 F.3d at 380 ("[I]f allowed to go forward, Relators' FCA claim would have to rest primarily on facts learned through the costly process of discovery. This is precisely what Rule 9(b) seeks to prevent."). Indeed, Rule 9(b) serves several purposes. In *Harrison*, 176 F.3d 776, the Court said, *id.* at 784 (citation omitted):

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

Several cases have clarified Rule 9(b)'s "who," "what," and "when" requirements in the context of the Act. As to "who," in FCA cases where the defendant is a corporate entity, Rule 9(b) requires the plaintiff to name the individuals involved in the allegedly fraudulent

conduct. *See, e.g.*, *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 145 (N.D. Ill. 1993) (stating that Rule 9(b) requires a plaintiff asserting a FCA claim against a corporate defendant to specify the "identity and/or role of the individual employee involved in the alleged fraud."). With respect to "what," a plaintiff must show a link between allegedly wrongful conduct and a claim for payment actually submitted to the government. *See, e.g.*, *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (noting that Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted to the Government."), *cert. denied*, 537 U.S. 1105 (2003). Finally, as to "when," Rule 9(b) requires a plaintiff to allege with particularity the dates of the supposed fraudulent conduct. *See, e.g.*, *United States ex rel. Cericola v. Fed. Nat. Mortg. Assoc.*, 529 F. Supp. 2d 1139, 1146 (C.D. Cal. 2007) (stating that Rule 9(b)'s requirements were not fulfilled when, among other deficiencies, a plaintiff's complaint alleged that FCA violations occurred between 1995 and 1998 but did not allege any specific dates).

This case is well past the motion to dismiss stage.[28] At this juncture, the Relator should be able to point to evidence that supports bald allegations expected in the suit. Yet, the Relator's evidence is thin and self-serving. Schnupp has not pointed to any evidence of the burner card scheme, apart from his own testimony that he purportedly witnessed Mr. Blair "do it." *See* ECF 156-2 at 27. He has not provided any receipts of Mr. Blair's alleged purchase of the burner cards, nor has he provided any pharmacy payment records showing alleged use of the burner cards. He

---

[28] Defendants previously moved to dismiss under Rule 9(b). ECF 38 at 2. I denied the motion by Memorandum Opinion (ECF 55) and Order (ECF 56) of December 9, 2022.

has not pointed to specific prescriptions that were allegedly paid by way of burner cards, nor has he identified patients whose prescriptions were allegedly paid with burner cards. He has not identified how many prescriptions were allegedly paid with burner cards, nor the time period during which Mr. Blair allegedly did so.

Schnupp's bare-bones assertion is not sufficient to create a dispute of material fact as to Scheme 4. Therefore, I shall grant summary judgment in favor of defendants as to Scheme 4.

### F.  Damages

Schnupp calculated the treble damages he claims Blair owes, pursuant to 31 U.S.C. § 3729(a)(1). *See* ECF 149 at 23. This sum is based on the Stipulation, in which Mr. Blair admitted the factual basis for his illegal kickback scheme. *See* Criminal Case, ECF 181-1.

The Stipulation begins: "The undersigned parties stipulate and agree that if this case had proceeded to trial, [the government] would have proven the following facts beyond a reasonable doubt." *Id.* at 15 (emphasis in original). It continues: "The amount of $6,352,941.66 (as described in detail in Attachment B, incorporated herein) was the total reimbursement amount TRICARE paid to Blair Pharmacy from November 2014–May 2015, based upon the claims Blair submitted to TRICARE tainted by remuneration payments Blair Pharmacy paid to independent 1099 sales contractors." *Id.* at 19. And, as stated in the Stipulation, Attachment B to the Plea Agreement identifies 582 specific false claims submitted by defendants to TRICARE, in violation of the Anti-Kickback Statute. *Id.* at 21–35. Accordingly, there is no dispute that Blair submitted 582 false claims to TRICARE, totaling $6,352,941.66. Blair Pharmacy retained half of that sum, and the other half was paid by BPI to independent contractors, such as Atlas. Criminal Case, ECF 181-1 at 5.

However, defendants contend there is still a factual dispute as to the "true measure of the Government's FCA damages in this case." ECF 156 at 64. They argue that "[t]he baseline figure for Schnupp's damages calculation—$6,352,941.66—represents the global amount of TRICARE reimbursements from *all* of BPI'S 1099 sales representatives," *Id.* at 66 (emphasis in original), but that the Plea Agreement and Count Thirty-One of the Superseding Indictment refer to payments defendants made to Atlas and Alavi, "and not to any of the other 1099 sales representatives." *Id*. In fact, the Stipulation states: "The specific proportion of that reimbursement amount TRICARE paid to Defendant, based upon claims Defendant submitted to TRICARE tainted by *remuneration payments Defendant paid to Atlas Group*, amounts to $4,932,246.49." *See* Criminal Case, ECF 181-1 at 19 (emphasis added).

Moreover, defendants argue that "it is unclear the correct number of claims to serve as the basis for any penalty." ECF 156 at 67. Regardless, defendants argue that "a spreadsheet without any authenticating witness testimony or corroborating evidence," a description they argue applies to Attachment B to the Plea Agreement, "cannot carry the factual burden needed to establish summary judgment on the issue of damages." *Id.* at 68. As Schnupp points out, however, none of the cases cited by Blair regarding spreadsheets "involved a spreadsheet incorporated into a Plea Agreement and verified by the criminal defendant's stipulation of the facts contained therein as in this case." ECF 165 at 30–31.

But, Schnupp's calculation of damages is based on Mr. Blair's admissions in the Stipulation that are related to Scheme 5. I have granted summary judgment to Blair as to Scheme 5. Therefore, this calculation of damages is not pertinent here.

### V.    Conclusion

For the foregoing reasons, I shall deny the Motion as to Scheme 5 and grant the Cross Motion as to Scheme 4 and Scheme 5.  I shall deny the Cross Motion as to Schemes 1 through 3.

An Order follows, consistent with this Memorandum Opinion.


Date:  January 27, 2025                                    _____/s/_____

                                                          Ellen Lipton Hollander
                                                          United States District Judge