IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES *ex rel.* TIMOTHY
SCHNUPP,
    *Relator,*

    v.

BLAIR PHARMACY, *et al.*,
    *Defendants.*

Civil No. ELH-17-2335

## MEMORANDUM OPINION

In this qui tam case,[1] filed on August 15, 2017, Timothy Schnupp, the Relator, sued his

former employer, Blair Pharmacy, Inc. ("BPI," "Blair Pharmacy," or "Pharmacy"), and its owner,

Matthew Blair ("Mr. Blair") (collectively, "Blair"), pursuant to the False Claims Act ("FCA" or

the "Act"), 31 U.S.C. §§ 3728 *et seq. See* ECF 1 ("Complaint"). At the relevant time, BPI was a

compounding pharmacy.[2] Schnupp, who previously worked as "Pharmacist in Charge" for Blair

Pharmacy, alleged that defendants knowingly submitted false prescription claims to the Medicare

Program, 42 U.S.C. § 1395 *et seq.* ("Medicare"), a federally funded health insurance program for

people ages 65 and older and for certain people with disabilities, and to the Department of Defense

TRICARE health insurance program ("TRICARE").[3] Initially, Schnupp claimed that, in

submitting the insurance claims, Blair perpetrated four distinct fraud schemes. ECF 1, ¶¶ 27–34.

---

[1] "Qui tam is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

[2] "Compounding" involves alteration or mixing of ingredients to create a customized medication.

[3] TRICARE was formerly known as the Civilian Health and Medical Program of the Uniformed Services or "CHAMPUS." *See* 32 C.F.R. § 199.17.

In May 2022, following a lengthy investigation, the United States declined to intervene in the case. ECF 28. Nevertheless, the Relator opted to pursue the case, *see* 31 U.S.C. § 3730(b)(4)(B), and on May 11, 2022, he filed a "First Amended False Claims Act Complaint." ECF 30 (the "Amended Complaint"). It contains two counts: Count I asserts false claims under 31 U.S.C. § 3729(a)(1)(A) and Count II asserts false claims under 31 U.S.C. § 3729(a)(1)(B).

In the Amended Complaint, Schnupp again alleges that defendants knowingly submitted false prescription claims to Medicare and TRICARE. And, he identified five distinct fraud schemes. ECF 30, ¶¶ 36–43. In particular, the Relator claims that Blair knowingly submitted false claims for certain compound drugs by substituting a less expensive drug for a more expensive drug; by billing for medication that was not provided; by overcharging for certain medications; by paying deductibles for beneficiaries, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b); and by illegal payment of commissions or kickbacks, in violation of the AKS. *See* ECF 30, ¶¶ 28–43.

Notably, some of the claims lodged by the Relator were the subject of a federal criminal prosecution of Mr. Blair. *See United States v. Matthew Blair*, ELH-19-410 (D. Md.) ("Criminal Case"). Mr. Blair was indicted on August 27, 2019. Criminal Case, ECF 1. A Superseding Indictment was filed on March 3, 2020. *Id.*; ECF 20. It added allegations as to Scheme 5. *See*, *e.g.*, ECF 20, ¶ 21. Pursuant to a Plea Agreement in the Criminal Case (*id.*, ECF 181; ECF 181-1), Mr. Blair entered a plea of guilty on December 3, 2021, to one count charging him with payment of illegal remunerations, in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A). As discussed,

*infra*, the charge is predicated on Mr. Blair's payment of kickbacks to Atlas Group, LLC ("Atlas"), owned by Bahram Alavi,[4] with regard to prescription medication claims paid by TRICARE.[5]

On February 10, 2022 (*id.*, ECF 188), pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Court sentenced Mr. Blair to a term of imprisonment of twelve months and one day. *See id.*, ECF 189 (Judgment). Mr. Blair was also ordered to pay restitution to the government in the sum of $3,176,470.83. *Id.* That sum has been paid. *Id.*, ECF 194.

Schnupp filed a post-discovery motion for summary judgment. ECF 149. It pertained to "the defendants' violations of the Anti-Kickback statute which have been conclusively established in this action by Matthew Blair's criminal conviction." *Id.* at 9. This corresponded to what the parties have referred to as the Fifth Scheme or Scheme 5.[6] Schnupp stated: "'Scheme 5' for which the pending motion seeks summary judgment in favor of the United States involves the *same transactions* at issue in Blair's criminal proceedings." ECF 165 at 15 (emphasis in ECF 165).

In particular, as to Scheme 5, Schnupp claimed that Blair "recruited" Alavi, the owner of Atlas, "to market" BPI's "compounded drug prescriptions to physicians treating Medicare and TRICARE beneficiaries." ECF 30, ¶ 36. Further, the Relator alleged that BPI and Atlas entered into a "Distributor Agreement" on November 24, 2014. *Id.* ¶ 37; *see* ECF 156-7. It provided that Atlas would market the Pharmacy's scar and pain medications to physicians treating patients who

---

[4] In some submissions, Bahram Alavi is identified as "B.A." *See*, *e.g.*, ECF 181-1.

[5] Blair filed a Third-Party Complaint against Alavi and Atlas Medical Solutions, LLC, f/k/a Atlas Group, LLC, seeking contribution and indemnification. ECF 76. Blair subsequently filed an Amended Third-Party Complaint. ECF 127. By Memorandum (ECF 161) and Order (ECF 162) of September 5, 2024, I stayed the proceedings as to the Third-Party Complaint, pending resolution of Schnupp's FCA claims.

[6] The Amended Complaint does not identify the different fraud schemes by number. But, the parties did so in their submissions with respect to summary judgment, and I have used their descriptions.

had Medicare or TRICARE benefits, and then use the Pharmacy to fill the prescriptions.  ECF 30, ¶¶ 36, 38; *see* ECF 156-7.  Moreover, the Amended Complaint asserts that Blair agreed to pay Alavi[7] a commission equal to 50 percent of the gross reimbursement paid to BPI as a result of Atlas's marketing efforts.  *Id.* ¶ 37; *see also id.* ¶¶ 38–41.

In response, defendants filed a combined cross motion for summary judgment and opposition to Schnupp's summary judgment motion.  ECF 156.  Notably, the cross motion was aimed at all five schemes alleged in the Amended Complaint.  *Id.*  It was supported by thirty-three exhibits.  ECF 156-1 to ECF 156-33.

With respect to Scheme 5, Blair relied on the FCA's public disclosure bar.  ECF 156 at 13–14; *see* 31 U.S.C. § 3730(e)(4).  According to Blair, Schnupp could not prevail because the factual allegations underlying the qui tam suit were publicly disclosed when the qui tam suit was filed in August 2017.  ECF 156 at 35.  Moreover, defendants vigorously argued that Schnupp does not qualify as an original source under the FCA.  *Id.*  In this regard, Blair posited that the Relator's "disclosures were not voluntary," nor did the Relator "provide the Government with any information related to the AKS violations to which Mr. Blair pled guilty that either materially added to or was independent from information the Government already had in its possession."  *Id.* at 14.

Schnupp opposed Blair's cross motion for summary judgment and replied.  ECF 165.  Blair also replied.  ECF 170.

Effective March 23, 2010, the public disclosure provision of the FCA states, 31 U.S.C. § 3730(e)(4)(A):

---

[7] The Distributor Agreement provides that Blair was to pay Atlas the commission, rather than Alavi.  ECF 156-7, Section VI.

The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Thus, the public disclosure bar "disqualifies private suits based on fraud already disclosed in particular settings—such as hearings, government reports, or news reports—unless the relator meets the definition of an 'original source' under the FCA." *Beauchamp v. Academi Training Center*, 816 F.3d 37, 39 (4th Cir. 2016); *see United States ex rel. Siller v. Becton Dickenson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994). Put another way, if the relator qualifies as an "original source," the public disclosure bar does not apply.

Under 31 U.S.C. § 3730(e)(4)(B), an "original source" is defined as an individual who either:

(i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

The public disclosure bar requires the Court to consider three questions: (1) is there a qualifying public disclosure? (2) if yes, is the disclosed information the basis of the relator's suit? (3) and, if so, is the relator the original source of that information? *United States ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 528 F.3d 292, 308 (4th Cir. 2008), *rev'd on other grounds*, 559 U.S. 280 (2010); *see United States ex rel. Maharaj v. Est. of Zimmerman*, 427 F.

Supp. 3d 625, 646 (D. Md. 2019); *United States ex rel. Moore v. Cardinal Fin. Co., L.P.*, CCB-12-1824, 2017 WL 1165952, at \*10 (D. Md. Mar. 28, 2017); *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 579 (E.D. Va. 2011).

Of relevance, Schnupp agreed that the FCA's public disclosure ban applied to Scheme 5 unless he qualifies as an "original source." ECF 165 at 38 (citing 31 U.S.C. § 3730(e)(4)(A)); *see* ECF 173 at 25–51. And, he maintained that he was an original source. Schnupp claimed, *inter alia,* that he provided relevant information to the government voluntarily, first in the form of the Disclosure Memorandum and its exhibits, produced in August 2017, and then during numerous interviews with the government, beginning in October 2017. *See* ECF 149 at 34; ECF 165 at 39–40.

Defendants insisted that, as to Scheme 5, Schnupp does not meet the statutory definition of an original source. ECF 56 at 35. Blair argued that the Disclosure Memorandum "was not voluntarily filed," because it was a statutorily required filing. *Id.* at 37. Moreover, defendants maintained that the Disclosure Memorandum did not include any factual allegations pertinent to the Fifth Scheme. *Id.* Defendants also maintained that Schnupp did not provide information to the government related to Scheme 5. *Id.* at 37–38.

By Memorandum Opinion (ECF 171) and Order (ECF 172) of January 27, 2025, I denied Schnupp's summary judgment motion, which concerned Scheme 5. But, I granted Blair's cross motion for summary judgment as to both Scheme 4 and Scheme 5, and denied the cross motion as to Scheme 1, Scheme 2, and Scheme 3. ECF 172. An Amended Memorandum Opinion followed on January 28, 2025. ECF 173.

In particular, I determined that the Relator's Disclosure Memorandum of August 14, 2017, which was required by 31 U.S.C. § 3730(b)(2), could not be deemed to have been "voluntarily"

provided under 31 U.S.C. § 3730(e)(4)(B)(ii).  *See* ECF 173 at 41.  And, I "concluded that Schnupp is not an original source as to Scheme 5 under either prong of 31 U.S.C. § 3730(e)(4)(B)."  *Id.* at 51.  The Relator's claims as to Schemes 1, 2, and 3 remain pending.

On March 7, 2025, Schnupp filed "Plaintiff-Relator's Motion for Leave to File an Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b)."  ECF 177 (the "Motion").  Blair opposes the Motion.  ECF 182.  Schnupp replied.  ECF 185.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.    Factual and Procedural Background[8]

Mr. Blair was the founder of Blair Pharmacy as well as a director and a principal of BPI. ECF 30, ¶ 3.  The Pharmacy operated as an independent compounding pharmacy.  *Id.* ¶ 2. "Compounding" is a practice by which pharmacists combine, mix, or alter ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription.  *Id.* ¶ 24.

Mr. Blair is not a licensed pharmacist.  Under Maryland law, a licensed pharmacist must be on the premises to provide services when a pharmacy is in operation.  *See* Md. Code (2021 Repl. Vol.), § 12-403(c)(3) of the Health Occupations Article.  In August 2014, BPI hired Schnupp as its Pharmacist in Charge, pursuant to an Employment Agreement.  *See* ECF 30, ¶ 1; ECF 156-1; ECF 156-2 at 4.  Mr. Blair signed the Employment Agreement on behalf of BPI.  ECF 156-1 at 7.  Schnupp and BPI executed an Addendum to the Employment Agreement on February 25, 2015, which concerned Schnupp's compensation.  ECF 156-5.

---

[8] In setting forth the background, I have reused much of the content of my recent opinion (ECF 173).  It is one of several opinions in this case.  *See* ECF 55; ECF 80; ECF 100; ECF 125; ECF 147; ECF 161.

Schnupp holds a Doctor of Pharmacy and is a Maryland licensed pharmacist. ECF 156-1. He was employed by the Pharmacy from August 2014 until January 2017. ECF 156-19. Among Schnupp's duties, he was to advise the Pharmacy "with regard to maintaining pharmacy standards that meet . . . regulatory agency requirements for the operation of [BPI]." ECF 156-1 at 1. He was also to assist in communications with health care providers and customers. *Id.* at 2. Given Schnupp's employment with BPI, he asserts that the allegations in the Amended Complaint are based "upon his own direct and independent knowledge, and he is the original source of the information in this Complaint." ECF 30, ¶ 1.

As noted, the Complaint was filed in August 2017 (ECF 1) and amended in May 2022. ECF 30. The Amended Complaint alleges that Blair engaged in five distinct fraud schemes, as follows: (1) substitution of less expensive Lipoderm cream for more expensive SteraBase cream, while billing for compound drugs that supposedly contained SteraBase cream (*id.* ¶ 28); (2) billing for medication that BPI did not provide, *i.e.*, billing for compound drugs that supposedly contained 360 grams of product when only 300 grams were dispensed (*id.* ¶ 29); (3) overcharging for Gabapentin by billing for compound drugs containing 10% Gabapentin when only 6% was provided (*id.* ¶ 30); (4) using pre-paid gift cards or "burner cards" to pay coinsurance and/or deductible amounts for beneficiaries to induce them to use BPI "to fill lucrative compound medication prescriptions" (*id.* ¶ 34), in violation of the AKS, 42 U.S.C. § 1320a-7b(b) (*id.* ¶¶ 34, 35); and (5) payment of commissions to independent contractors, equal to 50 percent of reimbursements paid to the Pharmacy by Medicare and TRICARE for compounded prescriptions that were marketed by the independent contractors to physicians, in violation of the AKS. *Id.* ¶¶ 36–43.

As to Scheme 5, Schnupp alleges that Blair "recruited" Bahram Alavi, the owner of Atlas, "to market" the Pharmacy's "compounded drug prescriptions to physicians treating Medicare and TRICARE beneficiaries." *Id.* ¶ 36. Further, the Relator alleges that BPI and Atlas entered into a "Distributor Agreement" on November 24, 2014. *Id.* ¶ 37; ECF 156-7. It provided that Atlas would market the Pharmacy's scar and pain medications to physicians treating patients who had Medicare or TRICARE benefits, and then use the Pharmacy to fill the prescriptions. ECF 30, ¶¶ 36, 38; *see* ECF 156-7. Moreover, the Amended Complaint asserts that Blair agreed to pay Alavi[9] a commission equal to 50 percent of the gross reimbursement paid to BPI as a result of Atlas's marketing efforts. *Id.* ¶ 37; *see also id.* ¶¶ 38–41.[10] And, the Relator claims that Blair entered into similar agreements with other marketers. *Id.* ¶¶ 42, 43.[11]

According to the Relator, from November 2014 until May 2015, TRICARE paid Blair Pharmacy $6,352,941.66 based upon claims that defendants submitted to TRICARE that "were tainted by the remuneration payments Defendants paid to [all] their independent sales contractors. . . ." *Id.* ¶ 43; *see id.*, ¶ 45; *see also* ECF 30-1 ("subset of the larger spreadsheet provided to the government" with the Disclosure Memorandum).

In August 2015, Atlas filed suit in federal court in Maryland against the Pharmacy and Mr. Blair. *See* JKB-15-2491 ("Atlas Suit"), ECF 1 ("Atlas Complaint"). Atlas alleged that defendants

---

[9] The Distributor Agreement provides that Blair was to pay Atlas the commission, rather than Alavi. ECF 156-7, Section VI.

[10] Attachment 3 to the Distributor Agreement (ECF 156-7) supposedly specifies the commission. But, it was not submitted with ECF 156-7.

[11] The other independent contractors included Paladin Enterprises, Brevor Medical, Stratified Solutions, and Absolute Ortho. ECF 30, ¶ 42. Blair allegedly arranged to pay these independent marketers a percentage of any reimbursement monies received by the Pharmacy from the TRICARE and Medicare programs. *Id.*

wrongfully refused to pay Atlas commissions of 50 percent of gross sales, as provided in the Distributor Agreement, allegedly in retaliation for issues raised by Atlas concerning health care fraud laws. A few months later, in October 2015, Atlas voluntarily dismissed the Atlas Suit. *Id.*, ECF 4.

Blair maintains that after the Atlas Suit was filed, "the Government began investigating BPI and Mr. Blair based on allegations in the Atlas Lawsuit that BPI paid Alavi/Atlas commissions for referrals of TRICARE business." ECF 156 at 20–21. Indeed, Blair contends: "By at least July 12, 2017 (i.e., one month *before* Schnupp filed his Complaint), the FBI had already assembled all of the facts supporting its allegations that Defendants had purportedly violated the AKS by paying commissions to 1099 sales representatives." *Id.* at 21 (emphasis in original). Defendants add, *id.*: "[B]efore Schnupp filed this *qui tam* action, the Government *already knew* of and about the relationship between Schnupp and Alavi, the number of TRICARE prescriptions being referred to BPI by outside sales representatives, and the details of the 2015 Atlas Lawsuit against Defendants." (Emphasis in ECF 156).[12]

In January 2017, in connection with the investigation of Mr. Blair, U.S. Magistrate Judge A. David Copperthite signed a search warrant for a Google email account. ECF 46-1 (search warrant); *see also* ECF 156-20, ¶ 28. Then, in July 2017, U.S. Magistrate Judge Beth Gesner approved a search warrant application for J2 Cloud Services, LLC ("J2"). *See* ECF 156-20. The Affidavit in support of the J2 search warrant application, dated July 12, 2017, was submitted by Special Agent Eugene Choi of the Office of Inspector General, Department of Defense, Defense Criminal Investigative Services. *Id.* ¶ 3. He averred, *inter alia*, that the government learned of

---

[12] Indeed, the United States sought to delay its decision whether to intervene in the FCA case because the matter was "actively being pursued on a parallel criminal and civil track." ECF 10-1 at 3.

Mr. Blair's "possible malfeasance" in August 2015, when the Defense Health Agency ("DHA"), which manages the TRICARE program, provided a report detailing allegations of "fraudulent billings of compound prescriptions by [Mr.] Blair." *Id.* ¶ 10; *see also id.* ¶¶ 12–14. Of relevance, Choi also discussed the Atlas Complaint. *Id.* ¶¶ 19–21.

As indicated, on August 15, 2017, about one month after the search warrant was issued for J2, the Relator filed his qui tam suit. ECF 1. And, as noted, the Complaint only referenced conduct consistent with Schemes 1 through 4; it did not reference conduct pertaining to Scheme 5. *See* ECF 1, ¶¶ 27–34. However, the Relator also provided the government with the Disclosure Memorandum, as required by 31 U.S.C. § 3730(b)(2). ECF 1, ¶ 57; ECF 156-21.

Among other things, the Disclosure Memorandum referenced a "dispute" between Mr. Blair and Atlas, "in which [Mr.] Blair refused to pay Atlas sales commissions under a 'distributor agreement' with Atlas." ECF 156-21 at 5. Schnupp indicated that Mr. Blair agreed to settle the case because "Atlas threatened in its lawsuit to reveal [Mr.] Blair's use of 'burner cards' to unlawfully pay for patients' co-payments." *Id.* The text of the Disclosure Memorandum, which was prepared by counsel, made no reference to a scheme by which Blair paid commissions to Atlas equal to 50 percent of monies paid to BPI by Medicare or TRICARE for certain compounded prescriptions marketed by Atlas to physicians.

Schnupp included thirteen exhibits with the Disclosure Memorandum, as follows: (1) the Atlas Complaint; (2) BPI purchase orders for Lipoderm Base cream; (3) the BPI Dispense Report in Excel spreadsheet format; (4), (5) two articles published by the United States Government Accountability Office on compound pharmaceuticals; (6), (7), (10) three articles published by the United States Department of Health and Human Services, Office of the Inspector General, concerning Medicare coverage of prescriptions; (8) a Department of Justice Press Release; (9) a

Kaiser Health News article; (11) an unverified PowerPoint slide deck referred to as a "Drug Pricing Overview"; (12) publicly available business documents related to the formation of BPI; and (13) a December 2015 invoice from Medisca, Inc. to BPI for a 150 milliliter pump dispenser. *See* ECF 156-21.

According to the Relator, after he filed suit in August 2017, his "first contact with anyone associated with the government's criminal investigation of Matthew Blair or Blair Pharmacy came on October 2, 2017, when [he] was interviewed at the U.S. Attorney's Office by government attorneys and investigators." ECF 165-1 at 2. The Relator claims that he provided "truthful information about the fraudulent activities" of Mr. Blair and the Pharmacy and that he "continued to do so in a series of interviews with government investigators and/or government attorneys on seventeen (17) separate occasions between October 2, 2017 and October 8, 2021." *Id.* He also maintains that at no time was he offered, nor did he ever receive, "immunity from prosecution or any other type of consideration in exchange for [his] cooperation during the criminal investigation of Matthew Blair and Blair Pharmacy." *Id.* at 3.

Daniel Parker, a Special Agent with the FBI, confirmed that Schnupp's first contact with FBI investigators involved in the criminal investigation of Mr. Blair occurred on October 2, 2017, when Mr. Schnupp was interviewed. ECF 75-1 (Parker Declaration). The FBI Interview Report for Schnupp is docketed at ECF 86-8. It states that in April 2017, Schnupp's attorney, Ray Shepard, advised Schnupp to "file a qui tam against Blair and Blair Pharmacy which Schnupp did in August 2017." *Id.* at 26. The Report continues, *id.*:

> [Schnupp] filed the qui tam to "cover his ass." Based on the way Blair was acting over the vacation time payment dispute (particularly that he was lying and fabricating information), Schnupp was worried that if Blair Pharmacy was ever audited or investigated, Blair would lie and throw Schnupp under the bus by trying to blame everything on him. Schnupp was further worried because he knew how it

12

would look since he was the pharmacist in charge at the pharmacy and the one who submitted the claims for reimbursement. Schnupp did not want to go to jail.

As noted, Mr. Blair was indicted on August 27, 2019. *See* Criminal Case, ELH-19-410. ECF 1.[13]  The Indictment contained ten counts. *Id.*  In particular, Counts One through Five charged wire fraud, under 18 U.S.C. § 1343, and Counts Six through Ten charged aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b).  Of relevance, the Indictment does not reference facts that correspond to Scheme 5.

A Superseding Indictment was filed on March 3, 2020, containing thirty-six counts.  *Id.*, ECF 20.  It added, *inter alia*, allegations as to Scheme 5.  *See*, *e.g.*, *id.* ¶ 21.  Specifically, it alleges, among other things, that Mr. Blair violated the AKS based on BPI's payments to Atlas in exchange for Atlas's referrals of compounded prescriptions to BPI that were paid by TRICARE.  *Id.*, Counts Twenty-Nine to Thirty-Three.  Mr. Blair was also charged with money laundering, under 18 U.S.C. § 1957, as well as additional counts of wire fraud and identity theft.

Pursuant to a Plea Agreement (Criminal Case, ECF 181, ECF 181-1), Mr. Blair entered a plea of guilty on December 3, 2021 (*id.*, ECF 178), to Count Thirty-One of the Superseding Indictment.  That count (*id.*, ECF 20 at 17) charged Mr. Blair with payment of illegal remunerations to Atlas in April 2015, in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A), *i.e.*, two payments of $500,000 each, in the total sum of $1,000,000.  *See id.*, ECF 178.

In support of the guilty plea, the Plea Agreement included a detailed "Stipulation of Facts" ("Stipulation").  *See id.*, ECF 181-1.[14]  In the Stipulation, the word "Blair" was a reference only to

---

[13] This Court previously took judicial notice of certain pleadings from Mr. Blair's criminal case.  *See* ECF 55.

[14] The factual summary consists of five pages that are typed and single-spaced.  With exhibits, the Stipulation exceeds twenty pages.

Mr. Blair; BPI was not named as a defendant. Under oath at his guilty plea proceeding, Mr. Blair

agreed to the content of the Stipulation. *Id.*, ECF 197 (Transcript), at 8–9.

The Stipulation (*id.*, ECF 181-1) provides in part: "Blair entered into 1099 independent

contractor arrangements with several sales marketers . . . and Blair arranged to pay the independent

marketers a percentage of any reimbursement money he received from health care benefit

programs, including TRICARE." *Id.* at 2. Further, the Stipulation provides that Mr. Blair recruited

"B.A., the owner of Atlas Group, LLC," *i.e.*, Bahram Alavi, to engage in violations of the AKS.

*Id.* And, it states that on November 24, 2014, Mr. Blair and Atlas entered into a "Distributor

Agreement," which "Blair entered into . . . with the knowledge that such an arrangement violated

federal law." *Id.* at 3. The Stipulation also posits, *id.*: "With this knowledge of the wrongfulness

of his conduct, Blair intentionally entered into an agreement with B.A. to pay him a value based

50% commission on any successfully reimbursed TRICARE pharmacy benefit claim."

Moreover, the Stipulation asserts, *id.*:

The Distributor Agreement required Atlas to use Blair Pharmacy exclusively, and
to refer all business within his established territory to Blair Pharmacy, and Blair
induced and encouraged these referrals to his pharmacy by offering B.A. a 50%
percentage payment of any money that Blair received from health care benefit
programs. The payment of 50% of the health care benefit program reimbursement
monies was the "sole compensation" under the November 24, 2014 financial
agreement between Blair and B.A. B.A. was not paid any money or compensation,
unless Blair was successful in obtaining reimbursement from a health care benefit
program for a prescription that B.A. referred to Blair, and then, and only then was
B.A. paid a percentage of the successful reimbursement.

This "Distributor Agreement" was thus a financial arrangement based on
the value and volume of prescription referrals that B.A. caused to be directed to
Blair's pharmacy, including referrals of federal health care program business, such
as TRICARE.

Relevant here, the Stipulation also states: "The amount of $6,352,941.66 (as described in

detail in Attachment B, incorporated herein) was the total reimbursement amount TRICARE paid

to Blair Pharmacy from November 2014 – May 2015, based upon the claims Blair submitted to TRICARE tainted by remuneration payments Blair Pharmacy paid to independent 1099 sales contractors." *Id.* at 5. Attachment B to the Plea Agreement specifically identified 582 false claims submitted by Blair to TRICARE, in violation of the AKS, and the amount TRICARE paid for each tainted claim, which totaled $6,352,941.66. *Id.* at 7–21.

In the Plea Agreement, entered pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to recommend to the Court a sentence of twelve months and one day of incarceration for Mr. Blair. *Id.*, ECF 181, ¶ 9.[15] Mr. Blair also agreed to pay restitution to the government in the amount of $3,176,470.83. *Id.* On February 10, 2022, the Court sentenced Mr. Blair to the agreed upon term of imprisonment. Criminal Case, ECF 188, ECF 189, ECF 190. The Court also ordered defendant to pay restitution to the government in the amount of $3,176,470.83. *Id.*, ECF 189 at 5. As noted, that sum has been paid. *Id.*, ECF 194.

With respect to the qui tam case, the government apparently conducted a lengthy investigation to determine whether to intervene. *See* ELH-17-2335, ECF 4; ECF 6; ECF 8; ECF 10; ECF 13; ECF 16; ECF 18; ECF 20; ECF 22; ECF 24; ECF 26. Ultimately, on or about May 2, 2022, the United States declined to intervene. ECF 28. In the interim, by Order of October 15, 2019, the Court partially lifted the seal to permit the government to disclose the qui tam suit to defendants. ECF 15.

Mr. Blair and BPI were served with the qui tam suit on June 6, 2022. ECF 32; ECF 33. Thereafter, they moved to dismiss the case. ECF 38. The Court denied the motion by Memorandum Opinion and Order of December 9, 2022. ECF 55, ECF 56. Soon after, plaintiff moved for partial summary judgment (ECF 57), "based upon the defendants' violations of the

---

[15] The offense carries a maximum term of imprisonment of five years. *Id.*, ECF 181, ¶ 3.

Anti-Kickback statute which have been conclusively established in this action by Matthew Blair's criminal conviction." *Id.* at 1.  By Memorandum Opinion and Order docketed on May 24, 2023 (ECF 100, ECF 101), I denied plaintiff's pre-discovery summary judgment motion.

Approximately thirteen months later, on June 27, 2024, Schnupp moved for summary judgment, but only as to Scheme 5 of the Amended Complaint.  ECF 149.  As noted, defendants filed a combined cross motion for summary judgment and opposition to Schnupp's summary judgment motion.  ECF 155.  They sought summary judgment as to all five fraud schemes alleged in the Amended Complaint.

As noted, by Memorandum Opinion (ECF 171) and Order (ECF 172) of January 27, 2025, as amended (ECF 173), I denied Schnupp's summary judgment motion but granted Blair's cross motion for summary judgment as to Scheme 4 and Scheme 5.  However, I denied the cross motion as to Scheme 1, Scheme 2, and Scheme 3.

In the Memorandum Opinion, I noted that the conduct pertaining to Scheme 5, set forth in the Amended Complaint, corresponds to the allegations contained in a prior qualifying public disclosure, *i.e.*, the Superseding Indictment in the Criminal Case, ECF 20.  *See* ECF 173 at 35.  And, I noted that Schnupp did not dispute that the allegations in the Amended Complaint as to Scheme 5 are "'substantially the same'" as the allegations contained in the criminal case against Mr. Blair.  ECF 173 at 32 (quoting ECF 47 at 39).  I also pointed out that the Relator previously conceded that "'qualifying public disclosures of Fraudulent Scheme #5 occurred in connection with Blair's criminal proceedings before the Amended Complaint was filed.'"  ECF 173 at 31-32 (quoting ECF 47 at 39, and citing *Moore*, 2017 WL 1165952, at *12 (federal criminal documents filed in criminal proceedings are qualifying public disclosures)).  In particular, "'the government had already investigated, indicted, and convicted Blair for his conduct of Fraudulent Scheme #5

16

when the Amended Complaint was filed.'"  ECF 173 at 32 (quoting ECF 47 at 39); *see Maharaj*, 427 F. Supp. 3d at 649.

Notably, Schnupp agreed that the public disclosure bar would apply to Scheme 5, unless Schnupp qualifies as an "original source" of the information.  ECF 173 at 32 (citing ECF 165 at 38; 31 U.S.C. § 3730(e)(4)(A)).  The question was whether the Relator "is an original source of the information."  ECF 173 at 35 (citing 31 U.S.C. § 3730(e)(4)(A)).

The definition of "original source" in 31 U.S.C. § 3730(e)(4)(B) consists of two alternatives.  A relator qualifies as an original source if he "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" or if he had "knowledge that is independent of and materially adds to the publicly disclosed allegations," which was provided to the government before the qui tam suit was filed.  31 U.S.C. § 3730(e)(4)(B) (2010); *see also Maharaj,* 427 F. Supp. 3d at 649-50.  Both alternatives require disclosures that are made "voluntarily."

I concluded that the Disclosure Memorandum, which is required by 31 U.S.C. § 3730(b)(2), cannot be deemed to have been "voluntarily" provided under 31 U.S.C. § 3730(e)(4)(B)(ii).  *See* ECF 173 at 35–42.  And, as to Scheme 5, which corresponded to Count Thirty-One of the Superseding Indictment, I determined that Schnupp did not disclose information to the government on which the allegations were based, independent of and materially adding to publicly disclosed allegations.  *See id.* at 46–49.  Among other things, I noted, *id.* at 46, that the government disclosed Scheme 5 in the Superseding Indictment filed on March 3, 2020.  But, the Relator did not add facts pertinent to Scheme 5 to the Amended Complaint until May 2022.  In my view, Schnupp did not present anything beyond bald assertions to support his claim that in his

interviews with the FBI, he revealed information as to Scheme 5 that was not already known to the government. *Id.* at 48.

Congress has sought to preclude relators from bringing claims based on information gleaned from government criminal indictments. Although Schnupp argued that it was he "who first contacted the government through the filing of his qui tam lawsuit," ECF 165 at 45, this is not true as to Scheme 5, and that is the only scheme for which Schnupp sought summary judgment. Indeed, Schnupp filed the qui tam suit in August 2017, including allegations only as to Schemes 1 through 4. Two and a half years later, on March 3, 2020, the government filed the Superseding Indictment, disclosing Scheme 5. Nearly two years after that, on December 3, 2021, Mr. Blair pleaded guilty to a count in the Superseding Indictment that was based on conduct pertaining to Scheme 5. It was six months after Mr. Blair's guilty plea, and nearly five years after Schnupp originally filed his qui tam suit, that Schnupp amended his qui tam suit to add allegations with respect to Scheme 5.

Armed with Mr. Blair's guilty plea, accompanied by its lengthy Stipulation, Schnupp moved for summary judgment. ECF 173 at 48. In my view, to allow Schnupp to recover as to Scheme 5 merely by piggybacking on the government's investigation of Mr. Blair, the Superseding Indictment, and the Plea Agreement would undermine the objective of the FCA. *Id.* at 49. He was not entitled to summary judgment as to Scheme 5. Conversely, Blair was entitled to summary judgment as to Scheme 5.

As mentioned, plaintiff's claims as to Schemes 1, 2, and 3 are pending. They await resolution by way of trial.

## II.    Standard of Review

### A.

Pursuant to 28 U.S.C. § 1292(b), Schnupp seeks leave to file an interlocutory appeal with respect to the Court's rulings on summary judgment as to Scheme 5.

Under 28 U.S.C. § 1291, the federal courts of appeals "have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."  Interlocutory appeals, governed by 28 U.S.C. § 1292, are an exception to the grant of jurisdiction to appellate courts to hear appeals only from "final decisions" of district courts.  *Johnson v. Jones*, 515 U.S. 304, 309 (1995); *see Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 626 (D. Md. 2013).

Section 1292 of 28 U.S.C. is titled "Interlocutory decisions."  It "'provides a mechanism by which litigants can bring an immediate appeal of a non-final order upon the consent of both the district court and the court of appeals.'"  *Bradley v. Dentalplans.com*, BAH-20-1094, 2024 WL 5158791, at *3 (D. Md. Dec. 18, 2024) (quoting *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 451 (D. Md. 2015)).  Section 1292(b) states:

> (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, [s]he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

"A party seeking review of a nonfinal order must first obtain the consent of the trial judge." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474 (1978); *see Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 820 (D. Md. 2011).  As reflected in 28 U.S.C. § 1292(b), a trial judge may

certify an interlocutory order for appeal if the party seeking the appeal shows that (1) the desired appeal "involves a controlling question of law"; (2) "there is substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011).

Notably, an "interlocutory appeal under § 1292(b) is the exception, not the rule." *Coalition For Equity & Excellence In Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, CCB–06–2773, 2015 WL 4040425, at *2 (D. Md. June 29, 2015). Indeed, an interlocutory appeal "is intended to be an extraordinary remedy." *United States ex rel. Fitzer v. Allergan, Inc.*, SAG-17-cv-0668, 2022 WL 9974736, at *1 (D. Md. Oct. 17, 2022). Accordingly, certification under § 1292(b) is granted "'sparingly'" and the statute's requirements must be "'strictly construed.'" *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989)).

In *Johnson*, 515 U.S. at 309, the Supreme Court explained the rationale for circumscribing the availability of interlocutory appeals:

> An interlocutory appeal can make it more difficult for trial judges to do their basic job—supervising trial proceedings. It can threaten those proceedings with delay, adding costs and diminishing coherence. It also risks additional, and unnecessary, appellate court work either when it presents appellate courts with less developed records or when it brings them appeals that, had the trial simply proceeded, would have turned out to be unnecessary.

The party moving for certification of an interlocutory order "bears the burden of proving that the prospective appeal satisfies each of the statutory prerequisites for certification." *Boyd*, 828 F. Supp. 2d at 820. "Failing to meet even one of the statutory requirements will defeat a litigant's request for an interlocutory appeal." *District of Columbia v. Trump*, 344 F. Supp. 3d 828, 833 (D. Md. 2018); *see Butler*, 307 F.R.D. at 452 ("Unless all of the statutory criteria are

satisfied . . . 'the district court may not and should not certify its order . . . under section 1292(b).'") (internal citation omitted).

The Fourth Circuit has recognized that district courts have considerable discretion to determine whether the § 1292(b) criteria are met. *In re Trump*, 958 F.3d 274, 283 (4th Cir. 2020) (en banc) (citing *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 46 (1995)), *vacated sub nom. as moot*, *Trump v. District of Columbia*, 141 S. Ct. 1262 (2021); *see Randolph v. ADT Sec. Servs., Inc.*, DKC-09-1790, 2012 WL 273722, at *5 (D. Md. Jan. 30, 2012) ("The decision to certify an interlocutory appeal is firmly in the district court's discretion."); *see also Feinberg v. T. Rowe Price Grp., Inc.*, JKB-17-0427, 2021 WL 2784614, at *2 (D. Md. July 2, 2021) ("The District of Maryland has emphasized that '[t]he decision to certify an interlocutory appeal is firmly in the district court's discretion.'"). However, unless "all of the statutory criteria are satisfied . . . 'the district court may not and should not certify its order . . . for an immediate appeal under section 1292(b).'" *Butler*, 307 F.R.D. at 452 (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000)). And, "piecemeal review" should be "avoided" because review of non-final judgments is "effectively and more efficiently reviewed together in one appeal" at the conclusion of the litigation. *James v. Jacobson*, 6 F.3d 233, 237 (4th Cir. 1993); *see Clark v. Bank of America, N.A.*, SAG-18-3672, 2020 WL 3868990, at *2 (D. Md. July 9, 2020) ("Interlocutory appeal should not be sought to provide early review of difficult rulings in hard cases.").

**B.**

As mentioned, the first factor concerns a controlling question of law. It is defined by the Fourth Circuit as a "'pure question of law,'" that is, "'an abstract legal issue that the court of appeals can decide quickly and cleanly.'" *Michaels*, 848 F.3d at 340 (quoting *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016)). A pure question of law does not require the appellate court

"'to delve beyond the surface of the record in order to determine the facts.'"  *Michaels*, 848 F.3d at 341 (quoting *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004)).  In contrast, a question is not a controlling question of law where the appellate court is asked to consider "'whether the district court properly applied settled law to the facts or evidence of a particular case.'"  *Michaels,* 848 F.3d at 341 (quoting *McFarlin*, 381 F.3d at 1259); *see also International Refugee Assistance Project ("IRAP") v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019).

To illustrate, a controlling question of law is a question as to the "meaning of a statutory or constitutional provision, regulation, or common law doctrine," not a "question[] of law heavily freighted with the necessity for factual assessment."  *Butler*, 307 F.R.D. at 452; *see Fannin v. CSX Transp., Inc.*, 873 F.2d 1438, 1989 WL 42583, at *5 (4th Cir. 1989) (table) ("Certainly the kind of question best adapted to discretionary interlocutory review is a narrow question of pure law whose resolution will be completely dispositive of the litigation, either as a legal or practical matter, whichever way it goes."); *Coal. for Equity*, 2015 WL 4040425, at *5 (The "standard . . . generally recited to justify denying interlocutory appeal on a summary judgment ruling" is "a *pure* question of law, something the court of appeals could decide quickly and cleanly without having to study the record.") (emphasis in *Coal. For Equity*) (citation omitted).

A question of law may be controlling "'if interlocutory reversal might save time for the district court, and time and expense for the litigants.'"  *Coal. for Equity*, 2015 WL 4040425, at *4 (quoting 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, Federal Practice & Procedure § 3930 (3d ed. 2021)); *see also LaFleur v. Dollar Tree Stores, Inc.*, Civ. No. 2:12-cv-0363, 2014 WL 2121721, at *2 (E.D. Va. May 20, 2014) ("A question of law is not controlling if litigation will

'necessarily continue regardless of how that question [is] decided.'") (alteration in *LaFleur*) (citation omitted).

The second requirement of § 1292(b) pertains to "substantial ground for difference of opinion." For purposes of the second element, courts find substantial grounds for difference of opinion "where 'the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.'" *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (citation omitted)*; see also Bush v. Adams*, 629 F. Supp. 2d 468, 478 (E.D. Pa. 2009) (stating that this element is met "when there is genuine doubt or conflicting precedent as to the correct legal standard applied in the orders at issue"). The element is met when "courts, as opposed to parties, disagree on a controlling legal issue." *Randolph*, 2012 WL 273722, at *6.

For example, this requirement may be satisfied when there is a "dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits," or "where a court's challenged decision conflicts with decisions of several other courts." *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F.Supp.2d 90, 97–98 (D.D.C. 2003). But, "[t]he level of uncertainty required . . . should be adjusted to meet the importance of the question in the context of the specific case." 16 WRIGHT ET AL., Federal Practice & Procedure § 3930. And, the "'mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient'" to meet this requirement. *IRAP*, 404 F. Supp. 3d at 950 (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996)); *see also Lynn*, 953 F. Supp. 2d at 624 (same).

Moreover, lack of unanimity among courts and lack of relevant authority do not suffice. *See Union County v. Piper Jaffray & Co., Inc.*, 525 F.3d 643, 647 (8th Cir. 2008); *North Carolina ex rel. Howes v. W.R. Peele, Sr. Trust*, 889 F. Supp. 849, 852 (E.D.N.C. 1995); *cf. Va. ex rel.*

*Integra Rec, LLC v. Countrywide Sec. Corp.*, MHL-14-0706, 2015 WL 3540473, at *5 (E.D. Va. June 3, 2015) ("A mere lack of unanimity, or opposing decisions outside of the governing circuit, need not persuade a court that a substantial ground for disagreement exists.") (citation omitted). Similarly, "a party's disagreement with the decision of the district court, no matter how strong, does not create substantial grounds." *IRAP*, 404 F. Supp. 3d at 950. In addition, "[t]hat settled law might be applied differently does not establish a substantial ground for difference of opinion." *Couch*, 611 F.3d at 633 (citing *Bush*, 629 F. Supp. 2d at 475).

Notably, "[t]he threshold for establishing the 'substantial ground for difference of opinion' with respect to a 'controlling question of law' required for certification pursuant to § 1292(b) is a high one." *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19–20 (D.D.C. 2002). "In other words, for interlocutory appeals, 'it matters not whether the lower court simply got the law wrong,' but 'whether courts themselves disagree as to what the law is.'" *In re Nichols*, TDC-14-0625, 2014 WL 4094340, at *3 (D. Md. Aug. 15, 2014) (quoting *KPMG Peat Marwick, LLP v. Estate of Nelco, Ltd.*, 250 B.R. 74, 82 (E.D. Va. 2000)).

Finally, under the material-advancement prong, certification of an interlocutory appeal is appropriate only "'in exceptional situations in which [doing so] would avoid protracted and expensive litigation.'" *Fannin*, 873 F.2d 1438, 1989 WL 42583, at *2 (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982)) (alteration in *Fannin*); s*ee Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (concluding that an interlocutory appeal would materially advance resolution of litigation where reversal by the appellate court would dismiss one defendant and resolve multiple claims against all defendants, even though it would not resolve the entire case). In deciding whether certification will materially advance the ultimate termination of the litigation, "'a district court should consider whether an immediate

appeal would: (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'" *Goodman v. Archbishop Curley High School, Inc.*, 195 F. Supp. 3d 767, 773 (D. Md. 2016) (quoting *Coal. For Equity*, 2015 WL 4040425, at *6).

This requirement is understood to mean that the resolution of the controlling legal question "would serve to avoid a trial or otherwise substantially shorten the litigation." *Clark Constr. Grp., Inc. v. Allglass Sys., Inc.*, DKC-02-1590, 2005 WL 736606, at *4 (D. Md. Mar. 30, 2005). Material advancement "is more likely to occur at earlier stages in the litigation, when resolving a question on interlocutory appeal can obviate the need for a lengthy or costly discovery process." *Feinberg*, 2021 WL 2784614, at *2; *see also Est. of Giron Alvarez v. Johns Hopkins Univ.*, TDC-15-0950, 2019 WL 1779339, at *2 (D. Md. Apr. 23, 2019) (finding the material advancement requirement satisfied when "expert discovery is ongoing, discovery issues remain, and discovery motions remain to be resolved," and "[g]oing forward, the parties have signaled that extensive pre-trial dispositive motions will be filed").

Courts in this District have declined to grant interlocutory appeals "when a trial would still be required regardless of the outcome of the appeal." *Feinberg*, 2021 WL 2784614, at *2 (declining to grant interlocutory appeal when "an interlocutory appeal—regardless of its substantive outcome—would not materially advance the termination of this case because it would not remove the need for discovery, dispositive motions, or ultimately, a trial"); *see also Clark Constr.*, 2005 WL 736606, at *4 (denying interlocutory appeal when there was a controlling question of law with a substantial ground for difference of opinion, but an appeal would not materially advance the termination of the litigation because "a favorable ruling for Defendants on appeal would not eliminate the need for a trial").

### III.    Discussion

### A.  28 U.S.C. § 1292(b)

Schnupp moves the Court to "certify its Amended Memorandum Opinion [ECF 173] to permit interlocutory appeal pursuant to 28 U.S.C. § 1292(b)."  ECF 177 at 1.[16]  Specifically, Schnupp asks the Court to certify two legal questions for appeal, ECF 177 at 7, 8:

> (1)    Whether the Relator's Disclosure Memorandum, which included the Atlas Complaint and Blair Pharmacy Dispense Report, provided to the government in accordance with 31 U.S.C. § 3730(b)(2) may be a "voluntary" disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(B).
>
> ***
>
> (2)    Whether a relator may qualify as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B)(i) when he voluntarily discloses in government interviews information previously known or under investigation by the government but prior to any public disclosure of the information?

Defendants oppose the Motion for three reasons.  They argue that (1) it is untimely; (2) Schnupp does not satisfy any of the requirements of 28 U.S.C. § 1292(b); and (3) "there are no exceptional circumstances that warrant an immediate appeal" of the Court's ruling.  ECF 182 at 2–3.

---

[16] Schnupp cites *In re Trump*, 928 F.3d 360, 369 (4th Cir. 2019), for the propositions that a district court "has a '*duty* . . . to allow an immediate appeal to be taken,'" and that "district courts should not hesitate to certify an interlocutory appeal under § 1292(b) when a decision 'involves *a new legal question or is of special consequence*.'"  ECF 177 at 2 (quoting *In re Trump*, 928 F.3d at 369 (internal citations omitted)) (emphasis in *In re Trump*).  But, after a panel of the Fourth Circuit issued that opinion, the Fourth Circuit "subsequently agreed to hear the case en banc, vacating the panel opinion."  *In re Trump*, 958 F.3d 274, 281 (4th Cir. 2020), *vacated as moot sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021).  The Fourth Circuit, en banc, concluded that "the President has not shown that he is entitled to a writ of mandamus compelling the district court to certify its orders for interlocutory review under § 1292(b)."  *In re Trump*, 958 F.3d at 285.  The Supreme Court vacated the judgment and remanded the case to the Fourth Circuit "with instructions to dismiss the case as moot."  *Trump v. D.C.*, 141 S. Ct. 1262 (2021).

As discussed, to grant an interlocutory appeal, three criteria must be satisfied under 28 U.S.C. § 1292(b): (1) there must be "a controlling question of law" (2) about which there is "substantial ground for difference of opinion" and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." I address each, in turn.

### 1.  Controlling Question of Law

With respect to the matter of "a controlling question of law," Schnupp contends that the questions he raises are "new questions of law not yet confronted by the Fourth Circuit that have potentially broad-reaching effect in other FCA cases." ECF 177 at 5. He argues, *id.* at 8: "The interpretation of 31 U.S.C. § 3730 is a pure question of law that may be decided by the Fourth Circuit without any need for factual assessment. The contents of the Disclosure Memorandum and the timing of the Disclosure Memorandum and the relevant public disclosure are undisputed and easily determined with only a cursory review of the record."

Defendants do "not dispute that Schnupp's first question—the Court's ruling that a disclosure required to be provided under 31 U.S.C. 3730(b)(2) is not made 'voluntarily' within the meaning of 31 U.S.C. § 3730(e)(4)(B)—is a matter of statutory construction that presents a pure question of law." ECF 182 at 8. But, defendants dispute that this question is "controlling," as required under 28 U.S.C. § 1292(b). *Id.* They assert, *id.*: "Regardless of how this question is resolved, the litigation will continue, both as to Schnupp's claims under Scheme 5 and his claims relating to Schemes 1-3, for which the Court determined there were genuine disputes of material fact."

Defendants challenge Schnupp's claim that a reversal of the Court's ruling by the Fourth Circuit would "'eliminat[e] any need for a trial.'" *Id.* (quoting ECF 177 at 8). They observe that the claim is "based on his own self-serving suggestion that he would choose to dismiss his

remaining claims against Blair if he is successful on his claim under Scheme 5." ECF 182 at 8.[17]
They posit: "If Schnupp is only interested in pursuing his claim against Blair relating to Scheme
5, then he should dismiss his claims relating to Schemes 1-3 now and proceed directly to the Fourth
Circuit for an appeal of this Court's rulings. But the Court should not allow Schnupp to pursue
piecemeal appeals so that he can determine which of his claims he wants to litigate." *Id.* at 8–9.

According to Schnupp, the Fourth Circuit has previously considered an interlocutory
appeal "involv[ing] interpretation of the same statutory provision at issue," but a different
subsection: 31 U.S.C. § 3730 (e)(4). ECF 177 at 5. In *Michaels*, 848 F.3d 330, the Fourth Circuit
concluded that whether the Attorney General has "absolute veto power over voluntary settlements
in" qui tam actions under the FCA was "a pure question of law" appropriate to consider for
interlocutory appeal. *Id.* at 339, 341. In contrast, whether statistical sampling was a permissible
means of proving the plaintiff's claims "based on the particular facts and evidence in this case"
was not a pure question of law "subject to . . . interlocutory review." *Id.* at 341.

Schnupp's first question is one of statutory interpretation and constitutes a question of law.
I am satisfied that it meets the first element—a controlling question of law—because if the Fourth
Circuit were to reject my ruling, this would mean that Schnupp qualifies as an original source
under 31 U.S.C. § 3730(e)(4)(B)(ii). And, if so, the public disclosure bar would not apply. *See*
ECF 173 at 26. In turn, this would upend my summary judgment ruling as to Scheme 5 because,

---

[17] Defendants' assertion appears to be based on Schnupp's opposition to Blair's cross
motion for summary judgment, in which Schnupp stated: "Should this Court grant Relator's
Motion for Summary Judgment in favor of the United States, it is the intention of Mr. Schnupp at
that point to seek permission to voluntarily dismiss the remaining allegations in the Amended
Complaint because pursuing the remaining claims after summary judgment in favor of the United
States would be a waste of judicial resources in that Blair likely lacks resources to fully satisfy the
judgment sought." ECF 165 at 66 n.18.

as I noted in the Memorandum Opinion, Blair "relie[d] on the FCA's public disclosure bar" to argue that Schnupp could not prevail on summary judgment. *Id.* at 24.

Regarding the second question, Schnupp contends that the Fourth Circuit has not "addressed the extent to which the government's prior knowledge of information voluntarily provided by a relator before any public disclosure of the information may negate the relator's status as an 'original source' under the new definition of 'original source' found in 31 U.S.C. § 3730(e)(4)(B)(i)," as amended in 2010. ECF 177 at 11. Schnupp correctly posits that this question "requires interpretation of § 3730(e)(4)(B)(i) in the context of the competing FCA policies of encouraging whistleblower actions while discouraging parasitic ones." *Id.* But, Schnupp also argues that resolving this question would not require the Fourth Circuit "to study the factual record or develop it." *Id.* at 12. He claims that the information he "provided to the government during his initial interview on October 2, 2017 and in subsequent interviews occurring before the Superseding Indictment of Blair is easily identified in the record." *Id*.

Defendants counter that whether Schnupp is an original source "unquestionably requires a fact-intensive inquiry regarding, among other things, what Schnupp disclosed, to whom he disclosed the information, when he disclosed that information, and what information the party to whom he disclosed the information already possessed at the time of his disclosure." ECF 182 at 6-7. They add, *id.* at 7: "The Court's lengthy recitation of the substance and timing of Schnupp's conversations with the government and his qui tam filings also undermines Schnupp's argument that the Fourth Circuit could decide this issue without a factual analysis." In addition, defendants maintain that "the Court's detailed analysis establishes that Schnupp's second proposed question of law is so 'heavily freighted with the necessity of factual assessments' that it would be improper

for an interlocutory appeal under 28 U.S.C. § 1292(b)." *Id.* at 8 (quoting *Michaels*, 848 F.3d at 341).

But, according to Schnupp, the facts that the Fourth Circuit would need to consider "are undisputed facts easily found in the existing record." ECF 185 at 8. He cites *Kennedy*, 657 F.3d at 195, for the proposition that "there is no doctrine counseling courts to avoid [an interlocutory appeal under § 1292(b)] on legal issues involving undisputed facts that are before them." ECF 185 at 8.

In *Kennedy*, the majority responded to Judge King's dissent, in which he asserted that the appeal was improvidently granted because the motion for summary judgment was made "before the parties had completed any discovery." *Kennedy*, 657 F.3d at 197 (King., J., dissenting). The question in *Kennedy* involved the interpretation of 42 U.S.C. § 2000e–1(a), also known as the religious organization exemption, to decide whether it barred Title VII claims for religious discrimination and retaliation. *Id.* at 190. But, the factual record here is seemingly much more substantial, and the legal analysis of Schnupp's question is wrapped up in these facts.

Schnupp's contention that the Fourth Circuit would not need to engage in fact-intensive inquiries is plainly incorrect. To be sure, it is not that the parties had a dispute as to the facts at summary judgment. But, the length of the case and sheer number of exhibits was substantial. And, this Court spent considerable time considering the various documents in this case, in an effort to determine whether the material facts were in dispute; what Schnupp disclosed; to whom disclosures were made and when; and what was known at the time of any disclosure. Indeed, the Court's summary description of the events in this case spans many pages of the Memorandum Opinion. *See* ECF 173 at 5–14. Therefore, the second question that Schnupp seeks to certify does not constitute a controlling question of law.

## 2.  Substantial Ground for Difference of Opinion

As discussed, Schnupp must show there is a "substantial ground for difference of opinion" for each question he requests the Court to certify for interlocutory appeal.  This requirement is met when "courts, as opposed to parties, disagree on a controlling legal issue."  *Randolph*, 2012 WL 273722, at *6.  But, a "mere lack of unanimity, or opposing decisions outside of the governing circuit, need not persuade a court that a substantial ground for disagreement exists."  *Integra Rec, LLC*, 2015 WL 3540473, at *5 (citation omitted).

Schnupp contends that in the Court's Memorandum Opinion, "[t]he Court acknowledged a circuit split (Fifth and D.C. Circuits vs. Second, Seventh, and Tenth Circuits) on the question and that 'the Fourth Circuit has not addressed whether the fact that the Disclosure Memorandum is required by statute vitiates voluntariness.'"  ECF 177 at 7 (quoting ECF 173 at 40–41).[18] According to Schnupp, nothing more is required to show a substantial ground for difference of opinion.  ECF 177 at 7.

Defendants counter that "the weight of authority—including a decision from the Second Circuit within the last several months and another District Court in the Fourth Circuit—supports this Court's conclusion" on the question.  ECF 182 at 9 (citing ECF 173 at 40).  And, they add, *id.*: "Schnupp, on the other hand, has not cited to any case decided within the last decade to support

---

[18] Schnupp contends that the "level of uncertainty is exacerbated" because the Court relied on cases that "were decided prior to the 2010 amendments to the statute in question."  ECF 177 at 7.  This is incorrect.  The Court relied, *inter alia*, on a Second Circuit case, *United States ex rel. Omni Healthcare, et al., v. U.S. Oncology, Inc.*, No. 23-1334-cv, 2024 WL 4751635 (2d Cir. Nov. 12, 2024), which was about two months old when the Court issued the Memorandum Opinion. *See* ECF 173 at 40.  And, the case from another trial court in the Fourth Circuit on which the Court also relied, *United States ex rel. Beauchamp v. Academi Training Ctr.*, 933 F. Supp. 2d 825 (E.D. Va. 2013), was decided in 2013, *i.e.*, after the 2010 amendments.  *See* ECF 173 at 41.  Moreover, Schnupp relied on a D.C. Circuit case, *U.S. ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997), decided in 1997, *i.e.*, prior to the 2010 amendments.

his position." But, defendants do not argue that the cases to which Schnupp cites have been reversed or are otherwise no longer good law in those circuits. Accordingly, there is a substantial ground for difference of opinion as to the first question.

To argue that there is a substantial ground for difference of opinion as to Relator's second question, Schnupp points to the Fourth Circuit's decision in *U.S. ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 777 F.3d 691 (4th Cir. 2015). ECF 177 at 12. He contends that in *Wilson*, the Fourth Circuit interpreted "public disclosure" within the meaning of 31 U.S.C. § 3730(e)(4) to "'require[] some act of disclosure outside of the government,'" and in doing so, "expressly disagreed with the Seventh Circuit's holding in *United States v. Bank of Farmington*, 166 F.3d 853 (7th Cir. 1999) that information had been 'publicly disclosed' because it had been disclosed to a competent government official." ECF 177 at 12 (quoting *Wilson*, 777 F.3d at 696–97). Schnupp argues: "The *Wilson* case highlights that substantial ground for difference of opinion exists when determining the materiality of prior government knowledge in connection with issues arising under the post-1986 public disclosure bar. This case simply shifts the statutory question presented in *Wilson*, i.e., was there a 'public disclosure' because of the government's prior knowledge of the information, to the materiality of the government's prior knowledge of the relator's information for qualification as an 'original source' under 31 U.S.C. § 3730(e)(4)(B)(i)." ECF 177 at 12.

Defendants respond: "Although Schnupp attempts to generate a dispute between the Fourth Circuit and the Seventh Circuit on a *different* issue—whether information disclosed to a government official constitutes a 'public disclosure'—the Fourth Circuit observed in *Wilson* that '[n]o other circuit . . . has adopted the Seventh Circuit's interpretation of the public disclosure requirement" and that "the other five circuits to consider the question have rejected the Seventh

Circuit's approach.'"  ECF 182 at 10 (quoting *Wilson*, 777 F.3d at 697) (boldface and alterations in ECF 182).

According to defendants, Schnupp suggests that his second question "is an issue of first impression."  ECF 182 at 10.  Defendants argue that the "'mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient'" to qualify as a substantial ground for difference of opinion.  *Id.* (quoting *IRAP*, 404 F. Supp. 3d at 950).  But, Schnupp notes that this quotation actually cites *In re Flor*, 79 F.3d at 284, and is misleading.  *See* ECF 185 at 10.  He states, *id.*: "Contrary to Blair's understanding of the quote from *In re Flor*, the Second Circuit was not saying that questions of first impression are inappropriate for § 1292(b) appeals."  Instead, the Second Circuit explained that "'[i]t is the duty of the district judge . . . to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute.'"  *In re Flor*, 79 F.3d at 284 (citation omitted) (alterations in *In re Flor*).  But, Schnupp does not point to any cases or provide any authority supporting his argument in opposition to the Court's ruling on the issue underlying the second question.

In my view, Relator has not satisfied the element of a substantial ground for difference of opinion as to the second question, as required under 28 U.S.C. § 1292(b).

### 3.  Materially Advance Conclusion of the Litigation

In the Motion, Schnupp argues that if the Fourth Circuit were to reverse the Court's ruling, this "would likely entitle the government to summary judgment of between $22,259,824.98 and $24,500,824,98, given Blair's guilty plea, stipulations, and this Court's rulings on the other issues argued by Blair in opposition to summary judgment.  As a practical matter, such a judgment would make further litigation of the remaining fraudulent schemes alleged unnecessary and would end

the need for a trial." ECF 177 at 6. And, he contends that, even if the Fourth Circuit were to uphold the Court's ruling, this "would at a minimum lend clarity to and incentivize settlement discussions." *Id.* at 6–7. Specifically, Schnupp maintains that "reversal by the Fourth Circuit" on both questions would "would result in Relator's qualification as an original source . . ., and summary judgment in favor of the government should follow, eliminating any need for a trial." ECF 177 at 8 (first question), 12 (second question).

In opposition, Blair argues that "a ruling on appeal will not eliminate the need for a trial," "unless Schnupp intends to drop the case if the Fourth Circuit affirms this Court's ruling with respect to Scheme 5." ECF 182 at 11. In other words, because the Court denied Blair's cross motion for summary judgment with respect to Scheme 1, Scheme 2, and Scheme 3, these issues still need to be resolved through trial, regardless of how the Fourth Circuit might rule on the two questions Schnupp proposes, unless Schnupp chooses not to pursue these claims. Defendants state: "The interlocutory appeal process set forth in 28 U.S.C. § 1292(b) is not designed for the convenience of litigants so they can pick and choose when and how to litigate their cases. The fact that an interlocutory appeal ruling may guide Schnupp's strategic decisions regarding how to pursue his case does not qualify as 'materially advancing' the litigation for the purposes of 28 U.S.C. § 1292(b)." *Id.* at 12.

Moreover, defendants disagree with Schnupp's contention that appeal would foster settlement discussions. *Id.* They state, *id.*: "Nothing prohibits Schnupp from resolving this case in the absence of an interlocutory appeal. Rather, the true sentiment behind Schnupp's reference to settlement appears to be not that the case cannot settle, but rather the case will not settle for the amount Schnupp had hoped for when he amended his Complaint to add a claim relating to Scheme 5."

Schnupp paints Blair's argument as "targeted to achieve a tactical advantage by requiring Schnupp to sacrifice the government's remaining claims against Blair without a trial in order for Schnupp to obtain a final appealable order on Scheme 5." ECF 185 at 2. But, this is not Schnupp's only possible path to obtain a final appealable order as to Scheme 5. Schnupp would have a final appealable order as to Scheme 5 after going to trial on the claims remaining in the case (Schemes 1 through 3).

In his Reply, Schnupp attempts to clarify why he believes a reversal by the Fourth Circuit would make trial "unnecessary." ECF 185 at 3. He states, *id.* at 12:

> Such an outcome would eliminate the need for any trial because many of the claims in Schemes 1, 2 and 3 are the same claims already determined to be false claims submitted in violation of the FCA in Scheme 5, and because the statutorily mandated damages and penalties would range between $22,259,824.98 and $24,500,824.98, making a trial unnecessary as a practical matter. Assuming *arguendo* that trial on Schemes 1-3 were to proceed to trial anyway, as Blair argues, the trial would be substantially shortened because all TRICARE claims would be resolved before trial, greatly limiting the scope of any trial on Schemes 1-3.[1] No evidence or testimony related to TRICARE claims would be necessary in such a trial, and the issues would be limited to claims submitted outside of TRICARE to other government payors, such as those submitted to Medicare and alleged to be false because of one of the remaining Schemes.

But, as Schnupp points out, ECF 185 at 3, the dispute on appeal could resolve only the question of whether Schnupp was the original source, and therefore, whether the public disclosure bar was correctly applied. In other words, because the TRICARE claims were resolved by this Court in its Memorandum Opinion, they would not be the subject of trial. The options are as follows:

> (1) The Court does not certify this appeal. The parties proceed to trial as to Schemes 1 through 3.

> (2) The Court certifies the appeal, and the Fourth Circuit reverses the Court's ruling as to Scheme 5. Schnupp contends that a reversal by the Fourth Circuit would result in summary judgment being granted to plaintiff, and thus, a trial as to Scheme 5 would be unnecessary. ECF 177 at 6. The parties would still proceed to trial as to Schemes 1 through 3.

(3) The Court certifies the appeal, and the Fourth Circuit upholds the Court's ruling as to Scheme 5. The parties proceed to trial as to Schemes 1 through 3.

As defendants aptly state, "discovery has already concluded, and the Court has already ruled on dispositive motions, after extensive briefing by the parties. Aside from the settlement conference that was scheduled recently with Judge Austin, the case is essentially trial-ready at this point. Thus, if the Court's ruling as to Scheme 5 were certified for interlocutory appeal, the case would still proceed to trial as to Schemes 1-3 regardless of the interlocutory appeal's outcome, and certification would simply result in an unnecessary delay of an otherwise trial-ready case." ECF 182 at 11.

Judge Gallagher stated in *Bezek v. First Nat'l Bank of Pennsylvania*, SAG-17-2902, 2023 WL 2571508, at *5 (D. Md. Mar. 20, 2023):

> As a more general matter, Plaintiffs' contention that interlocutory appeal will materially advance this litigation ignores that this case, and the other related RESPA cases currently pending before this Court, are already quite old. This action was filed in September, 2017. ECF 1. Five-and-a-half years later, the parties have completed discovery and finally stand on the precipice of trial. Of course, there is some risk that, if the Fourth Circuit ultimately disagrees with this Court's damages ruling, the case could need to be tried twice. But an order certifying the damages issue for interlocutory appeal will *guarantee* an additional indefinite delay in this case, and potentially in the related and equally aged RESPA actions referenced above.[] Against this certain delay, Plaintiffs offer only the hypothetical assertion that interlocutory appeal could increase the chance of a possible settlement once an appellate ruling has been issued. Ultimately, this Court concludes that the best way to move this years-old case toward eventual disposition is to proceed to trial.

I am persuaded by this sound logic. In fact, the delay here is even more egregious, because Schnupp filed his Complaint in August 2017, one month before the plaintiffs did so in Judge Gallagher's case, and it is now 2025, two years beyond the time when Judge Gallagher issued her opinion. The delay may have been largely unavoidable, for reasons discussed earlier. But, the bottom line is that this case needs to proceed to trial.

Moreover, based on my rulings denying summary judgment as to Schemes 1 through 3, the case is ready to proceed to trial as to those schemes. This is so, regardless of whether an appeal occurs or the outcome of the appeal.

Schnupp contends that a reversal on appeal by the Fourth Circuit as to Scheme 5 "would likely entitle the government to summary judgment," and there would be no need for a trial as to Scheme 5. ECF 177 at 6. Of course, it is possible that the Fourth Circuit could remand Scheme 5 for trial. But, an order certifying the questions for interlocutory appeal would "*guarantee* an additional indefinite delay in this case." *Bezek*, 2023 WL 2571508, at *5 (emphasis in *Bezek*). Therefore, I conclude that appeal as to both questions would not materially advance the litigation.

### B.  Other Grounds

#### 1.  Timeliness

Blair contends that "Schnupp filed his Motion for Leave on March 7, 2025, 39 days after the Court issued its January 27, 2025 Order on the parties' respective summary judgment motions." ECF 182 at 4. And, according to Blair, because Schnupp did not "obtain the Court's approval to file his Motion for Leave in an untimely manner," and has not "offered any justification for the delay in seeking permission to pursue an interlocutory appeal or any excuse as to why he could not do so in a reasonable time period," "the Court should deny Schnupp's belated Motion for Leave as untimely." *Id.* at 5.

Defendants cite other cases where courts dismissed a motion to certify as untimely due to a delay in filing it. ECF 182 at 4 (citing *Minter v. Wells Fargo Bank, N.A.*, WMN-07-3442, 2013 WL 1795564, at *1 (D. Md. Apr. 26, 2013) (two months); *Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co.*, No. 01-CV-6217 (CJS), 2003 WL 22384797, at *2 (W.D.N.Y. Sept. 4, 2003) (nine months); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044-JD, 2016 WL

1593232, at *5 (N.D. Ind. Apr. 21, 2016) ("years-old orders"); *Morton Coll. Bd. of Trustees of Illinois Cmty. Coll. Dist. No. 527 v. Town of Cicero*, 25 F. Supp. 2d 882, 885 (N.D. Ill. 1998) (30 days); *Fabricant v. Sears Roebuck & Co.*, No. 98-1281-CIV-NESBITT, 2001 WL 883303, at *1 (S.D. Fla. Jan. 29, 2001) (46 days); *Ward v. Shelby Cty.*, No. 2:20-cv-02407-JPM-cgc, 2021 WL 5277482, at *3 (W.D. Tenn. Sept. 2, 2021) (41 days)).

But, the Court is not aware of a deadline for such a motion set by statute or the Federal Rules of Civil Procedure. Nor did the Court set a deadline for Schnupp to submit his Motion. The Court docketed the Amended Memorandum Opinion (ECF 173) on January 28, 2025. The Court held a telephone conference on February 13, 2025, during which counsel for Schnupp informed the Court of its intent to file such a motion. ECF 174. The Motion was then filed on March 7, 2025.

I see no reason to deny the Motion as untimely. It was docketed approximately three weeks after counsel informed the Court of the plan to do so, and with no deadline requiring the Motion to be filed by a certain date.

### 2. Exceptional Circumstances

Even if the Court finds that Schnupp's Motion satisfies the requirements of 28 U.S.C. § 1292(b), Blair asks the Court to "exercise its 'unfettered' discretion to deny Schnupp's request because there are no exceptional circumstances present that would justify an interlocutory appeal of the Court's ruling." ECF 182 at 13 (quoting *Fitzer*, 2022 WL 9974736, at *3). Blair explains, *id.*:

> Schnupp's request for leave neither promotes judicial economy and efficiency nor resolves significant legal issues that will impact the trial of this matter. Rather, . . . Schnupp's request serves no purpose other than to convenience Schnupp and his counsel. . . . Schnupp's motivation in seeking leave is no different than any other litigant who has received or been denied partial relief before a final judgment. The Court should not allow Plaintiff to circumvent the traditional

38

appellate procedures simply because he may ultimately elect not to pursue his remaining claims if he is successful on appeal.

Schnupp complains that, "contrary to the dicta in *Fitzer*," "if the statutory elements of § 1292(b) are satisfied, . . . the Court does not then retain 'unfettered' discretion to deny immediate appeal." ECF 185 at 2. Because I have determined that Schnupp does not meet all requirements of 28 U.S.C. § 1292(b), I need not address this issue.

## IV.    Conclusion

For the foregoing reasons, I shall deny the Motion. An Order follows, consistent with this Memorandum Opinion.


Date:  May 7, 2025                                              _____/s/_____

                                                               Ellen Lipton Hollander
                                                               United States District Judge