IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES *ex rel.* TIMOTHY
SCHNUPP,
    *Relator,*

    v.

BLAIR PHARMACY, *et al.*,
    *Defendants.*

Civil No. ELH-17-2335

**MEMORANDUM OPINION**

In this qui tam case,[1] filed on August 15, 2017, Timothy Schnupp, the Relator, sued his

former employer, Blair Pharmacy, Inc. ("BPI," "Blair Pharmacy," or "Pharmacy"), and its owner,

Matthew Blair ("Mr. Blair") (collectively, "Blair"), pursuant to the False Claims Act ("FCA" or

the "Act"), 31 U.S.C. §§ 3728 *et seq. See* ECF 1 ("Complaint").  At the relevant time, BPI was a

compounding pharmacy.[2]  Schnupp, who previously worked as "Pharmacist in Charge" for the

Pharmacy, alleged that defendants knowingly submitted false prescription claims to the Medicare

Program, 42 U.S.C. § 1395 *et seq.* ("Medicare"), a federally funded health insurance program for

people ages 65 and older and for certain people with disabilities, and to the Department of Defense

TRICARE health insurance program ("TRICARE").[3]  Initially, Schnupp claimed that Blair

perpetrated four distinct fraud schemes.  ECF 1, ¶¶ 27–34.

---

[1] "Qui tam is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,'
which means 'who pursues this action on our Lord the King's behalf as well as his own.'"
*Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

[2] "Compounding" involves alteration or mixing of ingredients to create a customized
medication.

[3] TRICARE was formerly known as the Civilian Health and Medical Program of the
Uniformed Services or "CHAMPUS."  *See* 32 C.F.R. § 199.17.

In May 2022, following a lengthy investigation, the United States declined to intervene in the case. ECF 28. Nevertheless, the Relator opted to pursue the case, *see* 31 U.S.C. § 3730(b)(4)(B), and on May 11, 2022, he filed a "First Amended False Claims Act Complaint." ECF 30 (the "First Amended Complaint"). It contains two counts: Count I asserts false claims under 31 U.S.C. § 3729(a)(1)(A) and Count II asserts false claims under 31 U.S.C. § 3729(a)(1)(B).

In the First Amended Complaint, Schnupp identified five distinct fraud schemes involving both Medicare and TRICARE. ECF 30, ¶¶ 28–43.[4] In particular, the Relator claims that Blair knowingly submitted false claims to Medicare and TRICARE by: (1) billing for compound drugs containing SteraBase cream when no SteraBase cream was actually used. Lipoderm cream was used instead. (*Id.* ¶ 28); (2) billing Medicare and TRICARE for compound drugs supposedly containing 360 grams of "compounded medication" when only 300 grams were dispensed. (*Id.* ¶ 29); (3) billing for compound drugs containing 10% Gabapentin when the compound actually contained only 6% Gabapentin. (*Id.* ¶ 30); (4) and (5) committing two violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). *Id.* ¶¶ 31–43. As to the AKS, the Relator alleged that defendants used pre-paid gift cards to pay coinsurance or deductibles for beneficiaries. *Id.* ¶ 34. And, the Relator also claimed that defendants recruited Bahram Alavi of Atlas Group, LLC ("Atlas") to market BPI's compounded drugs prescriptions to physicians treating Medicare and TRICARE beneficiaries, for which Alavi received a commission equal to fifty percent of the gross reimbursement paid to BPI by Medicare and/or TRICARE. *Id.* ¶¶ 36–43. The last scheme is referred to by the parties as Scheme 5.

---

[4] The First Amended Complaint does not identify the different fraud schemes by number. But, the parties did so in their submissions with respect to summary judgment, and I have used their numerical descriptions.

Critically, some of the claims lodged by the Relator were the subject of a federal criminal prosecution of Mr. Blair. *See United States v. Matthew Blair*, ELH-19-410 (D. Md.) ("Criminal Case"). Mr. Blair was indicted on August 27, 2019. *Id.*, ECF 1. A Superseding Indictment was filed on March 3, 2020 (*id.*, ECF 20), which added allegations as to Scheme 5. *See*, *e.g.*, *id.* ¶ 21.

Pursuant to a Plea Agreement in the Criminal Case (*id.*, ECF 181; ECF 181-1), Mr. Blair entered a plea of guilty on December 3, 2021, to one count charging him with payment of illegal remunerations, in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A). Specifically, the charge is predicated on Mr. Blair's payment of kickbacks to Atlas, owned by Alavi,[5] in connection with prescription claims paid by TRICARE.[6] Notably, the Plea Agreement did not reference Medicare. *See id.*, ECF 181; ECF 181-1.

Relying heavily on the conviction of Mr. Blair, Schnupp filed a post-discovery motion for summary judgment in the qui tam case. ECF 149 ("S.J. Motion" or "Summary Judgment Motion"). It pertained only to "the defendants' violations of the Anti-Kickback statute which have been conclusively established in this action by Matthew Blair's criminal conviction." *Id.* at 9. Schnupp stated: "'Scheme 5' for which the pending motion seeks summary judgment in favor of the United States involves the *same transactions* at issue in Blair's criminal proceedings." ECF 165 at 15 (emphasis in ECF 165). Notably, the transactions at issue in the Criminal Case concerned TRICARE, not Medicare.

---

[5] In some submissions, Bahram Alavi is identified as "B.A." *See*, *e.g.*, ECF 181-1.

[6] Blair has filed a Third-Party Complaint against Alavi and Atlas Medical Solutions, LLC, f/k/a Atlas Group, LLC, seeking contribution and indemnification. ECF 76. Blair subsequently filed an Amended Third-Party Complaint. ECF 127. By Memorandum (ECF 161) and Order (ECF 162) of September 5, 2024, I stayed the proceedings as to the Third-Party Complaint, pending resolution of Schnupp's FCA claims.

In response to Schnupp's S.J. Motion (ECF 149), defendants filed a combined cross motion for summary judgment and opposition to Schnupp's Summary Judgment Motion. ECF 156 ("Cross Motion"). Blair's Cross Motion encompassed all five schemes alleged in the First Amended Complaint. *Id.* It was supported by thirty-three exhibits. ECF 156-1 to ECF 156-33.

By Memorandum Opinion (ECF 171) and Order (ECF 172) of January 27, 2025, as amended on January 28, 2025 (ECF 173), I denied Schnupp's Summary Judgment Motion, which concerned only Scheme 5 and had relied on the facts presented by the government in the Criminal Case. Instead, I granted Blair's Cross Motion as to both Scheme 4 and Scheme 5. However, I denied the Cross Motion as to Scheme 1, Scheme 2, and Scheme 3. ECF 172.

The Relator's claims as to Schemes 1, 2, and 3 remain pending. Trial is scheduled for March 23, 2026. ECF 194.

Now pending is Schnupp's "Motion for Leave to Amend the First Amended Complaint," and to file a Second Amended Complaint. ECF 191 (the "Motion"). The proposed Second Amended Complaint ("SAC") is docketed at ECF 191-1. The Motion states, in part, *id.* at 4:

> The proposed Second Amended Complaint simply clarifies that after this Court's ruling on summary judgment, claims submitted to TRICARE remain relevant only as to fraudulent Schemes 1, 2 and 3. The proposed Second Amended Complaint makes clear that Scheme 5 is now limited to Medicare claims only. In other words, the proposed Second Amended Complaint deletes those claims subject to this Court's ruling on summary judgment, which cannot now be challenged on appeal until after trial and entry of a final judgment order.[] The proposed Second Amended Complaint does not seek to add any new parties, it does not allege any new or different facts, nor does it seek to add any new theories of liability. Instead, it seeks to narrow the scope of Scheme 5 to include only those claims submitted to Medicare, *i.e.*, claims for which there has never been any public disclosure.

Blair opposes the Motion. ECF 199. Defendants argue, *id.* at 8: "Schnupp has not satisfied (and cannot satisfy) the requirements of both Rule 15 and Rule 16 and his efforts are an overt attempt to circumvent this Court's recent summary judgment ruling." Schnupp replied. ECF 200 ("Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.    Factual and Procedural Background[7]

Mr. Blair was the founder of Blair Pharmacy as well as a director and a principal of BPI. ECF 30, ¶ 3. The Pharmacy operated as an independent compounding pharmacy. *Id.* ¶ 2. "Compounding" is a practice by which pharmacists combine, mix, or alter ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription. *Id.* ¶ 24.

Mr. Blair is not a licensed pharmacist. Under Maryland law, a licensed pharmacist must be on the premises to provide services when a pharmacy is in operation. *See* Md. Code (2021 Repl. Vol.), § 12-403(c)(3) of the Health Occupations Article. In August 2014, BPI hired Schnupp as its Pharmacist in Charge, pursuant to an Employment Agreement. *See* ECF 30, ¶ 1; ECF 156-1; ECF 156-2 at 4. Mr. Blair signed the Employment Agreement on behalf of BPI. ECF 156-1 at 7. Schnupp and BPI executed an Addendum to the Employment Agreement on February 25, 2015, which concerned Schnupp's compensation. ECF 156-5.

Schnupp holds a Doctor of Pharmacy and is a Maryland licensed pharmacist. ECF 156-1. He was employed by the Pharmacy from August 2014 until January 2017. ECF 156-19. Among Schnupp's duties, he was to advise the Pharmacy "with regard to maintaining pharmacy standards that meet . . . regulatory agency requirements for the operation of [BPI]." ECF 156-1 at 1. He was also to assist in communications with health care providers and customers. *Id.* at 2. Given Schnupp's employment with BPI, he asserts that the allegations in the First Amended Complaint

---

[7] In setting forth the background, I have restated much of the content of my recent Memorandum Opinion of May 7, 2025. ECF 188. It is one of several opinions I have written in this case. *See* ECF 55; ECF 80; ECF 100; ECF 125; ECF 147; ECF 161; ECF 173.

are based "upon his own direct and independent knowledge, and he is the original source of the information in this Complaint."  ECF 30, ¶ 1.

The Complaint was filed under seal in August 2017 (ECF 1) and amended in May 2022. ECF 30.  At the time of the summary judgment motions, ECF 30 was the operative pleading.  It alleges that Blair engaged in five distinct fraud schemes, as follows: (1) substitution of less expensive Lipoderm cream for more expensive SteraBase cream, while billing for compound drugs that supposedly contained SteraBase cream (*id.* ¶ 28); (2) billing for medication that BPI did not provide, *i.e.*, billing for compound drugs that supposedly contained 360 grams of product when only 300 grams were dispensed (*id.* ¶ 29); (3) overcharging for Gabapentin by billing for compound drugs containing 10% Gabapentin when only 6% was provided (*id.* ¶ 30); (4) using pre-paid gift cards or "burner cards" to pay coinsurance and/or deductible amounts for beneficiaries to induce them to use BPI "to fill lucrative compound medication prescriptions" (*id.* ¶ 34), in violation of the AKS, 42 U.S.C. § 1320a-7b(b) (*id.* ¶¶ 34, 35); and (5) payment of commissions to independent contractors, equal to 50 percent of reimbursements paid to the Pharmacy by Medicare and TRICARE for compounded prescriptions that were marketed by the independent contractors to physicians, in violation of the AKS.  *Id.* ¶¶ 36–43.

As to Scheme 5, the First Amended Complaint alleges that Blair "recruited" Bahram Alavi, the owner of Atlas, "to market" the Pharmacy's "compounded drug prescriptions to physicians treating Medicare and TRICARE beneficiaries."  *Id.* ¶ 36.  Further, the Relator alleges that BPI and Atlas entered into a "Distributor Agreement" on November 24, 2014.  *Id.* ¶ 37; ECF 156-7.  It provided that Atlas would market the Pharmacy's scar and pain medications to physicians treating patients who had Medicare or TRICARE benefits, and then use the Pharmacy to fill the prescriptions.  ECF 30, ¶¶ 36, 38; *see* ECF 156-7.  Moreover, the First Amended Complaint asserts

that Blair agreed to pay Alavi[8] a commission equal to fifty percent of the gross reimbursement paid to BPI as a result of Atlas's marketing efforts.  *Id.* ¶ 37; *see also id.* ¶¶ 38–41.[9]  And, the Relator claims that Blair entered into similar agreements with other marketers.  *Id.* ¶¶ 42, 43.[10] According to Schnupp, defendants induced Alavi and Atlas "to refer as many compounded prescriptions as possible" to BPI by "agreeing to pay Alavi 50% of every successfully reimbursed Medicare and/or TRICARE compound cream prescription . . . ." *Id.* ¶ 40.

Further, the Relator asserts that from November 2014 until May 2015, TRICARE paid Blair Pharmacy $6,352,941.66 based upon claims that the defendants submitted to TRICARE that "were tainted by the remuneration payments Defendants paid to [all] their independent sales contractors. . . ." *Id.* ¶ 43; *see id.*, ¶ 45; *see also* ECF 30-1 ("subset of the larger spreadsheet provided to the government" with the Disclosure Memorandum).  And, pursuant to the Distributor Agreement, the pharmacy paid Alavi or Atlas at least $1,544,030.50.  *Id.* ¶ 41.

In August 2015, Atlas filed suit in federal court in Maryland against the Pharmacy and Mr. Blair.  *See* JKB-15-2491 ("Atlas Suit"), ECF 1 ("Atlas Complaint").  Atlas alleged that defendants wrongfully refused to pay Atlas commissions of fifty percent of gross sales, as provided in the Distributor Agreement, allegedly in retaliation for issues raised by Atlas concerning health care

---

[8] The Distributor Agreement provides that Blair was to pay the commission to Atlas, rather than Alavi.  ECF 156-7, Section VI.

[9] Attachment 3 to the Distributor Agreement (ECF 156-7) supposedly specifies the commission.  But, it was not submitted with ECF 156-7.

[10] The other independent contractors included Paladin Enterprises, Brevor Medical, Stratified Solutions, and Absolute Ortho.  ECF 30, ¶ 42.  Blair allegedly arranged to pay these independent marketers a percentage of any reimbursement monies received by the Pharmacy from the TRICARE and Medicare programs.  *Id.*

fraud laws. A few months later, in October 2015, Atlas voluntarily dismissed the Atlas Suit. *Id.*, ECF 4.

Blair maintains that after the Atlas Suit was filed, "the Government began investigating BPI and Mr. Blair based on allegations in the Atlas Lawsuit that BPI paid Alavi/Atlas commissions for referrals of TRICARE business." ECF 156 at 20–21. Indeed, Blair contends: "By at least July 12, 2017 (i.e., one month *before* Schnupp filed his Complaint), the FBI had already assembled all of the facts supporting its allegations that Defendants had purportedly violated the AKS by paying commissions to 1099 sales representatives." *Id.* at 21 (emphasis in original). Defendants add, *id.*: "[B]efore Schnupp filed this *qui tam* action, the Government *already knew* of and about the relationship between Schnupp and Alavi, the number of TRICARE prescriptions being referred to BPI by outside sales representatives, and the details of the 2015 Atlas Lawsuit against Defendants." (Emphasis in ECF 156).[11]

In January 2017, in connection with the investigation of Mr. Blair, U.S. Magistrate Judge A. David Copperthite signed a search warrant for a Google email account. ECF 46-1 (search warrant); *see also* ECF 156-20, ¶ 28. Then, in July 2017, U.S. Magistrate Judge Beth Gesner approved a search warrant application for J2 Cloud Services, LLC ("J2"). *See* ECF 156-20. The Affidavit in support of the J2 search warrant application, dated July 12, 2017, was submitted by Special Agent Eugene Choi of the Office of Inspector General, Department of Defense, Defense Criminal Investigative Services. *Id.* ¶ 3. He averred, *inter alia*, that the government learned of Mr. Blair's "possible malfeasance" in August 2015, when the Defense Health Agency ("DHA"), which manages the TRICARE program, provided a report detailing allegations of "fraudulent

---

[11] Indeed, the United States sought to delay its decision whether to intervene in the FCA case because the matter was "actively being pursued on a parallel criminal and civil track." ECF 10-1 at 3.

billings of compound prescriptions by [Mr.] Blair." *Id.* ¶ 10; *see also id.* ¶¶ 12–14. Of relevance, Choi also discussed the Atlas Complaint. *Id.* ¶¶ 19–21.

As indicated, on August 15, 2017, about one month after the search warrant was issued for J2, the Relator filed his qui tam suit. ECF 1. And, as noted, the Complaint only referenced conduct consistent with Schemes 1 through 4; it did not reference conduct pertaining to Scheme 5. *See* ECF 1, ¶¶ 27–34. The Relator also provided the government with the Disclosure Memorandum, as required by 31 U.S.C. § 3730(b)(2). ECF 1, ¶ 57; ECF 156-21.

Among other things, the Disclosure Memorandum referenced a "dispute" between Mr. Blair and Atlas, "in which [Mr.] Blair refused to pay Atlas sales commissions under a 'distributor agreement' with Atlas." ECF 156-21 at 5. Schnupp indicated that Mr. Blair agreed to settle the case because "Atlas threatened in its lawsuit to reveal [Mr.] Blair's use of 'burner cards' to unlawfully pay for patients' co-payments." *Id.* The text of the Disclosure Memorandum, which was prepared by counsel, made no reference to a scheme by which Blair paid commissions to Atlas equal to fifty percent of monies paid to BPI by Medicare or TRICARE for certain compounded prescriptions marketed by Atlas to physicians.

Schnupp included thirteen exhibits with the Disclosure Memorandum, as follows: (1) the Atlas Complaint; (2) BPI purchase orders for Lipoderm Base cream; (3) the BPI Dispense Report in Excel spreadsheet format; (4), (5) two articles published by the United States Government Accountability Office on compound pharmaceuticals; (6), (7), (10) three articles published by the United States Department of Health and Human Services, Office of the Inspector General, concerning Medicare coverage of prescriptions; (8) a Department of Justice Press Release; (9) a Kaiser Health News article; (11) an unverified PowerPoint slide deck referred to as a "Drug Pricing Overview"; (12) publicly available business documents related to the formation of BPI; and (13)

a December 2015 invoice from Medisca, Inc. to BPI for a 150 milliliter pump dispenser. *See* ECF 156-21.

According to the Relator, after he filed suit in August 2017, his "first contact with anyone associated with the government's criminal investigation of Matthew Blair or Blair Pharmacy came on October 2, 2017, when [he] was interviewed at the U.S. Attorney's Office by government attorneys and investigators." ECF 165-1 at 2. The Relator claims that he provided "truthful information about the fraudulent activities" of Mr. Blair and the Pharmacy and that he "continued to do so in a series of interviews with government investigators and/or government attorneys on seventeen (17) separate occasions between October 2, 2017 and October 8, 2021." *Id.* He also maintains that he was never offered, nor did he ever receive, "immunity from prosecution or any other type of consideration in exchange for [his] cooperation during the criminal investigation of Matthew Blair and Blair Pharmacy." *Id.* at 3.

Daniel Parker, a Special Agent with the FBI, confirmed that Schnupp's first contact with FBI investigators involved in the criminal investigation of Mr. Blair occurred on October 2, 2017, when Mr. Schnupp was interviewed. ECF 75-1 (Parker Declaration). The FBI Interview Report for Schnupp is docketed at ECF 86-8. It states that in April 2017, Schnupp's attorney, Ray Shepard, advised Schnupp to "file a qui tam against Blair and Blair Pharmacy which Schnupp did in August 2017." *Id.* at 26. The report continues, *id.*:

> [Schnupp] filed the qui tam to "cover his ass." Based on the way Blair was acting over the vacation time payment dispute (particularly that he was lying and fabricating information), Schnupp was worried that if Blair Pharmacy was ever audited or investigated, Blair would lie and throw Schnupp under the bus by trying to blame everything on him. Schnupp was further worried because he knew how it would look since he was the pharmacist in charge at the pharmacy and the one who submitted the claims for reimbursement. Schnupp did not want to go to jail.

As noted, Mr. Blair was indicted on August 27, 2019. *See* Criminal Case, ELH-19-410. ECF 1.[12] The Indictment contained ten counts. *Id.* In particular, Counts One through Five charged wire fraud, under 18 U.S.C. § 1343, and Counts Six through Ten charged aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b). Of relevance, the Indictment does not reference facts that correspond to Scheme 5.

A Superseding Indictment was filed on March 3, 2020, containing thirty-six counts. *Id.*, ECF 20. Of relevance here, it added allegations as to Scheme 5. *See, e.g.*, *id.* ¶ 21. Specifically, it alleges, among other things, that Mr. Blair violated the AKS based on BPI's payments to Atlas in exchange for Atlas's referrals of compounded prescriptions to BPI that were paid by TRICARE. *Id.*, Counts Twenty-Nine to Thirty-Three. Mr. Blair was also charged with money laundering under 18 U.S.C. § 1957, as well as additional counts of wire fraud and identity theft.

Pursuant to a Plea Agreement (Criminal Case, ECF 181, ECF 181-1), Mr. Blair entered a plea of guilty on December 3, 2021 (*id.*, ECF 178), to Count Thirty-One of the Superseding Indictment. That count (*id.*, ECF 20 at 17) charged Mr. Blair with payment of illegal remunerations to Atlas in April 2015, in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2)(A), *i.e.*, two payments of $500,000 each, in the total sum of $1,000,000. *See id.*, ECF 178.

In support of the guilty plea, the Plea Agreement included a detailed "Stipulation of Facts" ("Stipulation"). *See id.*, ECF 181-1.[13] In the Stipulation, the word "Blair" was a reference only to Mr. Blair; BPI was not named as a defendant. Under oath at his guilty plea proceeding, Mr. Blair agreed to the content of the Stipulation. *Id.*, ECF 197 (Transcript), at 8–9.

---

[12] This Court previously took judicial notice of certain pleadings from Mr. Blair's criminal case. *See* ECF 55.

[13] The factual summary consists of five pages that are typed and single-spaced. With exhibits, the Stipulation exceeds twenty pages.

The Stipulation (*id.*, ECF 181-1) provides, in part: "Blair entered into 1099 independent contractor arrangements with several sales marketers . . . and Blair arranged to pay the independent marketers a percentage of any reimbursement money he received from health care benefit programs, including TRICARE." *Id.* at 2. Further, the Stipulation states that Mr. Blair recruited "B.A., the owner of Atlas Group, LLC," *i.e.*, Bahram Alavi, to engage in violations of the AKS. *Id.* And, it states that on November 24, 2014, Mr. Blair and Atlas entered into a "Distributor Agreement," and that Blair had "knowledge that such an arrangement violated federal law." *Id.* at 3. The Stipulation also posits, *id.*: "With this knowledge of the wrongfulness of his conduct, Blair intentionally entered into an agreement with B.A. to pay him a value based 50% commission on any successfully reimbursed TRICARE pharmacy benefit claim."

Moreover, the Stipulation asserts, *id.*:

The Distributor Agreement required Atlas to use Blair Pharmacy exclusively, and to refer all business within his established territory to Blair Pharmacy, and Blair induced and encouraged these referrals to his pharmacy by offering B.A. a 50% percentage payment of any money that Blair received from health care benefit programs. The payment of 50% of the health care benefit program reimbursement monies was the "sole compensation" under the November 24, 2014 financial agreement between Blair and B.A. B.A. was not paid any money or compensation, unless Blair was successful in obtaining reimbursement from a health care benefit program for a prescription that B.A. referred to Blair, and then, and only then was B.A. paid a percentage of the successful reimbursement.

This "Distributor Agreement" was thus a financial arrangement based on the value and volume of prescription referrals that B.A. caused to be directed to Blair's pharmacy, including referrals of federal health care program business, such as TRICARE.

Relevant here, the Stipulation also states: "The amount of $6,352,941.66 (as described in detail in Attachment B, incorporated herein) was the total reimbursement amount TRICARE paid to Blair Pharmacy from November 2014 – May 2015, based upon the claims Blair submitted to TRICARE tainted by remuneration payments Blair Pharmacy paid to independent 1099 sales

contractors." *Id.* at 5.  Attachment B to the Plea Agreement specifically identified 582 false claims submitted by Blair to TRICARE, in violation of the AKS, and the amount that TRICARE paid for each tainted claim, which totaled $6,352,941.66.  *Id.* at 7–21.  Of import, the Stipulation made no reference to false claims submitted by Mr. Blair to Medicare or paid by Medicare to BPI.

In Mr. Blair's Plea Agreement, entered pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to recommend to the Court a sentence of twelve months and one day of incarceration for Mr. Blair.  *Id.*, ECF 181, ¶ 9.[14]  Mr. Blair also agreed to pay restitution to the government in the amount of $3,176,470.83.  *Id.*  On February 10, 2022, the Court sentenced Mr. Blair to the agreed upon term of imprisonment.  Criminal Case, ECF 188, ECF 189, ECF 190.  The Court also ordered defendant to pay restitution to the government in the agreed amount of $3,176,470.83.  *Id.*, ECF 189 at 5.  That sum has been paid.  *Id.*, ECF 194.

With respect to the qui tam case, the government took considerable time to determine whether or not to intervene.  *See* ELH-17-2335, ECF 4; ECF 6; ECF 8; ECF 10; ECF 13; ECF 16; ECF 18; ECF 20; ECF 22; ECF 24; ECF 26.  Ultimately, on or about May 2, 2022, the United States declined to intervene.  ECF 28.  In the interim, by Order of October 15, 2019, the Court partially lifted the seal to permit disclosure of the qui tam suit to defendants.  ECF 15.

Mr. Blair and BPI were served with the qui tam suit on June 6, 2022.  ECF 32; ECF 33.  Thereafter, they moved to dismiss the case.  ECF 38.  The Court denied the motion by Memorandum Opinion and Order of December 9, 2022.  ECF 55, ECF 56.  Soon after, plaintiff filed a pre-discovery motion for partial summary judgment (ECF 57), "based upon the defendants' violations of the Anti-Kickback statute which have been conclusively established in this action by

---

[14] The offense carries a maximum term of imprisonment of five years.  *Id.*, ECF 181, ¶ 3.

Matthew Blair's criminal conviction." *Id.* at 1. By Memorandum Opinion and Order docketed on May 24, 2023 (ECF 100, ECF 101), I denied the motion.

Thereafter, on March 6, 2023, the Court issued a Scheduling Order in this case. ECF 73. It set a deadline for amendment of pleadings of April 6, 2023. *Id.* at 1.

On September 13, 2023, five months after the deadline of April 6, 2023 (ECF 73), Schnupp filed a "Motion for Leave to Supplement the First Amended Complaint." ECF 113. In particular, he sought to amend his suit to add a third claim, alleging unlawful retaliation under 31 U.S.C. § 3730(h). In support of the motion, plaintiff filed three exhibits, including a copy of a complaint filed in August 2022 by Mr. Blair and Blair Pharmacy in the Circuit Court for Baltimore County, naming as defendants Schnupp and Pharma Resolutions, LLC, Schnupp's wholly owned single-member limited liability company. ECF 113-1. Defendants opposed the motion for leave to amend. ECF 116. And, they submitted three exhibits: the motion to dismiss the State case, dated October 13, 2022 (ECF 116-1); a copy of Blair's opposition to that motion, dated November 4, 2022 (ECF 116-2); and a copy of the transcript of the hearing held on January 31, 2023, in the Circuit Court for Baltimore County (ECF 116-3).

By Memorandum Opinion (ECF 147) and Order (ECF 148) of June 6, 2024, I denied Schnupp's motion to amend. I concluded that Schnupp had "not shown the diligence required by Rule 16, so as to warrant leave to amend the First Amended Complaint." ECF 147 at 16. Moreover, I stated that Schnupp "also failed to meet Rule 15's requirements. Specifically, defendants have demonstrated that plaintiff's proposed 'amendment would be prejudicial to the opposing party' and 'the amendment would be futile.'" *Id.* at 17 (citation omitted).

On June 27, 2024, Schnupp filed his post-discovery S.J. Motion. It was limited to a portion of Scheme 5, *i.e.*, he sought summary judgment only as to claims paid by TRICARE. ECF 149.

There was no indication that Schnupp sought to preserve for trial the portion of Scheme 5 involving Medicare.

In the S.J. Motion, Schnupp did not "dispute that the allegations in the Amended Complaint are 'substantially the same' as the allegations or transactions contained [in the criminal case against Mr. Blair] because the government had already investigated, indicted, and convicted Blair for his conduct of Fraudulent Scheme #5 when the Amended Complaint was filed."   ECF 47 at 39; *see also* ECF 173 at 32; *United States ex rel. Maharaj v. Est. of Zimmerman*, 427 F. Supp. 3d 625, 649 (D. Md. 2019).   In particular, the facts in the S.J. Motion corresponded to Count Thirty-One of the Superseding Indictment in the Criminal Case (ECF 20).   In addition, Schnupp agreed that the public disclosure bar would apply to Scheme 5, unless Schnupp qualifies as an "original source" of the information.   ECF 173 at 32 (citing ECF 165 at 38; 31 U.S.C. § 3730(e)(4)(A)).   And, he maintained that he qualified as an original source.   *See* ECF 165 at 33.

As noted, defendants filed a combined opposition to the S.J. Motion and Cross Motion, seeking summary judgment as to all five fraud schemes alleged in the First Amended Complaint. ECF 156.   Schnupp filed a combined reply as to his Summary Judgment Motion and an opposition to defendants' Cross Motion.   ECF 165.   Notably, Schnupp did not make any reference to allegations related to Scheme 5 that concerned false claims paid by Medicare.   Defendants replied. ECF 170.

By Memorandum Opinion (ECF 171) and Order (ECF 172) of January 27, 2025, as amended (ECF 173), I denied Schnupp's Summary Judgment Motion as to Scheme 5.   But, I granted Blair's Cross Motion as to Scheme 4 and Scheme 5.   And, I denied defendants' Cross Motion as to Scheme 1, Scheme 2, and Scheme 3.

In the Amended Memorandum Opinion (ECF 173), I noted that the Relator previously conceded that "qualifying public disclosures of Fraudulent Scheme #5 occurred in connection with Blair's criminal proceedings before the Amended Complaint was filed." *Id.* at 31–32; *see* ECF 47 at 39; *see also United States ex rel. Moore v. Cardinal Fin. Co., L.P.*, CCB-12-1824, 2017 WL 1165952, at *12 (D. Md. Mar. 28, 2017) (recognizing that criminal documents filed in criminal proceedings are qualifying public disclosures). I determined that the conduct pertaining to Scheme 5, as set forth in the Summary Judgment Motion, was the subject of a prior qualifying public disclosure, *i.e.*, the Superseding Indictment in the Criminal Case (ECF 20). ECF 173 at 35. I also considered whether the Relator "is an original source of the information." *Id.* (citing 31 U.S.C. § 3730(e)(4)(A)).

The definition of "original source" in 31 U.S.C. § 3730(e)(4)(B) consists of two alternatives. A relator qualifies as an original source if he "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" or if he had "knowledge that is independent of and materially adds to the publicly disclosed allegations," which was provided to the government before the qui tam suit was filed. 31 U.S.C. § 3730(e)(4)(B) (2010); *see also Maharaj,* 427 F. Supp. 3d at 649-50. Both alternatives require disclosures that are made "voluntarily."

I concluded that the Disclosure Memorandum, which is required by 31 U.S.C. § 3730(b)(2), cannot be deemed to have been "voluntarily" provided under 31 U.S.C. § 3730(e)(4)(B)(ii). *See* ECF 173 at 35–42. Moreover, Schnupp did not disclose information to the government on which the allegations were based, independent of and materially adding to publicly disclosed allegations. *See id.* at 46–49. Among other things, I noted that the government

16

disclosed Scheme 5 in the Superseding Indictment filed on March 3, 2020. *Id.* at 46.[15]  The Relator

did not add facts to the First Amended Complaint, pertinent to Scheme 5, until May 2022. *Id*.  In

my view, Schnupp did not present anything beyond bald assertions to support his claim that in his

interviews with the FBI, he revealed information as to Scheme 5 that was not known to the

government. *Id.* at 48.  And, on summary judgment, bald assertions are not enough.

On March 7, 2025, approximately six weeks after the summary judgment ruling, Schnupp

filed a motion for leave to pursue an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b).  ECF

177.  He contended that an interlocutory appeal was appropriate because a reversal on appeal by

the Fourth Circuit as to Scheme 5 "would likely entitle the government to summary judgment,"

and there would be no need for a trial as to Scheme 5.  ECF 177 at 6.  Blair opposed the motion,

arguing that "the case would still proceed to trial as to Schemes 1-3 regardless of the interlocutory

appeal's outcome, and certification would simply result in an unnecessary delay of an otherwise

trial-ready case."  ECF 182 at 11.

By Memorandum Opinion (ECF 188) and Order (ECF 189) of May 7, 2025, I denied

Schnupp's motion for interlocutory appeal, concluding that "appeal as to both questions would not

materially advance the litigation."  ECF 188 at 37.  I stated, *id.* (quotation omitted):  "Of course,

it is possible that the Fourth Circuit could remand Scheme 5 for trial.  But, an order certifying the

questions for interlocutory appeal would 'guarantee an additional indefinite delay in this case.'"  I

added, *id.* at 36: "[T]he bottom line is that this case needs to proceed to trial."

Following the disposition of the parties' summary judgment motions (ECF 171, ECF 172,

ECF 173), and the denial of Relator's request for an interlocutory appeal (ECF 188, ECF 189), the

---

[15] Again, the relevant portion of the Superseding Indictment only concerned false claims
submitted to TRICARE.

Court scheduled a telephone conference for 1:00 p.m. on May 12, 2025, for the purpose of scheduling a trial date. ECF 190.[16] The Motion was filed approximately two hours before the telephone conference.

## II.    Standard of Review

In Schnupp's post-discovery Summary Judgment Motion, his contentions pertained solely to a portion of Scheme 5, concerning false claims paid by TRICARE. On that basis, the Court ruled. *See* ECF 171, ECF 172, ECF 173. But, in the Motion, Schnupp asserts that, "since the outset of this case," he has always alleged that "false claims were submitted to both TRICARE **and** Medicare." ECF 191 at 5 (citing ECF 1, ¶¶ 11–22; ECF 30, ¶¶ 11–23) (emphasis in original). Therefore, he seeks leave to amend, asserting that the SAC "makes clear that Scheme 5 is now limited to Medicare claims only." ECF 191 at 4. As he puts it, the SAC "seeks to narrow the scope of Scheme 5 to include only those claims submitted to Medicare, *i.e.*, claims for which there has never been any public disclosure." *Id.*

As noted earlier, the Scheduling Order of March 6, 2023 (ECF 73) set a deadline of April 6, 2023, for amendment of pleadings. The Motion was filed on May 12, 2025, more than two years beyond that deadline. ECF 191. In my view, through the proposed SAC, the Relator seeks to revive claims concerning Medicare that the Court (and the defense) believed he had abandoned.

The Motion implicates Rules 15 and 16 of the Federal Rules of Civil Procedure. And, as discussed, *infra*, the Motion also requires consideration of the issue of abandonment of a claim.

---

[16] The telephone conference took place as scheduled. ECF 196 (Transcript, 5/12/2025). To accommodate the Motion and possible additional briefing, the Court scheduled the trial to begin on March 23, 2026. ECF 194. But, I stated during the telephone conference that the date may be advanced. ECF 196 (Transcript, 5/12/2025, at 33).

### A.    Fed. R. Civ. P. 15

Fed. R. Civ. P. 15(a)(1) provides:  "A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(2) states:  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."

Under Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires."  It is the Fourth Circuit's "policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)."  *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010) (citing *Coral v. Gonse*, 330 F.2d 997, 998 (4th Cir. 1964)); *see also United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 197 (4th Cir. 2022) ("*MedCom*"); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities."  *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006); *see also MedCom*, 42 F.4th at 197.  Therefore, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  *Oroweat Foods Co.*, 785 F.2d at 509 (citing *Foman*, 371 U.S. at 182); *see also Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019); *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018); *Scott v. Family Dollar Stores*, 733 F.3d 105, 121 (4th Cir. 2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012); *Equal Rights Ctr. v. Niles Bolton Assocs.*,

602 F.3d 597, 603 (4th Cir. 2010); *Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W.Va.*, 985 F.2d 164, 168 (4th Cir. 1993).

Ultimately, the decision whether to grant leave to amend falls within the sound discretion of the district court. *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 553 (2010) ("By its terms, Rule 15(a) gives discretion to the district court in deciding whether to grant a motion to amend a pleading to add a party or a claim."); *see also Medigen of Ky., Inc.*, 985 F.2d at 167–68. "Put simply, an abuse of discretion is when the district judge is 'fundamentally wrong.'" *MedCom*, 42 F.4th at 198 (citing *Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 957 (7th Cir. 2014)). But, the trial judge 'will not be reversed simply because an appellate court disagrees.'" *MedCom*, 42 F.4th at 197 (quoting Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L. J. 747, 754 (1982)) (additional citation omitted).

As indicated, leave to amend should be denied if the amendment would be prejudicial, futile, or there is bad faith. These concepts are discussed below.

A pleading is futile "if the proposed amended [pleading] fails to satisfy the requirements of the federal rules." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (alterations added). Put another way, "'[f]utility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards,'" such as Fed. R. Civ. P. 12(b)(2) or (6). *Davison*, 912 F.3d at 690 (quoting *Katyle*, 637 F.3d at 471).

"Traditionally," the Fourth Circuit has "held that a proposed amendment was 'futile' if it was 'clearly insufficient or frivolous on its face.'" *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021) (quoting *Oroweat Foods Co.*, 785 F.2d at 510). More recently, however, the Fourth Circuit has "made clear that district courts are free to deny leave to amend as futile if

the complaint fails to withstand Rule 12(b)(6) scrutiny." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d at 750; *see also Daulatzai v. Maryland*, 606 F. Supp. 3d 252, 262 (D. Md. 2022) (recognizing that the Fourth Circuit has "explicitly confirmed" that the district court has authority to deny leave to amend if the proposed amendment would not withstand a Rule 12(b)(6) challenge), *aff'd*, 97 F.4th 166 (4th Cir. 2024).

When, as here, a motion for leave to amend is filed after close of discovery and after decision on summary judgment, some courts have applied the "standard applicable on a motion for summary judgment." *Engles v. Jones*, 405 F. Supp. 3d 397, 403–04 (W.D.N.Y. 2019) ("Here, discovery has closed, a motion for summary judgment has already been decided, and both parties have submitted and relied upon materials outside the pleadings in connection with the motion for leave to amend. The Court therefore finds it appropriate to apply the Rule 56(c) standard in assessing the adequacy of Plaintiff's proposed new claim."); *see also Steinburg v. Chesterfield Cty. Plan. Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (affirming denial of motion to amend complaint where district court determined amendment would be futile because it "would not survive summary judgment"); *Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 193 (E.D.N.Y. 2013); *Summit Health Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014) ("Ordinarily, leave to amend may be denied on the basis of futility if the proposed claim would not withstand a Rule 12(b)(6) motion to dismiss.  However, when the motion to amend is filed after the close of discovery and the relevant evidence is before the court, a summary judgment standard will be applied instead." (citation omitted)), *aff'd sub nom. APEX Employee Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*, 725 F. App'x 4 (2d Cir. 2018).

Under Rule 15(a)(2), "prejudice means that the party opposing the amendment would be hindered in the preparation of its case, or would have been prevented from taking some measure

in support of its position."  61A AM. JUR. 2d, Pleading § 664 (May 2025 update).  Prejudice to

the opposing party is "'often . . . determined by the nature of the amendment and its timing.'"

*Adbul-Mumit*, 896 F.3d at 293 (quoting *Laber*, 438 F.3d at 427); *see also Doe v. Mercy High Sch.,*

*Inc.*, JJR-23-01184, 2024 WL 4443076, at *3 (D. Md. Oct. 8, 2024) (same).  Courts should "look

to the 'particular circumstances' presented, including previous opportunities to amend and the

reason for the amendment."  *Adbul-Mumit*, 896 F.3d at 293.  In general, "'[t]he further the case

progressed before judgment was entered, the more likely it is that [subsequent] amendment will

prejudice the defendant.'"  *Id.* (citation omitted; alterations in *Adbul-Mumit*); *see also Ramnarine*

*v. Rainbow Child Dev. Ctr., Inc.*, RWT 17-2261, 2018 WL 2762564, at *2 (D. Md. June 8, 2018)

("The closer a case progresses toward trial, the more likely the amendment will prejudice the

defendant.").

A court may find undue prejudice sufficient to justify denying leave to amend if a new

claim or defense would force the non-moving party to "expend significant additional resources to

conduct discovery and prepare for trial"; it would "significantly delay the resolution of the

dispute"; or it would "prevent the plaintiff from bringing a timely action in another jurisdiction."

61A AM. JUR. 2d, Pleading § 664; *see also Sharkey IRO/IRA v. Franklin Res.*, 263 F.R.D. 298,

301 (D. Md. 2009) (concluding that amendment "may prejudice the non-moving party when the

motion would shift the theory of the case, thereby rendering the non-moving party's prior

discovery a misdirected use of resources and compelling the non-moving party to engage in costly

additional discovery").  The Fourth Circuit explained in *Laber*, 438 F.3d at 427: "A common

example of a prejudicial amendment is one that 'raises a new legal theory that would require the

gathering and analysis of facts not already considered by the [defendant, and] is offered shortly

before or during trial.'"  (Citation omitted; alteration in *Laber*).

22

"An amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." *Id.* (citing *Davis v. Piper Aircraft Co.*, 615 F.2d 606, 613 (4th Cir. 1980), *cert. denied*, 448 U.S. 911 (1980)); *see also Ramnarine*, 2018 WL 2762564, at *2. Moreover, "the time, effort, and money . . . expended in litigating [a] case" do not constitute "substantial prejudice." *Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc.*, 4:05-CV-0033, 2006 WL 1289545, at *3 (M.D. Pa. May 9, 2006); *see also Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (concluding that the time, effort, and money expended by the plaintiffs in litigating the case did not amount to substantial prejudice).

To be sure, "a court may consider a movant's 'undue delay' or 'dilatory motive' in deciding whether to grant leave to amend under Rule 15(a)." *Krupski*, 560 U.S. at 553 (quoting *Foman*, 371 U.S. at 182). But, "[d]elay alone is an insufficient reason to deny leave to amend." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999); *see also MedCom*, 42 F.4th at 197 ("Delay alone is not enough to deny leave to amend, though it is often evidence that goes to prove bad faith and prejudice."); *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) ("Delay alone, without prejudice, does not support the denial of a motion for leave to amend."); *Davis*, 615 F.2d at 613 ("Delay alone however, without any specifically resulting prejudice, or any obvious design by dilatoriness to harass the opponent, should not suffice as reason for denial."). "Rather, the delay must be accompanied by prejudice, bad faith, or futility." *Edwards*, 178 F.3d at 242; *see also Mayfield*, 674 F.3d at 379 (stating that "a request to amend should only be denied if one of three facts is present: 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile.'") (citation omitted); *Franks v. Ross*, 313 F.3d 184, 193 (4th Cir. 2002) ("In fact, such leave 'should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party,

or the amendment would be futile.'") (citation omitted) (emphasis in *Franks*).  And, "[p]rejudice is the weightiest factor, the absence thereof, 'though not alone determinative, will normally warrant granting leave to amend.'"  *Oliver v. Dep't of Public Safety and Correctional Servs.*, 350 F. Supp. 3d 340, 346 (D. Md. 2018) (Blake, J.) (quoting *Davis*, 615 F.2d at 613); *see V.E. v. Univ. of Md. Balt. Cty.*, JRR-22-02338, 2023 WL 5153650, at *2 (D. Md. Aug. 10, 2023), *aff'd*, 2024 WL 4563857 (4th Cir. Oct. 24, 2024).

The Fourth Circuit has said that it "cannot provide a comprehensive definition of a term like bad faith; in truth, it is a difficult term to define without retreating to circular reasoning or just listing examples."  *MedCom*, 42 F.4th at 198.  But, it has pointed to Black's Law Dictionary, which defines "bad faith" as "'[d]ishonesty of belief or purpose.'"  *Id.* (citation omitted).  The Court added, *id.*: "To act with a dishonesty of purpose is to act for the wrong reasons.  It may be outright lying, deceiving, playing unjustifiable hardball, slacking off, intentionally causing confusion, or stubbornly refusing to follow rules—you can imagine cases where a party just wants to cause chaos—or it might be something as mundane as noticing someone's mistake and saying nothing about it."  And, although "not always" evidence of bad faith, "when a party withholds evidence for an extended period, it is not unreasonable for a district court to presume bad faith, at least where no satisfactory explanation is given for the delay."  *Id.* at 199.

### B.    Fed. R. Civ. P. 16

Rule 16 governs scheduling, case management, and amendment of pleadings filed beyond the deadline set forth in a Scheduling Order.[17]  Notably, "[i]n an era of burgeoning case loads and

---

[17] Schnupp does note cite or address Rule 16 in his Motion.  *See* ECF 191.  But, in his Reply, he argues there is good cause under Rule 16.  *See* ECF 200 at 17–19.

thronged dockets, effective case management has become an essential tool for handling civil litigation." *Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 45 (1st Cir. 2002).

Scheduling orders serve a vital role in helping courts manage their civil caseloads. *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Md. 1985); *see also Naughton v. Bankier*, 114 Md. App. 641, 653, 691 A.2d 712, 718 (1997) (recognizing that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency"). A scheduling order is an important tool in "'securing the just, speedy, and inexpensive determination of every action.'" *Miller v. Transcend Servs., Inc.*, LPA-10-362, 2013 WL 1632335, at *4 (M.D.N.C. Apr. 16, 2013) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 253 (S.D.W. Va. 1995)). It is not a "'frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375-76 (D. Md. 1999) (quoting *Gestetner Corp.*, 108 F.R.D. at 141).

Where, as here, a party "moves to amend after the deadline established in the scheduling order for doing so, Rule 16(b)(4) becomes the starting point in the Court's analysis." *Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 106 (D. Md. 2013); *see Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 152 (4th Cir. 2020). Rule 16(b)(4) provides: "A schedule may be modified only for good cause and with the judge's consent."

Under Rule 16(b)(4), a movant must demonstrate good cause to satisfy the requirement for a modification of a scheduling order. *See Faulconer*, 808 F. App'x at 152; *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Wonasue*, 295 F.R.D. at 106–07; *see also Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012) (stating that Rule 15(a)(2) "applies . . . prior to the entry of a scheduling order, at which point, under Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule

15(a)(2) standard for amendment"); *United States v. Hartford Accident & Indem. Co.*, JKB-14-2148, 2016 WL 386218, at *5 (D. Md. Feb. 2, 2016) ("The burden for demonstrating good cause rests on the moving party."); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D. Md. 2003) ("[O]nce the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under [Rule] 15(a).").  Nevertheless, Rule 16 "recognize[s] . . . that the parties will occasionally be unable to meet . . . deadlines [in a scheduling order] because scheduling order deadlines are established relatively early in the litigation."  *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004) (citation omitted).  In *Nourison*, 535 F.3d at 298, the Fourth Circuit explained:

> There is tension within the Federal Rules of Civil Procedure between Rule 15(a) and Rule 16(b) . . . Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile. HCMF Corp. v. Allen, 238 F.3d 273, 276–77 (4th Cir. 2001). On the other hand, Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge."

Accordingly, "after the deadlines provided by a scheduling order have passed, the good cause standard" under Rule 16 "must be satisfied to justify leave to amend the pleadings." *Nourison*, 535 F.3d at 298.  The "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'"  *Faulconer*, 808 F. App'x at 152 (citation omitted).  Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard." *Id.*; *see also id.* at 152 n.1 (collecting cases); *accord Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted).  "Effectively, if amendment of the pleadings would satisfy Rule 16(b)(4)'s good cause standard, then it would also satisfy Rule 15(a)(2)'s freely given standard." *Varner v. South Carolina Farm Bureau Ins. Co.*, TLW-18-2098, 2020 WL 12834378, at *1 (D.S.C. Oct. 2, 2020).

In evaluating diligence, courts mainly focus "'[on] the timeliness of the motion to amend and the reasons for its tardy submission.'" *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 520 (D. Md. 2014) (quoting *CBX Techs., Inc. v. GCC Techs., LLC*, JKB-10-2112, 2012 WL 3038639, at *4 (D. Md. July 24, 2012) (internal quotation marks omitted)) (alteration in *Elat*). "'Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.'" *Wonasue*, 295 F.R.D. at 107 (quoting *CBX Techs., Inc.*, 2012 WL 3038639, at *4). If, for example, the "moving party knew of the underlying conduct giving rise to a claim but simply failed to raise it in an initial [pleading], then the party" has not acted diligently, and therefore "cannot establish good cause under Rule 16." *Faulconer*, 808 F. App'x at 152 (alteration added). In contrast, where "'at least some of the evidence needed for a [party] to prove his or her claim did not come to light until after the amendment deadline,' a [party] has 'good cause' for moving to amend at a later date." *Wonasue*, 295 F.R.D. at 107 (quoting *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768–69 (D. Md. 2010)) (alterations added).

To determine whether the moving party has met his burden to show good cause, a court may consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat*, 993 F. Supp. 2d at 520. However, "'[i]f the movant has not been diligent in meeting the scheduling order's deadlines,' then other factors . . . generally will not be considered." *Faulconer*, 808 F. App'x at 152 (quoting *Kmak v. Am. Century Cos., Inc.*, 873 F.3d 1030, 1034 (8th Cir. 2017)); *see also Rassoull*, 209 F.R.D. at 374 ("'If [the moving party] was not diligent, the inquiry should end.'") (citation omitted) (alteration added); *Marcum*, 163 F.R.D. at 254 ("'[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.'") (citation omitted) (emphasis removed).

Notably, the Court need not address Rule 15 unless Rule 16 is satisfied.  But, if the moving party demonstrates good cause pursuant to Rule 16(b)(4), the movant must then "satisfy the liberal standard of Fed. R. Civ. P. 15(a)."  *Humane Soc'y of the U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016); *see Cook*, 484 F. App'x at 814–15; *Wonasue*, 295 F.R.D. at 106–07.

### III.    Discussion

In the Motion, Schnupp seeks leave to amend his suit by way of the proposed SAC.  ECF 191.  He contends that, "[a]s amendments go, the proposed Second Amended Complaint is about as benign as they come."  ECF 200 at 5.  According to Schnupp, the proposed Second Amended Complaint does not allege new facts or legal theories, nor does it add or change parties.  *Id*.

Schnupp points out that the suit has always alleged the submission of false claims to Medicare.  *See* ECF 191 at 7.  But, he notes that the Court's ruling as to Scheme 5 only concerned false claims submitted to TRICARE.  *See* ECF 200 at 5.  Moreover, Schnupp notes that the Court's summary judgment ruling "is based entirely on the Court's opinion that Mr. Schnupp does not qualify as an original source," which cannot extend to the Medicare claims because, "[u]nlike the TRICARE claims alleged in Scheme 5 . . . which were the subject of Mr. Blair's criminal conviction and the focus of the cross motions for summary judgment, there is no public disclosure which relates to the Medicare claims."  *Id.* at 6.  Without public disclosure, argues Schnupp, the public disclosure bar cannot apply, and the Court does not inquire as to whether a relator is an original source.  Therefore, he insists that he should be permitted to pursue his claim as to Scheme 5 with respect to false claims submitted to Medicare.

According to Schnupp, the "proposed Second Amended Complaint simply clarifies that after this Court's ruling on summary judgment, claims submitted to TRICARE remain relevant

only as to fraudulent Schemes 1, 2 and 3" and that "Scheme 5 is now limited to Medicare claims only." ECF 191 at 4. He adds, *id.*: "In other words, the proposed Second Amended Complaint deletes those claims subject to this Court's ruling on summary judgment, which cannot now be challenged on appeal until after trial and entry of a final judgment order." Distilled to its essence, Schnupp asserts that the Medicare claims were always a part of the case; the Court did not address Scheme 5 as to Medicare; and therefore the Medicare claims remain part of the case and may be litigated at trial.

Not surprisingly, Blair holds a different view. Blair asserts, ECF 199 at 8: "After nearly eight years of litigation, and approximately ***two hours*** before the Court and the parties were scheduled to discuss setting a trial date and corresponding final pre-trial deadlines, Schnupp filed the instant Motion for Leave, seeking to revive a claim relating to Medicare payments that, though plead in his Amended Complaint, he neither pursued during discovery nor even acknowledged as a remaining, viable claim in connection with the parties' extensive summary judgment briefing or following the Court's summary judgment rulings." (Emphasis in ECF 199). Further, Blair characterizes Schnupp's Motion as "a desperate attempt to revive a claim that Schnupp abandoned long ago in a clear effort to circumvent the Court's entry of summary judgment in Blair's favor and his failure to file a motion to reconsider, amend, or clarify the Court's summary judgment ruling regarding the only claim in the case that Schnupp actually wants to pursue at trial." *Id.* at 9.

In Blair's view, Schnupp abandoned the Medicare claims in Scheme 5. ECF 199 at 18. Schnupp disagrees. *See* ECF 200 at 7. The question of whether Schnupp abandoned the Medicare claims is a threshold issue.

### A.     Abandonment

There is no question that, in the First Amended Complaint, Schnupp made repeated references to fraudulent claims submitted to both Medicare and TRICARE.  ECF 30, ¶¶ 31, 36, 39, 40, 42–58, 60, 66.  But, it is not uncommon for a party to refine his claims after discovery and by the time of summary judgment.

In arguing that Schnupp abandoned the Scheme 5 Medicare claims, Blair points out that Schnupp sought summary judgment as to Scheme 5, but only with respect to TRICARE claims. ECF 199 at 16; *see also* ECF 149.  Defendants observe, ECF 199 at 16:  "Schnupp made no argument that his Scheme 5 claims pertaining to Medicare should go to the jury even if the Court disposed of his Scheme 5 claims based on TRICARE."

In Blair's Cross Motion, Blair sought summary judgment as to all five schemes, without distinguishing "between reimbursements to TRICARE, Medicare, or Medicaid."  ECF 199 at 16; *see also* ECF 156.  Of relevance, Blair's Cross Motion "defined 'Scheme 5' as allegations 'related to Defendants' violations of the AKS via commission payments to 1099 sales representatives,' including allegations related to TRICARE, Medicare, Medicaid, or any other insurer."  ECF 199 at 16 (quoting ECF 156 at 24).  And, Blair posits that, in Schnupp's opposition to Blair's Cross Motion, Schnupp did not distinguish "Schnupp's Medicare/Medicaid Scheme 5 claims from his TRICARE Scheme 5 claims.  Nor did Schnupp argue that, even if he was not an original source for his TRICARE claims, he has the facts necessary to proceed on his Medicare/Medicaid claims." ECF 199 at 16.

Moreover, defendants note that, after the Court granted summary judgment to Blair as to Scheme 5 (ECF 173, ECF 172), "Schnupp did not move the Court to reconsider, amend, or clarify its summary judgment ruling to advise the Court that he was pursuing a Medicare/Medicaid-related

claim under Scheme 5 that was not adjudicated in the summary judgment ruling." ECF 199 at 17.

Instead, Schnupp sought leave to file an interlocutory appeal. ECF 177. And, even then, Schnupp

did not raise the issue of Scheme 5 Medicare claims in ECF 177. *See* ECF 199 at 17.

In Schnupp's motion for leave to file an interlocutory appeal (ECF 177), he did not suggest

that the Court's summary judgment ruling was incorrect because the legal reasoning underlying

the disposition of the Scheme 5 TRICARE claims could not apply to Medicare claims under

Scheme 5. Specifically, Schnupp asked the Court to certify two questions for interlocutory appeal,

ECF 177 at 7, 8:

> (1) Whether the Relator's Disclosure Memorandum, which included the Atlas Complaint and Blair Pharmacy Dispense Report, provided to the government in accordance with 31 U.S.C. § 3730(b)(2) may be a "voluntary" disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(B).

> &ast;&ast;&ast;

> (2) Whether a relator may qualify as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B)(i) when he voluntarily discloses in government interviews information previously known or under investigation by the government but prior to any public disclosure of the information?

Schnupp disputes the contention that he abandoned the Scheme 5 Medicare claims. ECF

200 at 7. To support his position, Schnupp relies on a footnote in his summary judgment motion.

*See* ECF 200 at 6–7. There, Schnupp stated, ECF 149 at 23 n.6 (emphasis added):[18]

> Although Mr. Alavi and the other sales reps were paid commissions on the value of the prescription referrals they made to Blair Pharmacy regardless of the insurance company billed, *Mr. Blair testified during his deposition that "Nobody got paid anything on Medicare. We didn't pay sales reps on Medicare*." . . .[19] Analysis of the Dispense Report from Blair Pharmacy—the same report used by the government to calculate total losses to TRICARE— indicates Medicare losses

---

[18] Blair points to the same footnote but reaches the opposite conclusion. *See* ECF 199 at 15.

[19] As indicated, in the government's prosecution of Mr. Blair, the Stipulation did not assert that Mr. Blair submitted false claims to Medicare.

were $2,190,438 associated with 802 separate claims submitted to Medicare.  Given the level of damages owed to the United States based on TRICARE losses alone is likely more than can be successfully collected, *Relator does not seek any damages in this Motion for losses to Medicare.  Accordingly, Mr. Blair's testimony regarding Medicare reimbursement to Blair Pharmacy does not create a material factual dispute for purposes of this Motion.*  The Court may in exercising its discretion, however, consider this when determining the proper civil penalty that should apply in this case.

The Relator maintains that "the above quoted language indicates the Relator's position that false claims submitted to Medicare in violation of the AKS remained relevant to the litigation and to [the] calculation of penalties, but not to the motion for summary judgment because otherwise there would be a material dispute of fact arising from Mr. Blair's deposition testimony."  ECF 200 at 7.  In contrast, Blair argues that this language meant that Schnupp had "unequivocally conveyed that Medicare and Medicaid payments were not part of his theory of recovery under Scheme 5."  ECF 199 at 15.  Defendants insist that, "at the time of summary judgment briefing, Schnupp's claim under Scheme 5 was limited to TRICARE payments."  *Id.* at 16.

To be sure, the First Amended Complaint included allegations as to Medicare.  But, as noted, it is not uncommon for a complaint to make broad allegations that are narrowed after discovery.  *See, e.g.*, *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").  By the time of summary judgment, a plaintiff typically focuses on the claims that are most viable.  *See id.* ("[P]reparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses.  Indeed, Rule 56 is known as a highly useful method of narrowing the issues for trial.").

Schnupp pursued summary judgment as to Scheme 5, only with respect to the TRICARE claims.  Indeed, the Summary Judgment Motion was presented as if the only claims at issue in the

case—not just the only claims at issue in the S.J. Motion—concerned TRICARE.  Schnupp never indicated that he did not seek summary judgment as to the Medicare claims because of a dispute of material fact.  Nor did the Relator oppose Blair's Cross Motion as to Scheme 5 on the basis of a dispute of material fact with regard to Medicare, or on the ground that the public disclosure bar could not apply to the Medicare claims.  Moreover, Schnupp gave no indication that he intended to preserve his Medicare claims for trial.

In a footnote, Schnupp stated:  "Given the level of damages owed to the United States based on TRICARE losses alone is likely more than can be successfully collected, Relator does not seek any damages in this Motion for losses related to Medicare."  ECF 149 at 23 n.6.  In other words, Schnupp recognized that recovery as to the Scheme 5 TRICARE claims would exceed Blair's ability to pay.  Therefore, he acknowledged that pursuit of the Scheme 5 Medicare claims would not prove fruitful.  This does not constitute a preservation of the Medicare claims.

The Court had no basis to believe that the Relator sought to preserve the Medicare portion of Scheme 5.  In seeking summary judgment, the Relator relied fully on the criminal prosecution and conviction of Mr. Blair.  And, as discussed, the Stipulation of Facts in the Criminal Case concerned only TRICARE.  Moreover, in Schnupp's opposition to the Cross Motion, Schnupp stated:  "The parties also agree that the Superseding Indictment contains substantially the same allegations or transactions as alleged in 'Scheme 5' in this action."  ECF 165 at 35.

It appears that Blair, too, had no inkling that Schnupp intended to preserve the Medicare claims.  Blair said, ECF 170 at 8: "This Court should award summary judgment to Defendants on Scheme 5 because Mr. Blair's Plea, on its own, is insufficient to establish *all* elements of Schnupp's FCA claims." (Emphasis in ECF 170); *see also* ECF 199 at 16 (stating that Blair "understood" that the S.J. Motion was limited to TRICARE).

Schnupp put his eggs in the TRICARE basket because it was expedient. His S.J. Motion corresponded to the portion of Scheme 5 that the government pursued in its prosecution of Mr. Blair. Indeed, Schnupp's counsel candidly acknowledged during the Court's telephone conference with counsel on May 12, 2025, that Schnupp's Summary Judgment Motion "was limited to Tricare because Mr. Blair's plea and conviction was solely as to Tricare" and counsel thought that, "given the guilty plea, it was an open-and-shut case." ECF 196 (Transcript, 5/12/2025), at 7.

Relator's counsel also conceded that if Schnupp "had succeeded on the Motion for Summary Judgment as to Tricare claims, it was [counsel's] intent to forego any trial on scheme five as to the Medicare claims because, comparatively speaking, it's a much smaller percentage of the claims that were submitted." ECF 196 at 11–12. But, after Schnupp did not succeed, it "struck" counsel "that the court's order cannot apply to scheme five as it pertains to medical [sic] claims because there's never been a public disclosure relating to the Medicare claims." *Id*. at 7–8. As the saying goes, "hindsight is 20/20." In other words, it was not until the Court ruled against Schnupp on summary judgment as to the TRICARE claims that Schnupp decided to pursue the Medicare claims.

Schnupp acknowledges that his "arguments were insufficiently clear in briefing on cross motions." ECF 200 at 7. But, as noted, he relies on a footnote in his S.J. Motion to support his contention that he did not abandon the Medicare claims. *See* ECF 149 at 23 n.6. In an appellate context, such a "conclusory" sentence in a brief would be "insufficient to raise" an appellate issue. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006). This is because the court is entitled to more than "'a passing shot at the issue.'" *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (citation omitted). Of course, this is not an appeal. But, the same principle

ought to apply.  A reference to Medicare in a footnote is simply not sufficient to alert the Court that the Medicare claims required the Court's consideration.

The Fourth Circuit has said:  "No procedural principle is more familiar to this Court than that a constitutional right, or a right of any other sort, may be forfeited in criminal *as well as civil cases* by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."  *United States v. Solis-Rodriguez*, No. 22-4654, 2025 WL 2055070, at *9 (4th Cir. July 23, 2025) (quoting *United States v. Olano*, 507 U.S. 725, 731 (1993) (cleaned up) (Traxler, J., concurring) (emphasis added).  To be sure, this is not an appeal.  But the same logic should apply.

In my view, the Court (and Blair) reasonably concluded that Schnupp had abandoned the Medicare portion of Scheme 5.  *See Reichert v. Perdue*, No. 2:15-CV-139, 2018 WL 3550840, at *6 (D. Vt. July 24, 2018) ("Based on Plaintiff's partial opposition to Defendant's motion for summary judgment, the court infers that the claims that were not defended have been abandoned."), *aff'd*, 786 F. App'x 294 (2d Cir. 2019); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143–44 (2d Cir. 2016) (concluding that a party's failure to mention certain claims in opposition to summary judgment meant that "he had abandoned them"); *cf. United States v. Walton*, No. 23-4314, __ F.4th __, 2025 WL 2102686, at *9 (4th Cir. July 28, 2025) (concluding that a defendant "abandoned any argument that his West Virginia conduct did not qualify as a controlled substance offense under the Guidelines by not raising it in his opening brief even though the argument, and the [case law] specifically, was available to him at the time"); *United States v. Boyd*, 55 F.4th 272, 279 (4th Cir. 2022) ("'It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.'") (citation omitted); *Grayson O Co.*, 856 F.3d at 316 (same).

By attempting now to resurrect the Medicare claims, Schnupp seeks to salvage the portion of Scheme 5 that he abandoned or forfeited. Distilled to its essence, Schnupp wants a second bite at the apple, by resurrecting a claim that he abandoned. With this finding in mind, I proceed to consider the Motion under Rules 15 and 16.

### B.    Rule 16

Schnupp does not substantively address Rule 16 in the Motion. *See* ECF 199 at 8.[20] Blair argues that, pursuant to Fed. R. Civ. P. 16(b)(4), Schnupp has not shown good cause for the Court to grant leave to amend. *Id.* Moreover, Blair argues that Schnupp "plainly has not acted with the requisite diligence here." *Id.* at 21. Defendants point out that Schnupp filed the Motion more than two years after the deadline to amend pleadings and more than one year after the close of discovery. *Id.*; *see also* ECF 73. Blair adds, ECF 199 at 21: "Based on the claims and theories that Schnupp pursued, the parties extensively briefed cross-motions for summary judgment and the Court issued a lengthy Memorandum Opinion that resolved all of Schnupp's claims in Schemes 4 and 5 in Blair's favor. At all relevant times, Schnupp has pursued his claim under Scheme 5 solely as to TRICARE payments. Schnupp has not set forth any legitimate reason that would justify his decision to now move for leave to amend his Complaint to purportedly revive his abandoned Medicare-related claims."

According to defendants, Schnupp's Motion "is nothing more than a clear attempt to subvert the Court's summary judgment ruling with respect to Scheme 5." *Id.* at 22. They add, *id.*: "Schnupp has made it clear that the only scheme he has interest in pursuing at trial is Scheme 5,

---

[20] Schnupp observes in the Reply that Blair previously sought leave to file a third-party complaint against Alavi and Atlas, without addressing Rule 16 or establishing good cause for amendment. ECF 200 at 17. And, he points out that the Court "granted Blair's motion to both file the Third-Party Complaint and to amend it without addressing Rule 16's good cause standard." *Id.* (citing ECF 125).

which the Court disposed of through summary judgment. Faced with the unfavorable prospect of having to try this case as to Schemes 1, 2, and 3 before appealing the Court's summary judgment ruling as to Scheme 5, Schnupp seeks to amend his Complaint purely to manufacture a basis to keep Scheme 5 in the case for the purposes of the upcoming trial."

Schnupp counters that "applying this Court's summary judgement [sic] ruling to the false claims submitted to Medicare in violation of the AKS without any prior public disclosure related to such claims would be to let a mistake stand." ECF 200 at 8. He argues that good cause exists here because "[t]he proposed amendment was unnecessary until this Court's summary judgment ruling appeared to include the alleged Medicare claims that are part of Scheme 5 and the Court denied interlocutory appeal pursuant to 28 U.S.C. § 1292(b)." *Id.* at 19. In his view, the Relator "could not have reasonably anticipated these events before the April 6, 2023 deadline for amendments set forth in the Scheduling Order." *Id.*

In support of Schnupp's position that he has good cause to amend and revive claims as to Scheme 5, Schnupp cites cases in which a district court "revise[d]" or "reopen[ed]" a prior order. ECF 200 at 7 (citing *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983)). And, Schnupp illustrates lack of diligence by pointing to a situation when a party "'knew of the underlying conduct giving rise to a claim but simply failed to raise it in an initial [pleading].'" *Id.* at 18 (quoting *Faulconer*, 808 F. App'x at 152). Here, in contrast, he notes that the "allegations regarding AKS violations arising from Blair's Medicare claims has [sic] been alleged since Scheme 5 was added to the case." ECF 200 at 18.

It is difficult to credit Schnupp's logic. The Court's summary judgment ruling was issued on January 28, 2025. ECF 173; *see also* ECF 172 (docketed 1/27/2025). Schnupp did not file the

Motion until May 12, 2025 (ECF 191). That was more than three months after the Court's summary judgment ruling, and just two hours before the Court's scheduled telephone conference (ECF 190) to set a date for trial. In the meantime, Schnupp filed, and the Court denied, a motion for leave to file an interlocutory appeal. ECF 177; ECF 188; ECF 189. And, in that motion, Schnupp never referenced the Scheme 5 Medicare claims at issue in the Motion.

I conclude that Schnupp was not diligent in filing his Motion.

### C.    Rule 15

As stated, the Fourth Circuit has interpreted Rule 15(a) to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Oroweat Foods Co.*, 785 F.2d at 509.

Blair argues that "Schnupp's proposed amendment would be severely prejudicial to Blair, is not made in good faith, and would ultimately be futile if permitted." ECF 199 at 9. However, according to Schnupp, "there is no evidence of bad faith, the proposed amendment does not conceivably prejudice the defendants, and because the amendment would not be futile, refusal to permit the amendment would constitute an abuse of discretion." ECF 191 at 8.

### 1.    Futility

Blair argues that Schnupp "lacks any evidence whatsoever to support his Scheme 5 claim with respect to Medicare payments and, if his proposed amendment is allowed, that claim would never survive summary judgment." ECF 199 at 31. Specifically, Blair contends that "Schnupp made no effort in discovery to establish that Blair violated the AKS in connection with Medicare payments," and the only evidence Schnupp collected during discovery relating to Medicare "is the

testimony of Mr. Blair, who stated unequivocally that, unlike TRICARE, Blair did ***not*** pay commissions on Medicare." *Id.* (emphasis in ECF 199).

Further, Blair maintains that "Schnupp has no evidence to contradict Mr. Blair's deposition testimony regarding Medicare and has not disclosed any evidence—documentary or testimonial— or discovery response that would support his accusation that Blair violated the AKS with respect to Medicare claims." *Id.*  According to Blair, the two dispense reports proffered by Schnupp "merely list various transactions completed at Blair Pharmacy" and "make no reference to improper commissions or otherwise rebut Mr. Blair's testimony that Blair never paid commissions on Medicare claims." *Id.*

Schnupp characterizes as "demonstrably false" Blair's assertion that there is no evidence to contradict Mr. Blair's deposition testimony.  ECF 200 at 15.  He points to his own experience working at the Pharmacy, and he claims that, at Mr. Blair's instruction, he "prepare[d] commission reports for each of the independent sales representatives" and "calculate[d] the commissions owed to each." *Id.* at 16.  He also states, *id.* at 16–17:  "Commissions were paid based upon total gross receipts attributable to the sales representative regardless of who paid the pharmacy, *i.e.*, private insurance companies, TRICARE, Medicare and/or Medicaid were all included. . . . Schnupp never omitted from the commission reports prescriptions that were paid by Medicare Part D plans . . . . Blair paid commissions based on the total gross amount of reimbursement received during the report period, regardless of the insurance payor."  But, these assertions in the brief are not evidence.

Schnupp also argues that his "testimony" gives rise to "a material dispute of fact which would preclude summary judgment in Blair's favor, not guarantee it as Blair argues." *Id.* at 16, 17.  In support, Schnupp cites his Declaration (ECF 200-7), submitted with his Reply in support

of the Motion.    He avers: "Blair paid commissions based on the total gross amount of reimbursement received during the report period, regardless of the insurance payor." *Id.* ¶ 6.  He also avers that "reimbursement related to Medicare claims was included in the calculation of commission payments owed to each of Blair Pharmacy's independent sales representatives."  *Id.* ¶ 7.

Schnupp also points to the Distributor Agreement, claiming that the agreement for commission payments does not exclude commissions for Medicare claims.  *Id*.  Nor did Blair's other distributor agreements exclude "commissions resulting from Medicare referrals."  *Id*.  And, Schnupp observes that the Atlas Lawsuit is not limited to commissions related to TRICARE.  *Id*. at 15.  The Atlas Lawsuit alleges that "Blair filled and refilled prescriptions and reimbursements from third party payors, including (without limitation) Medicare, Tricare, and Medicaid."  *Id*. (quoting Atlas Lawsuit).  According to Schnupp, "[t]his evidence corroborates Mr. Schnupp's testimony regarding how commissions were calculated and paid to Blair's independent sales representatives in violation of the AKS."  ECF 200 at 16.

Of course, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  Testimony that is based on personal knowledge or firsthand experience can be evidence of disputed material facts, even if it is uncorroborated and self-serving.  *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017).  Indeed, the Fourth Circuit has said that "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing *United States*

*v. Sklena*, 692 F.3d 725, 733 (7th Cir. 2012)).  But, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658–59 (4th Cir. 2020) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).  And, "while self-serving affidavits offered by the *non-movant* can sometimes defeat summary judgment," a self-serving statement *by the movant* as "the key evidence in support of summary judgment" is "insufficient" to grant summary judgment.  *Pfaller v. Amonette*, 55 F.4th 436, 450 (4th Cir. 2022) (emphasis added)*; see also Knibbs v. Momphard*, 30 F.4th 200, 222 (4th Cir. 2022) (stating that the court is "constrained to assume that the jury will not credit [the movant's] evidence and will instead accept the [non-movant's] proffered evidence on disputed fact questions").

The statements in Schnupp's Declaration (ECF 200-7) appear to be based on his personal knowledge.  *See id.* ¶ 7.  This might be enough to create a dispute as to material fact with regard to the Medicare portion of Scheme 5.[21]  In other words, Schnupp's averments in his Declaration (ECF 200-7) might not warrant summary judgment in his favor, but they might be enough to defeat Blair's Cross Motion.  However, the Relator never presented the information in opposition to the Cross Motion.

That said, if Schnupp can rely on the Declaration, the claim as to Medicare might well survive summary judgment.  On the issue of futility, I will assume that the claim is not futile.

## 2.  Prejudice

Schnupp contends that "no prejudice arises from the proposed amendment" because defendants "have since the outset of this case been aware that Relator's Complaint alleges false

---

[21] Of course, I do not know what evidence Blair might have produced if Blair understood that the Relator was pursuing summary judgment as to the Medicare portion of Scheme 5.

claims were submitted to both TRICARE **and** Medicare." ECF 191 at 5 (first quotation altered; emphasis in ECF 191). He observes that "[t]he theory of liability is not new," because Medicare claims have "been a part of this case since the FAC was filed shortly after the matter was unsealed by the Court on May 4, 2022." ECF 200 at 11. Therefore, Schnupp argues that "this is not a case in which the proposed amendment would be prejudicial because it raises a new legal theory that would require the gathering and analysis of facts not already considered by the Defendants." ECF 191 at 6.

Relator acknowledges that "here the discovery period has closed and this is a post-judgment motion." *Id.* But, Schnupp rejects any argument of prejudice based on a need for additional discovery.

Schnupp also disputes Blair's contention that he did not pursue the Medicare claims during discovery. *See* ECF 200 at 9. He asserts, *id.*: "Blair's bald assertion about Schnupp not pursuing false Medicare claims under Scheme 5 is demonstrably false." In support, Schnupp cites his answer to one of Blair's interrogatories, where he provided calculations of damages for both the alleged TRICARE and Medicare claims. *Id.*; *see* ECF 200-1 at 10. Schnupp also cites Mr. Blair's deposition, at which Mr. Blair was questioned about Medicare claims and was told that the civil case was not limited to TRICARE claims. ECF 200 at 10; *see* ECF 200-2 at 3.

Blair counters that the prejudice defendants will suffer from the proposed amendment at this stage is "obvious." ECF 199 at 24. Defendants add, *id.* at 24–25: "Not only is this case in the late stages of litigation, but the Court has already entered summary judgment in Blair's favor with respect to Scheme 5 in its entirety based on the extensive briefing submitted by the parties. Discovery has been closed for more than a year and the parties were preparing to move forward with a trial as to Schemes 1, 2, and 3." According to Blair, the proposed amendment "would

contravene the Court's summary judgment ruling, would insert a new theory of liability against Blair that the parties had not litigated to date and that neither the Court nor Blair understood to be at issue, and would require the parties and the Court to undergo another extensive round of summary judgment briefing." *Id.* at 25.

Schnupp made some effort during discovery, including through interrogatories and his deposition of Mr. Blair, to pursue the Medicare claims. Prior to the filing of the Summary Judgment Motion by Schnupp, Blair certainly had no basis to assume that Schnupp had abandoned the Medicare claims. If the Court were to proceed on the First Amended Complaint, and allow plaintiff to pursue the Medicare portion of Scheme 5, there would be no basis to reopen discovery, because discovery was already afforded to the parties. But, this would not be so if the SAC contains new factual allegations that Blair had no opportunity to investigate through discovery.

Schnupp contends that the proposed SAC "'does not put any new facts at issue." ECF 200 at 11 (quoting *Laber*, 438 at 427–28). This claim is inaccurate. The proposed SAC clearly adds new facts with regard to the Medicare claims that are not included in the First Amended Complaint.

For example, Schnupp adds the following allegation: "As an incentive to solicit the compounded drug prescriptions for Blair Pharmacy, Blair paid his 1099 independent sales contractors between 30% and 50% of the reimbursement he received from Medicare." ECF 191-1, ¶ 35. And, another paragraph of the proposed SAC extends the period during which Schnupp alleges there were tainted remuneration payments, and also alleges new facts concerning the amount allegedly paid to Blair. *See* ECF 191-2 at 14. In particular, Schnupp previously alleged that from "November 2014 until May 2015, TRICARE paid Blair Pharmacy the amount of $6,352,941.66 based upon claims the Defendants submitted to TRICARE through Express Scripts Inc. . . . ." ECF 30, ¶ 43. But, in the SAC, Schnupp alleges that from approximately "October

43

2014 until January 2017, Medicare paid Blair Pharmacy the amount of $736,608.61 based upon claims the Defendants submitted to Medicare Part D plans . . . ."  ECF 191-1, ¶ 40.

A court may find undue prejudice if a new claim would force the non-moving party to "expend significant additional resources to conduct discovery and prepare for trial."  61A AM. JUR. 2d, Pleading § 664.  And, amendment "may prejudice the non-moving party when the motion would shift the theory of the case, thereby rendering the non-moving party's prior discovery a misdirected use of resources and compelling the non-moving party to engage in costly additional discovery."  *Sharkey IRO/IRA*, 263 F.R.D. at 301.

Schnupp posits that, to the extent the Court "perceives some minimal prejudice," it "could be cured by reopening discovery for a short period without affecting the scheduled trial date" of March 23, 2026.  ECF 200 at 12.  However, this ignores the expense of "additional time and resources" associated with the reopening of discovery, delay, and renewed motions for summary judgment that would likely follow.  *See MidAmerican Distribution, Inc. v. Clarification Tech., Inc.*, No. CV 09-96-DLB-JGW, 2011 WL 13227943, at *1 (E.D. Ky. Apr. 14, 2011) (denying leave to amend where plaintiff filed its motion on the day discovery closed and after defendants moved for summary judgment because reopening discovery and new motions for summary judgment would be prejudicial to plaintiff), *aff'd*, No. CV 09-96-DLB-JGW, 2011 WL 13227720 (E.D. Ky. July 5, 2011), *aff'd*, 485 F. App'x 779 (6th Cir. 2012).

In my view, the proposed SAC would be prejudicial to Blair.  The SAC alleges new facts that would, in fairness to Blair, require another round of discovery, as well as renewed summary judgment briefing, with attendant cost, well after the parties and the Court already spent significant time and resources during the previous round of summary judgment.

### 3.  Bad Faith

Schnupp argues that "there is no bad faith" because of his "diligence" in moving to amend "just days after this Court denied his motion to permit interlocutory appeal and not long after the Court's ruling on summary judgment." ECF 191 at 7 (first quotation altered).  Given that "Blair's alleged submission of false claims to Medicare has always been part of the Relator's case," Schnupp maintains that "there is no evidence that Relator has acted to sandbag the Defendants or to unnecessarily delay the presentation of his claims." *Id.*

According to Schnupp, the dispute here "arises because the defendants want this Court's grant of summary judgment on Scheme 5 to extend not just to TRICARE claims (which was the focus of motions practice) but to all claims, including claims submitted to Medicare." ECF 200 at 5.  But, as stated, Schnupp points out that the Court's summary judgment ruling "is based entirely on the Court's opinion that Mr. Schnupp does not qualify as an original source," which applies only to TRICARE but cannot extend to the Medicare claims.

In other words, Schnupp contends that the proposed SAC clarifies and corrects the Court's mistake in granting summary judgment to Blair as to all of Scheme 5.[22]  And, he argues that *Laber*, 438 F.3d at 427, stands for the proposition that, "where a summary judgment ruling triggers the need for amendment, bad faith cannot be inferred from the delay." *Id.* at 13.

Blair counters that "the bad faith nature" of Schnupp's Motion is evidenced by the "untimely" Motion, as well as the "lengthy history of this litigation and the current procedural

---

[22] As stated, to the extent that Schnupp claims that the Court made a "mistake" in addressing only the claims as to TRICARE, it is because Schnupp sought summary judgment only as to those claims, without any indication that he was pursuing or preserving his claims as to Medicare.  If Schnupp had been successful as to the TRICARE portion of Scheme 5, as he anticipated, he had no intention of pursuing the Medicare claims.  Yet, the defense sought summary judgment as to all false claims, and Schnupp never addressed the Medicare portion.

posture of the case." ECF 199 at 27. In particular, Blair points to the following activity that had occurred before Schnupp filed his Motion: (1) the Court issued a Scheduling Order (ECF 73) on March 6, 2023, that set a deadline of April 6, 2023, for amendment of pleadings; (2) the Court extended the Scheduling Order deadlines several times at the request of the parties, but the deadline to amend the pleadings was never extended, *see* ECF 147 at 5; (3) the parties completed discovery in May 2024, *see* ECF 199 at 15; (4) "the parties submitted length summary judgment motions"; (5) in January 2025, the Court issued its Amended Memorandum Opinion (ECF 173) and Order (ECF 172) granting summary judgment to Blair as to Schemes 4 and 5, in their entirety; and (6) the Court denied Schnupp's motion for leave to file an interlocutory appeal. *Id.* at 26–27. Defendants add, ECF 199 at 27: "Schnupp waited until after all of these events transpired to file his Motion for Leave. It was not until the Court rejected the Scheme 5 claim he has pursued exclusively throughout this lawsuit and denied his attempt to expedite the appeal of that ruling that he filed his Motion for Leave, seeking to revive Scheme 5 with a new theory based on Medicare payments."

Schnupp is correct that "a district court may not deny" a motion to amend "simply because it has entered judgment against the plaintiff—be it a judgment of dismissal, a summary judgment, or a judgment after a trial on the merits." *Laber*, 438 F.3d at 427. However, "the further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part." *Id.*; *see also Moore v. Equitrans, L.P.*, 27 F.4th 211, 218 (4th Cir. 2022).

Indeed, "it is fairly well established that '[d]enying leave to amend is particularly appropriate when a lawsuit is on the verge of final resolution.'" *Hoffmann v. United States*, 266 F. Supp. 2d 27, 34 (D.D.C. 2003) (quoting *Wardell v. City of Chicago,* 2001 WL 849536, *4 (N.D.

Ill. 2001)), *aff'd*, 96 F. App'x 717 (Fed. Cir. 2004). A plaintiff, "quite simply, cannot be permitted to 'circumvent the effects of summary judgment by amending the complaint every time a termination of the action threatens.'" *Hoffman*, 266 F. Supp. 2d at 34 (quoting *Glesenkamp v. Nationwide Mutual Ins. Co.,* 71 F.R.D. 1, 4 (N.D.Cal.1974), *aff'd,* 540 F.2d 458 (9th Cir.1976) (per curiam); *see also Local 472 of United Ass'n of Journeymen & Apprentices v. Georgia Power Co.,* 684 F.2d 721, 724–25 (11th Cir.1982) (stating that it is not an abuse of discretion to deny motion to amend that "appears to be nothing more than an effort to avoid an adverse summary judgment ruling").

"Much of the value of summary judgment . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a summary judgment and then, should that theory prove unsound, come back . . . and fight on the basis of some other theory." *Littlefield v. City of Afton*, 785 F.2d 596, 610 (8th Cir. 1986) (citing *Freeman v. Continental Gin Co.,* 381 F.2d 459, 469–70 (5th Cir. 1967)), *overruled on other grounds by Chesterfield Dev. Corp. v. City of Chesterfield,* 963 F.2d 1102, 1104 n. 2 (8th Cir. 1992); *see also Klay v. AXA Equitable Life Ins. Co.*, No. CV 09-12, 2011 WL 13234425, at *9 (W.D. Pa. Aug. 25, 2011) (same); *Aircraft Gear Corp. v. Kaman Aerospace Corp.*, 875 F. Supp. 485, 488 (N.D. Ill. 1995) (same). Yet, that is the path that Schnupp has followed.

In my view, circumventing the effects of the Court's summary judgment ruling is precisely what Schnupp is attempting to do with his Motion. He pursued only the Scheme 5 TRICARE claims at the summary judgment stage because he regarded the Scheme 5 TRICARE claims as open and shut, given Mr. Blair's federal conviction on that basis. And, when Blair filed a Cross Motion as to Scheme 5, in its entirety, *i.e.*, as to both Medicare and TRICARE, Schnupp never raised in his opposition the independent viability of the Scheme 5 Medicare claims.

Even after the Court issued its summary judgment ruling, which Schnupp now asserts was incomplete, Schnupp did not move for reconsideration on the grounds he articulates here.  Nor did Schnupp raise the issue of the Scheme 5 Medicare claims in his motion for leave to file an interlocutory appeal.  It was only when Schnupp exhausted his other options, and/or realized that he never indicated that he was not foregoing his Medicare claims, that Schnupp attempted to resurrect the Scheme 5 Medicare claims as another vehicle to possible recovery at trial.

I do not believe counsel acted in "bad faith" as that term is used.  But, the prejudice is obvious.

## IV.    Conclusion

Schnupp abandoned the Scheme 5 Medicare claims during summary judgment briefing.  In my view, if he were permitted to resurrect his abandoned claims through the SAC, this would be prejudicial to Blair and burdensome to the Court.  The facts and circumstances warrant denial of the Motion.

An Order follows, consistent with this Memorandum Opinion.


Date:  August 11, 2025                                        _____/s/_____

                                                             Ellen Lipton Hollander
                                                             United States District Judge